1  Tina Wolfson (SBN 174806)
2  twolfson@ahdootwolfson.com
   Robert Ahdoot (SBN 172098)
3  rahdoot@ahdootwolfson.com
4  **AHDOOT & WOLFSON, P.C.**
   2355 Westwood Boulevard
5  Los Angeles, California 90064
   Tel: 310-474-9111; Fax: 310-474-8585
6
7  *Class Counsel*
8
   Rosemary M. Rivas (SBN 209147)          Christopher Ridout (SBN 143931)
9  rrivas@finkelsteinthompson.com          c.ridout@ridoutlyonlaw.com
10 **FINKELSTEIN THOMPSON LLP**            **RIDOUT, LYON & OTTOSON, LLP**
   505 Montgomery Street, Suite 300        555 E. Ocean Blvd., Suite 500
11 San Francisco, CA 94111                 Long Beach, California  90802
12 Tel: 415-398-8700; Fax:  415-398-8704   Tel: 562-216-7380; Fax: 562-216-7385
13 *Class Counsel*                         *Class Counsel*
14
15              **UNITED STATES DISTRICT COURT**
                **CENTRAL DISTRICT OF CALIFORNIA**
16

17 | NATALIE PAPPAS, on behalf of herself and all others similarly situated, | CASE NO. LA CV 11-08276-JAK (PLAx), Lead Case |
|---|---|
18 | | |
19 | Plaintiff, | (Consolidated with LA CV 11-08007; SA CV 11-01701; LA CV 11-09412; LA CV 11-09677) |
20 | | |
21 | v. | **DECLARATION OF ROBERT AHDOOT IN SUPPORT OF MOTION FOR APPEAL BOND** |
22 | | |
23 | NAKED JUICE OF GLENDORA, INC., a California Corporation, | |
24 | | Hearing Date:  May 12, 2014 |
25 | Defendant. | Time:  8:30 AM |
   | | Place:  Courtroom 750, 7th Floor |
26 | | Hon. John A. Kronstadt, presiding |
27
28

I, Robert Ahdoot, declare as follows:

1.     I am an attorney licensed to practice in all courts in the State of California, and a founding member of the law firm of Ahdoot & Wolfson, PC ("AW"), counsel for Natalie Pappas and the Class in the above-captioned case.  I submit this declaration in support of Plaintiffs' Motion for Final Appeal Bond in this action.

2.     The matters stated herein are true of my own knowledge or, where indicated, I am informed and believe that they are true.  If called upon as a witness, I could and would competently testify to these facts.

3.     Attached hereto as **Exhibit A** is a true and correct copy of the transcript of proceedings dated April 23, 2014, in the case entitled *In re Hydroxycut Mktg. & Sales Practices Litig.*, No. 09-md-2087 (S.D. Cal.).

4.     Attached hereto as **Exhibit B** is a true and correct copy of excerpts from the Transcript from the fairness hearing held November 8, 2012, in *In re Oil Spill*, No. 10-MD-2179 (E.D. La.).

5.     Attached hereto as **Exhibit C** is a true and correct copy of the transcript from a hearing imposing an appeal bond on Darrell Palmer in *Poss v. 21st Century*, Case No. BC297438 (Los Angeles Super. Ct. April 25, 2011).

6.     Attached hereto as **Exhibit D** is a true and correct copy of the Order Denying Objection and Requiring Appeal Bond filed 9/13/10 in the action entitled *In re Herley Indus. Inc. Sec. Litig.*, No. 2:06-cv-02596-JS, Dkt. 291 (E.D. Pa., Sept. 13, 2010), which my office retrieved from PACER.

7.     Attached hereto as **Exhibit E** is a true and correct copy of the Declaration of Katherine Strohlein filed on 3/7/14 in the action entitled *In re Netflix Privacy Litig.*, No. 11-CV-00379-EJD, Dkt. 342 (N.D. Cal. Mar. 7, 2014), which my office retrieved from PACER.

8.      Attached hereto as **Exhibit F** is a true and correct copy of the Declaration of Jonathan D. Selbin filed on 11/28/11 in the action entitled *Arthur v. Sallie Mae, Inc.*, No. 10-cv-00198-JLR, Dkts. 203, 203-1 (W.D. Wash.), including Exhibit A thereto.

9.      Attached hereto as **Exhibit G** is a true and correct copy of the Motion For An Order To Show Cause Regarding Finding Of Civil Contempt And Award Of Sanctions filed on 10/03/11 in the action entitled *In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. 07-md-01819-CW, Docket No. 1395 (N.D. Cal. 2011), which my office retrieved from PACER.

10.     Attached hereto as **Exhibit H** is a true and correct copy of the Order Striking Objections filed 9/17/13 in the action entitled *In re Hydroxycut Mktg. & Sales Practices Litig.*, No. 09-md-02087-BTM-KSC, Dkt. 1681 (S.D. Cal. Sept. 17, 2013), which my office retrieved from PACER.

11.     Attached hereto as **Exhibit I** is a true and correct copy of an Order dated August 17, 2012 in the case entitled *Herfert v. Crayola, LLC*, No. C11-1301-JCC (W.D. Wash.), which my office retrieved from PACER.

12.      Attached hereto as **Exhibit J** is a true and correct copy of a Minute Order dated August 10, 2012 in the case entitled *Herfert v. Crayola, LLC*, No. C11-1301-JCC (W.D. Wash.), Docket No. 71, which my office retrieved from PACER.

13.     Attached hereto as **Exhibit K** is a true and correct copy of the PACER docket report for the action entitled *Arthur v. Sallie Mae Inc.*, No. 10-cv-00198-JLR (W.D. Wash.) including entry no. 264, which is the Court's minute order dated 9/14/12 revoking admission *pro hac vice* to Darrell Palmer.

14.     Attached hereto as **Exhibit L** is a true and correct copy of the complaint filed by the State Bar of California in the action entitled *In the Matter of Joseph Darrell Palmer*, Cal. State Bar Ct. Case No. 12-O-16924 (filed 12/6/13).

15.     Attached hereto as **Exhibit M** is a true and correct copy of the court's Order Denying Objection and Requiring Appeal Bond filed 8/11/10 in the action

11-cv-8276-JAK-PLA
AHDOOT DECLARATION ISO MOT. FOR APPEAL BOND

1    entitled *In re Broadcom Corp. Class Action Litig.*, Case No. 06-cv-05036-R-CW, Dkt.

2    No. 356 (C.D. Cal. Aug. 11, 2010).

3        16.    Attached hereto as **Exhibit N** is a true and correct copy of the transcript

4    of proceedings held in this action on December 2, 2013.

5

6        I declare under the penalty of perjury on the 9th day of April 2014, that the

7    foregoing is true and correct.

8

9                                            ____/s/ Robert Ahdoot_____

10                                           Robert Ahdoot

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

11-cv-8276-JAK-PLA
AHDOOT DECLARATION ISO MOT. FOR APPEAL BOND

Exhibit A

1

2

3

4               UNITED STATES DISTRICT COURT

5         FOR THE SOUTHERN DISTRICT OF CALIFORNIA

6

7

8   IN RE HYDROXYCUT MARKETING )   Case No. 09MD2087-BTM
    AND SALES PRACTICES         )
9   LITIGATION                  )
                                      *April 23, 2013*
10

11

12

13                      *Motion Hearing*

14

15

16

17

18

19

20
      *Official Reporter*:              Barbara Harris CM/RPR/CRR
21                                      333 West Broadway
                                        San Diego, CA 92101
22                                      619-990-3116

23

24

25

```
 1              San Diego, California  -  April 23, 2013

 2

 3

 4          THE CLERK:  Calling calendar matter number 1,

 5   09md2087, in re Hydroxycut Marketing and Sales Practices      20:25:31

 6   Litigation.

 7          THE COURT:  Okay.  Appearances, please.

 8          MR. Blood:  Good morning, your Honor.  Timothy

 9   Blood for the plaintiffs and plaintiff class.

10          MR. PALMER:  Good morning, your Honor.  Darrell      20:25:45

11   Palmer on behalf of objectors Sasha McBean and Tim Blanchard.

12          THE COURT:  Okay.  Do you want to pick a seat on

13   this side of the rail.

14          MS. RYAN:  Good morning, your Honor.  Elaine Ryan

15   for plaintiffs and the class.                               20:26:04

16          MR. Hood:  Good morning, your Honor.  Richard Hood

17   for the plaintiffs steering committee.

18          MR. O'REARDON:  Good morning, your Honor.  Thomas

19   O'Reardon on behalf of plaintiffs and the class.

20          THE COURT:  Okay.  We will do the defense here.      20:26:15

21          MR. GONZALEZ:  Good morning, your Honor.  Arturo

22   Gonzalez and Bill Tarantino for Morrison and Foerster on

23   behalf of the defendants.

24          THE COURT:  Okay.  We'll take the appearances by

25   telephone.                                                  20:26:30
```

```
 1                   (Telephone appearances were made.)

 2            THE COURT:  Okay.  Anybody else?  Okay.  I don't

 3     hear anybody else, so let's get started.

 4            The first issue I think is the issue concerning the

 5     objector, the standing of the objector, and the discovery.      20:29:23

 6     Then we'll get into the merits of the class action

 7     settlement.

 8            I'm going to want to -- maybe I can ask quickly the

 9     defendants, did you provide the notice required under 28 USC

10     1715 to the Attorney General of the United States and the      20:29:44

11     Attorney General of each of the states that has a class

12     member?  Was that notice --

13            MR. TARANTINO:  I believe we did, your Honor.  I

14     don't know if we filed a proof of service, but we can

15     supplement and file that.                                      20:30:03

16            THE COURT:  But you think you did that?

17            MR. TARANTINO:  Yes.

18            THE COURT:  That's under CAFA.

19            MR. TARANTINO:  That's correct.

20            THE COURT:  We need proof of that.  Do we have          20:30:10

21     anybody from any Attorney General's Offices appearing?  I

22     don't hear anybody.  Okay.

23            So why don't we take up the issue of the standing

24     of the objector and whether discovery is necessary.  So it's

25     the motion to quash.                                           20:30:28
```

1              MR. PALMER:  Your Honor, Darrell Palmer on behalf

2     of the --

3              THE COURT:  Would it be okay if you use the podium

4     and microphone because otherwise the people on the phone

5     wouldn't hear you.                                          20:30:42

6              MR. PALMER:  I would be happy to do so.  I wasn't

7     sure of the protocol in your courtroom.

8              THE COURT:  There is not a lot of protocol.  What's

9     that restaurant that says no rules, just right?

10             MR. PALMER:  Your Honor, I have nothing to add       20:30:57

11    other than what's in our papers.  Unless the court has

12    questions, I won't waste the court's time reiterating.

13             THE COURT:  So who wants to take this up?  You want

14    discovery; right?

15             MR. BLOOD:  Yes, your Honor.  Timothy Blood.  Your   20:31:09

16    Honor, the Manual For Complex Litigation advises courts to

17    distinguish between meritful objections and those that are

18    brought for an improper purpose.

19             There is also case law that is cited in our brief

20    that says that, when ruling on a motion for class, a motion   20:31:26

21    for final approval, the court should assess the merits of an

22    objection to a class action settlement; courts should

23    consider the background and intent of objectors and their

24    counsel.

25             Here, after notice has gone out, and it was a        20:31:43

1    robust notice program, only one objector or two objectors

2    technically appeared, brought by somebody that many courts

3    have found and described as a serial objector.

4            The people that have objected have objected in the

5    past and have been represented by Mr. Palmer.  And so this is    20:32:00

6    the very type of discovery that goes to the issue of the

7    intent and motivation in bringing these objections.

8            This is an issue that goes directly at something

9    the court should consider, and it's something that we should

10   absolutely be able to make a record of.    20:32:18

11           The game with serial objectors is not to win the

12   objection at the trial court level.  They don't want to do

13   that.

14           Instead, what they want to do is they want to lose

15   the objection at the trial court level because the leverage    20:32:29

16   is created when they file a notice of appeal with the

17   attendant delay.

18           We should be entitled to --

19           THE COURT:  Well, leverage to do what?

20           MR. BLOOD:  Leverage to exact a payment in return    20:32:42

21   for abandoning the appeal or just walking away.

22           THE COURT:  Wouldn't I have to approve that?

23           MR. BLOOD:  The court would have to approve it

24   first.

25           THE COURT:  What if I said I wouldn't approve that?    20:32:49

1  I mean, that would seem to me extortion, and I wouldn't get

2  involved in that.

3          So once they're in, in for a penny, in for a pound,

4  they're in.  And so I don't think that you are going to have

5  the issue of them saying, okay, we'll settle this, because I          20:33:07

6  don't think that that would be proper.  That would be a form

7  of extortion.

8          MR. BLOOD:  Your Honor, the problem becomes once a

9  notice of appeal is filed the court loses jurisdiction over

10  it, and there is case law that actually discusses this          20:33:20

11  phenomena.

12          Once that happens then people can pay off people

13  and they go away, and unfortunately the district court loses

14  the ability to look at that payment --

15          THE COURT:  But if a judge has to approve it, where          20:33:34

16  is the money -- it would seem to me that I would have to

17  approve the withdrawal of the objector.

18          Look, let me say, make it really clear, that I'm

19  going to get to the bottom of it, and if they're legitimate

20  objections, then I'm going to deal with them.          20:33:55

21          Frankly, they didn't raise anything that I wouldn't

22  have raised sua sponte.  I read the papers.  Anybody who has

23  been in this district knows how I proceed, and I have more

24  objections usually than anybody else, and I have a list of

25  things that I want to discuss here.          20:34:11

1          So, frankly, the objections really didn't point out

2     anything that I'm not ready to sua sponte deal with myself.

3     But if there are objectors and they have standing, they're

4     legitimate.  If they're not legitimate, then I think there is

5     a real problem.                                    20:34:30

6          You know, I don't think I have to say to this group

7     the scope of the problem.  If someone is falsifying an

8     application before a federal judge, that's a serious, serious

9     problem, whether they're objectors or whether they're class

10    action plaintiffs.  I think everybody knows what I'm talking   20:34:52

11    about.

12         So, but if they are legitimate objectors, then I

13    will deal with the objections.  But they can't withdraw their

14    objections on a secret payout by somebody.

15         So if it's part of the class action settlement that   20:35:08

16    the objections are withdrawn and they receive, you know, X

17    number of dollars or attorneys' fees or something, the court

18    has to approve that.

19         And so if it's up on appeal the court has no

20    jurisdiction anymore until the appeal is over, unless you --   20:35:25

21    it's called a Criteo letter.  You write a letter to the Court

22    of Appeals saying we would like it remanded for the purposes

23    of the court considering this, which would then vacate the

24    necessity of an appeal.  But someone, some judge, would have

25    to approve that.                                   20:35:46

8

```
 1              MR. BLOOD:  The case law suggests otherwise, your

 2    Honor, that once it's on appeal it's out of the district

 3    court's hands and --

 4              THE COURT:  I agree.  So who would approve?

 5              MR. Blood:  It presupposes that the district court      20:35:57

 6    has already approved the settlement.  So the settlement --

 7              THE COURT:  What I'm asking then, if the objectors

 8    want to withdraw their objections and you want to make a

 9    payment from the settlement fund, who would approve that?

10              MR. BLOOD:  Nobody approves it -- oh, from the          20:36:11

11    settlement fund?  It would have to be approved by the

12    district court.  But it's not always done from the settlement

13    fund.  That's one of the problems.

14              THE COURT:  So what you're saying is someone could

15    pay them off.  I would be really concerned about that.          20:36:27

16              MR. BLOOD:  As I think the court should be, and

17    it's happened before.  And the issue of standing with

18    objectors, there have been instances, including objectors

19    represented by Mr. Palmer, there are cases cited in our brief

20    where the objector did not have standing.                       20:36:47

21              It's very difficult in this type of case to figure

22    out whether somebody has standing, to begin with, but really

23    the only way to do it is to depose the person and ask them

24    about the purchase.  Otherwise there is no other way to do

25    it.                                                              20:37:01
```

```
1              Take, for example, Sasha McBean.  When we tried to

2    serve her with a deposition notice at her last known address,

3    which was the address that was listed in the claim form

4    submitted on her behalf, she no longer lived there.

5              THE COURT:  Where is that?                            20:37:16

6              MR. BLOOD:  In Truckee, California.  And she no

7    longer lived there.

8              Now, the affidavit that was filed with the court

9    saying that she bought the product, which is a pretty pro

10   forma affidavit absent, void of any real facts, was e-filed   20:37:27

11   with a typewritten signature, an S slash signature, as

12   opposed to even a real signature.

13             I mean, frankly, from the record we have no idea

14   whether Sasha McBean is a class member or not.

15             Mr. Blanchard also filed a very pro forma statement  20:37:44

16   that he is a member of the class.  We don't know if he's a

17   member of the class or not.

18             And also, with regard to both the objectors and the

19   objectors' lawyer, the case law says that it is the intent in

20   bringing the objection that the court should also consider.    20:38:01

21             THE COURT:  Well, which case law?  See, here is my

22   concern.  There needs to be some kind of balancing here.  I'm

23   concerned about scaring off objectors to class action suits

24   on the grounds that, well, if I object they're going to take

25   my deposition, they're going to ask me why I'm doing this,     20:38:19
```

```
 1    they're going to subpoena records and retention agreements

 2    and documents from my lawyer, and really all, if my

 3    objections hold, I'm still going to get the amount of the

 4    settlement, and there may be some changes with the cy pres

 5    and the legal fees, et cetera, but it's just not worth the    20:38:42

 6    effort.  And so I'm afraid of scaring off objectors, of

 7    chilling their freedom to object on one hand.

 8              On the other hand, I'm concerned about fraud on the

 9    court and extortionate activity, whether it's fake class

10    plaintiffs, representative plaintiffs, people who are, you     20:39:03

11    know, paid, and one has heard of such a thing, or whether

12    it's fake objectors, not fake defendants.  No one volunteers

13    to be a defendant.

14              MR. BLOOD:  I think it's a case-by-case basis and

15    it depends on the particular circumstances.  This is not, I    20:39:22

16    don't think, a case where courts --

17              THE COURT:  Do you have any circuit authority that

18    says that I cab allow inquiry in their intent?

19              MR. BLOOD:  It's all district court authority and

20    then the Manual For Complex Litigation, which says that the    20:39:35

21    court should distinguish between meritorious objections and

22    those advanced for improper purposes.

23              There is also Bar Review articles --

24              THE COURT:  So look at it this way.  Standing is

25    definitely an issue.                                           20:39:55
```

1          MR. BLOOD:  Right.

2          THE COURT:  And I'm concerned about that.  But if

3    they have standing and they make an objection and it's

4    frivolous, who cares whether it's for an improper purpose?

5          On the other hand, if it's meritorious, should I          20:40:09

6    disregard a meritorious objection because it was made for an

7    improper purpose?

8          MR. BLOOD:  Well, you should consider what -- it

9    depends on the nature of the objection.  But the answer is it

10   depends.                                                        20:40:23

11         If notice goes out to the class and the court finds

12   that the notice was proper, and that's a very important first

13   step, then you have an entire class of people who have

14   effectively approved the settlement.

15         If one person comes in and tries to hold up that        20:40:34

16   settlement for an improper purpose, yes, that's a relevant

17   factor because that is not somebody coming forward and

18   saying, I'm going to hold up the relief to the entire class,

19   but it's for a good reason and this is why this should be

20   looked at.  And there are plenty of examples where that       20:40:50

21   happens.

22         But if it's done for improper purposes, I'm going

23   to would hold up all the relief to the class so I can get a

24   payoff, then, yes, that is an improper purpose and the court

25   should not approve or sustain that objection.                 20:41:04

1          Now, there may be, because of the nature of class

2    actions, there may be some problem with the settlement that

3    the court has an independent obligation to look at and make a

4    determination on, like a due process type issue.  And that's

5    perfectly fine.  And if the court comes across that then the        20:41:22

6    court has a separate obligation to look into that and, if

7    it's not appropriate, then not approve the settlement.

8          But for somebody to come in and hold up and affect

9    the rights of absent class members for an improper purpose,

10   no, that's not proper.                                              20:41:39

11         THE COURT:  How do I balance the concern of

12   chilling the rights of objectors to make objections, you

13   know, people who have standing, with the concern about people

14   objecting for improper reasons?

15         MR. BLOOD:  I think you should be very cautious in           20:41:57

16   allowing discovery.  And in a case --

17         THE COURT:  So what types of discovery would affect

18   an appropriate balance?

19         MR. BLOOD:  I think I would first start with who

20   was making the objection.  So, on the one hand, let's say          20:42:12

21   that it's somebody who -- a regular class member comes in and

22   files an objection.  That happens.  That person, there

23   shouldn't be discovery taken of that person in the ordinary

24   instance.

25         Maybe it's a lawyer who raises an issue, who                 20:42:27

1    doesn't have a track record of making what courts have found

2    to be frivolous objections.  That lawyer shouldn't undertake

3    discovery, the client shouldn't undertake discovery, absent

4    some other indicator that there is something going on.

5         But where you have a situation where, not one or          20:42:45

6    two or three, but many, many courts have found that the

7    objectors' lawyer has engaged in bad faith behavior, has

8    advanced objectors that have no standing to object, that have

9    repeatedly ignored court orders and been sanctioned, have had

10   their pro hac vice applications thrown out by courts for      20:43:04

11   failing to be candid with courts about their background, in

12   those instances I think discovery is appropriate.

13        No one in this courtroom would be shocked to learn

14   that Mr. Palmer perhaps in this case has filed an objection

15   for an improper purpose.  Nobody would be surprised by that,   20:43:22

16   given his track record.  And he happens to have two class

17   members, or two objectors, who have done this with him

18   before.

19        THE COURT:  So one lives in Truckee and where does

20   the other one live?                                            20:43:37

21        MR. BLOOD Corpus Christi, Texas, where one of Mr.

22   Palmer's frequent co-objector lawyers lives.

23        THE COURT:  Let me hear from Mr. Palmer.

24        MR. PALMER:  It's true that out of the 100 plus

25   objections I filed I have made a couple of mistakes.  It is    20:44:05

1  not true --

2          THE COURT:  You mean in a hundred cases?

3          MR. PALMER:  In a hundred cases.

4          THE COURT:  Because you didn't make a hundred

5  objections here.                                    20:44:16

6          MR. PALMER:  Correct.  But it is grossly untrue

7  that this objection is brought for an improper purpose.

8  After all, the plaintiffs' lawyer here is Tim Blood.  You

9  know, he's well-known for his --

10         THE COURT:  Well, I don't want to get into things  20:44:33

11 that are not part of public record or things that I could

12 take judicial notice of, and I really have not been one who

13 is familiar with all the ins and outs of the class action

14 bar.

15         I get a case, I deal with the case.  So if it's in  20:44:51

16 some cases, if someone, some judge, has pointed out something

17 about Mr. Blood that is relevant, you can bring it up, but

18 otherwise his reputation in the community I can't take

19 judicial notice of.

20         MR. PALMER:  I guess that's what I'm saying, your  20:45:06

21 Honor, is that bringing up a single instance in another case,

22 in another district court, is hardly relevant here.  I mean,

23 if this is an evidentiary hearing, then let's adhere to the

24 Rules of Evidence.  Because what we just heard was a lot of

25 double and triple hearsay.                          20:45:20

 1          The truth is, your Honor, if you look at the

 2  objection filed, without presupposing my lack of integrity in

 3  filing this objection, it identifies real issues.

 4          Now, the fact may be that the court identified

 5  these issues on its own, but that does not eliminate the          20:45:35

 6  right of a bona fide -- of a class member to raise these

 7  issues before the court.

 8          That is the very purpose of the objection process,

 9  is to bring these things to the court's attention.  It isn't

10  intended to be critical of the court or the court's             20:45:52

11  preliminary approval decision.  Of course not.

12          It's to raise the issues and make sure that they

13  are addressed, so when the court is performing its duty now

14  as the fiduciary for the class it has the benefit of this

15  input.  Nothing more.                                           20:46:07

16          To suggest that this is brought for an improper

17  purpose is so hypothetical it's ridiculous.  The truth is --

18          THE COURT:  Are you seeking fees or any money for

19  the two objectors?

20          MR. PALMER:  I am not, not at this time.  Now, if      20:46:26

21  we were to make significant improvements in the settlement,

22  then perhaps.

23          I mean, there are serious issues that need to be

24  considered and that we have argued about and that I am

25  prepared to argue even further.  And if the settlement was     20:46:38

1    significantly improved, then it would be appropriate to make

2    a separate application at a later time for perhaps an

3    incentive award and maybe even attorney's fees, but that's

4    not before the court at this time.

5           And I don't want to move into the argument about          20:46:51

6    the settlement itself.  What we are arguing now is whether or

7    not it's proper to depose these people simply because they

8    have made an objection.

9           And I think there are much -- I mean, first of all,

10   all they did was follow the instructions set forth in the     20:47:08

11   notice.  And if class counsel wanted more details, it could

12   have been included in the notice.

13          The dilemma is that when you have a settlement that

14   provides a $25 payment for anybody who says, "I bought

15   Hydroxycut, then why should there be a higher standard for     20:47:29

16   someone who says, "I bought Hydroxycut, send me a check, and,

17   by the way, I am a class member and here are my legal

18   criticisms of the settlement."

19          Now, I admit that it's probably a mistake, the.

20   S slash signature of Ms. McBean.                              20:47:45

21          THE COURT:  It still would have to be -- the

22   adjudicator, the administrator of the fund could still

23   make -- for example, say there is X who has been found, in

24   cases for which the court can take judicial notice, to have

25   submitted false claims of membership in a class action, or    20:48:06

1    has submitted a series of claims in many class actions, that

2    make it seem like their claim may be false, there is nothing

3    that prevents the administrator from denying the claim and

4    asking the court to hold a hearing as to whether they have a

5    legitimate claim.                                              20:48:33

6               MR. PALMER:  That's correct.

7               THE COURT:  Regardless of whether they have, you

8    know, receipt for the purchase of Hydroxycut.  Still, it's

9    their credibility, and the court does not have to say, you

10   know, anyone who says I purchased Hydroxycut, purchased       20:48:46

11   Hydroxycut.  If all of a sudden -- I don't know how many

12   adults are there in the United States.

13              MR. PALMER:  Correct.

14              THE COURT:  If every adult in the United States

15   submitted a claim for $25, I think the administrator would    20:48:58

16   say, whoa, would have to, the court would say there is

17   something wrong here, we are going to require something else.

18              So the problem is the circumstances are suspicious

19   when there is a track record that they have pointed out that

20   the court could take judicial notice of from the various      20:49:28

21   cases.

22              That's not to say that it isn't -- the objectors

23   aren't totally legitimate here, but it gives the court pause,

24   and I think it spawns a basis for an evidentiary hearing.

25   Whether it's done by depositions or it's done here in court   20:49:47

1  before me is a different question.  But I am concerned under

2  the circumstances.

3          MR. PALMER:  Well, your Honor, I would respectfully

4  point out that in my reply, that I filed late last night,

5  that I gave the court many examples of significant          20:50:04

6  improvements in class actions as a result of objections filed

7  by my clients.

8          And I don't think anyone has pointed to any false

9  claims or false anything else that are in any way connected

10 to Sasha McBean or Mr. Blanchard.  It hasn't happened.       20:50:19

11         What they're doing is impugning my clients by

12 bringing up their lawyer's reputation.  And, frankly, that's

13 a violation of the evidence rules.  It simply has no place

14 here unless they have some specific examples.

15         THE COURT:  Well, to be frank, if you were to        20:50:40

16 stipulate that your clients -- that you and your clients

17 would not now or ever ask for any fees or incentive awards

18 for the objections, then I think this is a non-issue.

19         MR. PALMER:  Well --

20         THE COURT:  But if you are not willing to stipulate  20:50:55

21 to that and you are reserving the right to ask for it later

22 on, I'm concerned that, frankly, this may be just an attempt

23 to stall a settlement and hope that someone makes some kind

24 of payment.

25         MR. PALMER:  Well, then I don't think the court      20:51:15

1  understands really what Mr. Blood is alluding to.  He's not

2  talking about a fee application on behalf of an objector's

3  lawyer, or filed by an objector's lawyer, that is approved by

4  the court.

5       Why should you be foreclosed from doing that simply    20:51:36

6  as a condition of presenting an objection?  That would be --

7  that certainly would not follow the case law.

8       In fact, the case law surrounding depositions and

9  discovery on unnamed class members is fairly well developed,

10 and I mentioned it in the motion to quash.                   20:51:56

11      The court has to make specific findings about why

12 these people should be subjected to discovery of any kind,

13 and certainly there are much simpler ways of conducting

14 discovery than simply -- than going around the country to

15 take their deposition and inconvenience them and ask them     20:52:17

16 about their educational background and all sorts of

17 irrelevant things, when all we really want to know is did

18 they buy Hydroxycut within the class -- within the period,

19 the class period.

20      So I would encourage the court to really focus on      20:52:33

21 what Mr. Blood is alluding to.  What he's talking about is

22 that, by filing any objection, I necessarily later am going

23 to come to him and say, "Look, Tim, I'll drop my appeal if

24 you give me $10,000."  That's what he's talking about.

25      So let me put him on the stand right now and ask       20:52:53

```
 1    him under oath have I ever made such a demand from him,

 2    because the answer is no.  And I will represent to the court

 3    that I never will.  That's what he's talking about, your

 4    Honor.

 5              THE COURT:  So you're stipulating that you will      20:53:07

 6    not, under any circumstances, ask -- or accept any payment to

 7    withdraw an objection or an appeal?

 8              MR. PALMER:  I will not accept any payment from --

 9              THE COURT:  From anyone.

10              MR. PALMER:  From anyone.                            20:53:26

11              THE COURT:  From anyone.

12              MR. PALMER:  Correct, unless there is -- unless

13    it's approved by the court.

14              THE COURT:  Well, if there is an appeal, that

15    appeal is going to go through and you are not going to accept  20:53:35

16    from anyone, whether it's someone who was a fortuitous gadfly

17    who is going to just -- just wants to help the court of

18    appeals reduce their caseload or whatever, or someone

19    connected with this case, anyone -- anyone -- a corporate

20    live individual --                                            20:54:00

21              MR. PALMER:  Correct.

22              THE COURT:  -- you would not accept any sum of

23    money or anything of any form of consideration to withdraw

24    your objection or to dismiss your appeal.

25              MR. PALMER:  Unless it's approved by the court.      20:54:13
```

1    That's correct.  That's right.  I mean, we demonstrated that

2    in the Dennis v. Kellogg case.  You know, that made very

3    serious improvements to the cy pres process in this country.

4         Just yesterday morning the Ninth Circuit issued an

5    order in the Experian case, again raising serious questions        20:54:32

6    about the representation of class members by class counsel.

7         In that appeal we were joined by the Boyd Schiller

8    (phonetic) firm as objector and appellants, lawyers.

9         So we're seriously committed to this process of

10   maintaining integrity in this class action process, making         20:54:52

11   sure that the issues that are very important, the issues that

12   really have degraded the reputation of class lawyers and the

13   class action process among the public, that those issues are

14   seriously reviewed at the district court level and the

15   appellate level.                                                    20:55:09

16        That's why we're here.  And there are such issues

17   in this case.  Whether we will appeal them, I can't tell you,

18   but I will tell you there are serious problems with cy pres

19   and we can discuss that later.

20        THE COURT:  Did you want to say anything else?                 20:55:21

21        MR. PALMER:  No, your Honor.

22        THE COURT:  I was actually asking Mr. Blood.

23        MR. BLOOD:  You know, the Experian case I think is

24   a good example.  The Experian decision was issued by the

25   Ninth Circuit yesterday.  I read it, an interesting case.  We       20:55:32

1    actually went back to the trial court to see whether Mr.

2    Palmer had raised the issue that the Court of Appeals decided

3    in Experian, because I had a feeling he would be claiming --

4    taking credit for that.

5         It turns out he did not raise that issue.  Other          20:55:47

6    lawyers did.  It wasn't Mr. Palmer.  Mr. Palmer has a long

7    history -- it's not me saying it.  Don't take my word for it.

8    Take the word of other courts who have written about this --

9    about Mr. Palmer taking pay-offs in order to walk away from

10   cases.                                                          20:56:05

11        He has not agreed to not take any sort of payment.

12   What he has agreed to do is take a payment if someone

13   approved it.  The Ninth Circuit would probably approve it in

14   a heartbeat because they don't really care, it's one case off

15   their docket, and that's the end of it.                        20:56:19

16        If it comes out of the fund the court --

17        THE COURT:  I don't know that they could approve

18   it.  I don't know that they would have jurisdiction to

19   approve it.

20        I mean, what they could do is they could send it          20:56:27

21   back with, if there is a Criteo letter, they could send it

22   back to the district court to decide that.

23        MR. BLOOD:  Only -- it doesn't need -- the problem

24   is it doesn't need approval unless it changes the settlement

25   in some manner.  It never changes the settlement.  It comes    20:56:46

1   --

2          THE COURT:  I think based on what he said, if he

3   took any money and I found out about it, I think I would be

4   obligated, if he didn't get court approval, to refer it to

5   the U.S. Attorney's Office for criminal investigation.  I          20:56:59

6   don't think he's going to do that.

7          MR. BLOOD:  And so it would have to be approved by

8   the court.

9          THE COURT:  Well, I don't want to tell the court of

10  appeals, if the issue came before the court of appeals, who    20:57:09

11  would have to approve it, but I don't think the court of

12  appeals -- approval requires findings of fact, conclusions of

13  law, and courts of appeals don't get involved in that.  So

14  that's why I think it would have to be me.  All right.

15         MR. PALMER:  I agree.  The case law is clear on        20:57:27

16  that.  And, again, that is such a simple summary of what

17  happened in the Experian case.  I mean, well, I mean, there

18  is no reason to argue that, but --

19         THE COURT:  My biggest concern is whether your

20  clients actually have standing, and I am going to allow        20:57:45

21  discovery in that regard.

22         I am going to go back and look at the cases.  I am

23  concerned about the discovery or an evidentiary hearing or

24  anything else getting into their intent.

25             I'm not saying I won't allow that, but I have real    20:58:02

1    concerns about that and I want to study that further.  But

2    I'm convinced absolutely that there needs to be proof here

3    that they have standing; in other words, that they're class

4    members.

5           Now, I mean, there is two ways to do it.  One way    20:58:19

6    I'm afraid of is if we do depositions there are only going to

7    be objections during the depositions.  And I can tell you

8    right now that we are bypassing the magistrate judge on this.

9    Any discovery issues come to me.

10          Because if you go to the magistrate there will only 20:58:34

11   be an appeal.  Someone will be unhappy, whether it's the

12   plaintiffs or the objectors, and then there will be an appeal

13   and it will just delay things further.  So any discovery

14   disputes will be resolved by me.

15          My suggestion is we just have an evidentiary        20:58:50

16   hearing.  We do it right in the courtroom.  You bring the

17   objectors in.  They can issue subpoenas to them, duces tecum.

18   We can agree upon the items.  It really shouldn't be that

19   burdensome.

20          And if I find they have standing -- I am going to   20:59:08

21   look further into the intent issue, but if I find they have

22   standing, unless it's obvious that they have mal intent, then

23   I think we just move on.

24          MR. PALMER:  Well, your Honor, I would simply pose

25   the query, what questions are we going to ask them after     20:59:27

1    troubling them to come all the way to San Diego because they

2    objected in the settlement?

3            "Did you buy Hydroxycut?"  If they answer yes, are

4    you going to hold them to a higher standard as an objector

5    than as a claimant?                                        20:59:42

6            THE COURT:  Under the circumstances, I think I have

7    to make a credibility determination.  And, you know, it's

8    like in a lot of criminal cases, they come and they say, you

9    know, I came across the border illegally or with drugs

10   because my mother has a tumor and I was trying to make       20:59:56

11   medical money for her.

12           Just because they say it doesn't mean I have to

13   believe it.  Or they say, you know, I was forced across the

14   border.  I didn't want to come into the United States, but

15   the bandits came at me with guns.                           21:00:07

16           Sometimes it's true.  Sometimes it's not true.  I

17   have to make findings of fact as to whether people are

18   telling the truth.  And just saying "I bought Hydroxycut

19   products" does not mean that they're telling the truth.  They

20   may or they may not be.                                     21:00:23

21           The circumstances here are such that I think the

22   court is concerned and I think there needs to be specific

23   findings by the court that they have standing.

24           Now, as to what questions they are going to ask, I

25   mean, you saw the fee application and how much they get per  21:00:40

```
 1   hour.  That's way above my pay grade.  So I leave that to

 2   them as to what they could ask.

 3            But, you know, I would think that people would ask

 4   questions about their purchase of Hydroxycut, when and how

 5   they purchased it, what they used it for.                    21:00:59

 6            I don't want to start coming up with questions that

 7   are going to give away what the plaintiffs may want to ask.

 8            MR. PALMER:  Can we --

 9            THE COURT:  And, you know, demeanor is important.

10   And it may be that they never got a receipt and all they have 21:01:15

11   is their word.  And under the circumstances, watching their

12   testimony, if I believe them, that's all there is to it.

13            They don't have to necessarily establish that --

14   they don't have a burden of corroborating it, which is a

15   burden that the other people have who are submitting claims,  21:01:32

16   but under the circumstances, I would need to make findings of

17   fact that they actually have standing.

18            I'm going to look a little further into the intent

19   issue.  I really have concerns about that because there is

20   this issue about chilling the exercise of objections, and I   21:01:51

21   don't want to get involved in that.

22            MR. PALMER:  Can we, from the get-go, direct class

23   counsel that inquiries into the attorney/client relationship

24   will not be on the table?

25            THE COURT:  Well, that's pretty clear.  I don't see  21:02:10
```

```
 1   that they need retention agreements or anything of the like.
 2   I mean, the question is their standing, did they actually
 3   purchase.
 4              MR. PALMER:  Right.  And are we going to get
 5   into -- should we ask Sasha about other objections she filed,    21:02:25
 6   why would that be relevant if she had standing in those
 7   classes?
 8              THE COURT:  I don't know.  I mean, I would have to
 9   -- each one of these things would require some showing that
10   it's more than just a fishing expedition.                        21:02:40
11              MR. PALMER:  Well, then I would ask that -- then I
12   presume that what the court is proposing or ordering is that
13   the final approval hearing will be continued until this
14   evidentiary hearing.
15              THE COURT:  No, I thought we would continue now,      21:02:51
16   because, look, I read all this stuff.  I stayed up late, and
17   so I'm not going to read it again.
18              So we're going to conduct the hearing, and then in
19   ruling, when I issue my decision, when I rule on the
20   objections -- you know, I have to say you didn't raise          21:03:09
21   anything that I hadn't thought of.
22              You know, I write down -- I have things that I go
23   through.  I read this stuff myself.  I don't rely on the law
24   clerks.
25              MR. PALMER:  But you are not suggesting that          21:03:26
```

```
 1   invalidates --
 2            THE COURT:  What I'm saying is we are going to have
 3   to deal with those issues whether the objectors have standing
 4   or not.
 5            I think the real issue is, if the objectors have          21:03:33
 6   standing and if they furthered the ball, they are entitled to
 7   some compensation like the plaintiffs are asking for.  That's
 8   a question as to whether they have standing, so I need to
 9   decide the standing issue.
10            Also, standing is a question for appeal.  If you          21:03:52
11   don't have standing you can't appeal.
12            MR. PALMER:  Right.
13            THE COURT:  So I need to make findings of fact in
14   that regard.
15            MR. PALMER:  Anything else, your Honor?                   21:04:03
16            THE COURT:  No.  So I ask you this:  My preference
17   would be to do it in an evidentiary hearing right here.  That
18   way -- you know, I haven't practiced law in the private
19   practice of law since, I guess January 1985.
20            Depositions, I don't know if things have changed,        21:04:22
21   but they were miserable experiences.  Lawyers object, they do
22   this, they do that.  And it's not a pleasant experience.
23            When I was a magistrate judge sometimes when there
24   were problems I would have the deposition taken before me,
25   and so I could rule right then and there.  It may be better,      21:04:38
```

```
 1    rather than to do discovery, to just have an evidentiary
 2    hearing.
 3              MR. PALMER:  I agree.
 4              THE COURT:  And issue subpoenas duces tecum.  We
 5    can agree upon -- perhaps today we can agree upon the scope          21:04:52
 6    of them, and they can come here.
 7              Now, this is a civil case, and so whether they are
 8    obligated to come -- if this were a criminal case there is
 9    nationwide service of subpoenas, but this is a civil case so
10    they can proceed by deposition instead.                             21:05:10
11              MR. PALMER:  Well, I provided the court with one
12    example of a deposition taken by the Zelle Hoffman firm
13    ordered by Judge Freedman.  It's attached to the reply I
14    filed last night.  It took 50 minutes.  And it was defended
15    by Dave Carothers who you may know, a local ABOTA member, a         21:05:31
16    good friend of mine.
17              There were 33 objections, five instructions not to
18    respond.  It was completely devoid of any helpful information
19    except that establishing that, indeed, Joe Wilkins used to
20    work at Wal-Mart.                                                   21:05:45
21              Likewise, Judge Ilston ordered the deposition of
22    class members in the billion dollar LCD settlement, post-
23    settlement, and I produced one client for deposition.  A
24    local lawyer came with four boxes of exhibits to depose my
25    client.                                                             21:06:02
```

30

```
 1          We had to call the special master twice, or he
 2   called the special master twice about objections.  In the end
 3   the special master ended up coaching him on how to ask
 4   questions, about the objection.  And, again, it was of no use
 5   whatsoever to Judge Ilston, which is why my other two clients    21:06:18
 6   decided not to appear in order to test this whole idea of how
 7   extensive or how intrusive this process should be for people
 8   who simply raise legal issues about settlements.
 9          So I would hope that we would be able to have some
10   real boundaries on the inquiry.  I can speak for Sasha --        21:06:42
11          THE COURT:  The best way to have boundaries is to
12   do it right here.
13          MR. PALMER:  And I will speak for Sasha McBean and
14   commit that she can appear.
15          Mr. Blanchard was referred to me, as Tim said, by        21:06:54
16   Chris Bandas, and I will need to confer with him about
17   getting Mr. Blanchard here from Corpus Christi, Texas, but,
18   if possible, we will have him here.
19          THE COURT:  The other option is videoconferencing,
20   live videoconferencing.                                         21:07:13
21          MR. PALMER:  That might be --
22          THE COURT:  I have done that, not with objectors,
23   but in other cases.  So if the objector consents to it it's
24   like it's taken here, but they are sworn and we'll see each
25   other and I can rule.  But the benefit of this is I can rule    21:07:33
```

```
 1    right away.

 2              MR. PALMER:  Absolutely.  I appreciate the court's

 3    concern about this.

 4              THE COURT:  I am going to look into the intent

 5    issue.  I will issue a short written decision on this.  But      21:07:47

 6    my concern is that once you go down that, what I consider a

 7    slippery slope, it may be a situation where you're chilling

 8    the rights of people to object.

 9              MR. PALMER:  One final note that was an issue in

10    this motion to quash, and that is that I was personally         21:08:06

11    served without any notice, no meet and confer, anything like

12    that, with a deposition notice for a subpoena for me to

13    appear for a deposition, and produce hundreds of thousands

14    probably of pages of documents regarding my practice in this

15    area, which, by the way, is not my main practice by any        21:08:22

16    means.

17              So I'm not sure what the court's intention is on

18    that, but I think that I need to remind the court that I

19    respectfully requested either a protective order or motion to

20    quash the deposition of the objectors' lawyers, me, because I  21:08:38

21    just don't think there is any reason whatsoever to delve into

22    that.

23              THE COURT:  Okay.  Well, my ruling is that the

24    motion to quash is granted in part, denied in part.  I am

25    quashing the subpoena to you.                                  21:08:53
```

1              I am not -- you have subpoenas to the two

2     objectors; right?

3              MR. PALMER:  One was served, one wasn't.

4              THE COURT:  I am allowing the discovery to proceed

5     as to the two objectors, as to their standing, and I may in a          21:09:11

6     written decision indicate whether I am going to allow that to

7     go to intent.

8              But let's decide as to standing what documents you

9     would need so it's pretty clear, so you don't then issue a

10    subpoena duces tecum and then there is objections as to that          21:09:30

11    and we waste our time on that.  So --

12             MR. PALMER:  I'll represent to the court that I

13    will accept service of that subpoena on behalf of Ms. McBean.

14    I'll have to confer with Mr. Bandas about Mr. Blanchard.

15             So they don't have to send a process server out to          21:09:48

16    serve her yet again, with a subpoena in Truckee.

17             THE COURT:  Well, and we don't have to get into the

18    issue under Rule 4 and 5 whether they can serve it on you,

19    because she's essentially -- I forget, Blanchard is the man;

20    right?                                                                21:10:11

21             MR. PALMER:  Both are non-parties.

22             THE COURT:  Are they both women?

23             MR. PALMER:  One is a man, one is a woman, and they

24    are both non-parties to the action, so that creates some --

25             THE COURT:  Well, it's an interesting question that          21:10:20

```
 1    I hadn't researched as to whether, if they make an objection,

 2    that service on them can be service on a lawyer; in other

 3    words, where they submitted to the personal jurisdiction of

 4    the court.  I don't know the answer to that.  I just thought

 5    of that now.                                                    21:10:34

 6          But if you are willing to accept service for both

 7    of them, then we don't have to figure out the niceties of

 8    that question.

 9          MR. PALMER:  Thank you, your Honor.

10          THE COURT:  So let's talk about the scope of the         21:10:43

11    subpoena duces tecum.  Let's see if we have an agreement on

12    it now so we don't have to fight about it later.

13          MR. BLOOD:  I think as far as documents go, it

14    would be any evidence of the purchase of the product.  I

15    think that's the extent of it.  So it would be receipts.  It   21:11:00

16    would be, if they paid with a credit card, that aspect of the

17    credit card invoice.  Sometimes loyalty programs will have --

18    will show purchase of the product or something like that.

19          But as far as the objector goes, I think that's the

20    extent of the documents that would be needed.  And then it     21:11:20

21    would just be the witness appearing here in court to answer

22    questions.

23          THE COURT:  Okay.  So do we have an agreement that,

24    instead of a deposition, it will be an evidentiary hearing,

25    either they'll be here or they'll be by videoconferencing?     21:11:33
```

```
 1              MR. PALMER:  Yes, your Honor.

 2              MR Blood:  Yes, your Honor.

 3              THE COURT:  So how about -- how soon do you want to

 4     do this?  I assume you have no objection to the scope of that

 5     subpoena.                                                          21:11:48

 6              MR. PALMER:  No, not at all.

 7              THE COURT:  Okay.

 8              MR. PALMER:  If they have it they will be happy to

 9     produce it, I'm sure.

10              THE COURT:  Right.  So how far out do you want       21:11:59

11     this?  I'm thinking maybe --

12              MR. PALMER:  The sooner the better as far as I'm

13     concerned.

14              MR. BLOOD:  The same here.

15              THE COURT:  We're going to start a three-week trial  21:12:07

16     on Monday, so I'm thinking of -- Rick, tell me, the week of

17     May 27th, May 27th is Memorial Day, so like the middle of

18     that week.

19              THE CLERK:  We have a trial set beginning Tuesday.

20              THE COURT:  One that is likely to go?               21:12:38

21              THE CLERK:  Yes.  That's correct, yes.

22              THE COURT:  How long?

23              THE CLERK:  It's a 1326 with Mr. Camden.

24              THE COURT:  That wasn't the one that said it was

25     going to be a conditional plea?                              21:13:03
```

```
 1              THE CLERK:  Your Honor, it is the one that he said
 2    would be a conditional.
 3              THE COURT:  Okay.  So how about Wednesday, the
 4    29th?
 5              MR. BLOOD:  That works for plaintiffs, your Honor.    21:13:21
 6              THE COURT:  That way it doesn't interfere with
 7    anyone's Memorial Day plans and they won't have to travel on
 8    Memorial Day or the day right after.
 9              MR. PALMER:  I think that should be just fine.
10              THE COURT:  How about -- so assuming someone is       21:13:32
11    coming from Texas, do you want to do it, set it for
12    eleven o'clock?
13              MR. PALMER:  Okay.
14              THE COURT:  I don't really think the hearing should
15    take that long.                                                 21:13:45
16              MR. PALMER:  Agreed.
17              THE COURT:  Now, if I decide that they can also get
18    into their intent, then I will list the types of documents.
19    I'll look at whether the retention agreements, retainer
20    agreements, are covered by the lawyer/client privilege.        21:14:06
21              MR. PALMER:  Well, in California they're protected
22    by Business and Profession Code 6148.
23              THE COURT:  Did you cite that in your papers?
24              MR. PALMER:  I'm sure that I did, yes.
25              THE COURT:  I'll look at that.  But the              21:14:20
```

```
 1    lawyer/client privilege, isn't that a federal privilege when

 2    it comes to federal cases?  It used to be that you

 3    incorporated the privilege of the states, but isn't the

 4    lawyer/client privilege now a federal privilege?

 5              MR. PALMER:  Your Honor, what I was referring to      21:14:37

 6    specifically is that there is a California statute that says

 7    that an attorney/client agreement or retainer agreement is a

 8    privileged document, and that's the Business and Profession

 9    Code 6148.

10              THE COURT:  Right.  But in federal court does that,   21:14:54

11    if the court were to find that it's not privileged, does that

12    trump the court's ruling on that?

13              MR. PALMER:  I certainly wouldn't agree to it.

14              THE COURT:  You certainly wouldn't produce it

15    without a court order.  I understand that.  I'll give some      21:15:09

16    thought to that.

17              What other documents do you think would relate to

18    the issue of intent?  I doubt there is a retainer agreement

19    that says, you know, "I retain you to make a bogus

20    objection."  So I really think that that's kind of a wild       21:15:27

21    goose chase.

22              MR. BLOOD:  Any documents evidencing payment of

23    money.  And then also any documents from the previous cases

24    in which Mr. Palmer represented them in, that are not

25    attorney/client, but certainly the documents that show what     21:15:42
```

1   happened to those objections.

2          In other words, if there was an objection, appeal

3   filed, payoff made, appeal goes away, those documents would

4   be instructive on what their intent was here in this case.

5          THE COURT:  So any documents relating to the                    21:16:00

6   receipt of funds to withdraw an objection or an appeal.

7          MR. BLOOD:  Yes.

8          THE COURT:  Would you have any objection to that?

9          MR. PALMER:  Well, it would depend on the

10  circumstances and the cases.  I don't know.  I mean, are you  21:16:13

11  talking about documents where these people were objectors?

12         MR. BLOOD:  Where these people were objectors.

13         THE COURT:  Yes.

14         MR. PALMER:  I would have no objection to that

15  insofar as we are talking about documents that Ms. McBean     21:16:35

16  would have, for instance.  No problem.

17         THE COURT:  Why don't you, maybe you both can agree

18  upon the scope, submit to the court a proposal as to the

19  scope of the document production request on the issue of

20  intent.  I'm not saying I'm going to allow it to go that far. 21:16:59

21  I have serious concerns about that.

22         I understand that there is, you know, concerns

23  about people objecting and holding up class action

24  settlements for these purposes, but I also have concerns, on

25  the other hand, of chilling the rights of people to object.   21:17:20

 1              MR. PALMER:  Well, I have concerns about a very

 2   wide coordinated effort among class counsel to bring about

 3   this exact thing, and that is a chilling effect by using

 4   these tactics, because that is exactly what it is, your

 5   Honor.                                                        21:17:38

 6              And really what we should be asking for are the

 7   blog entries and the chat room discussions and the list

 8   served discussions shared by Mr. Blood and people in San

 9   Francisco and Seattle and talking about what they can do to

10   chill objections.  That would be just as relevant.           21:17:54

11              THE COURT:  Well, I don't think so.  Because the

12   question is, it's not you, and what you're doing.  It's the

13   objectors.  And if the objectors have a pattern -- it's like

14   404(b).

15              If their intent is to make objections, not for the 21:18:13

16   purposes of benefiting the class, but for obtaining some

17   money, and so then they withdraw their objections or they

18   withdraw their appeal, that I think goes to their intent,

19   that the intent is not to make valid objections, but to

20   essentially extort some kind of payment.                     21:18:35

21              But, you know, if they found you because you're the

22   guru -- it's just like class action.  People would say the

23   plaintiffs' class action lawyers -- the complaint by a lot of

24   corporations is that they bring these class action suits and

25   they know it will cost us a fortune and disrupt our business  21:18:53

39

```
 1   with discovery, et cetera, and so they get some kind of

 2   settlement and it's cheaper to settle than to litigate.

 3           That doesn't mean that they shouldn't bring class

 4   action lawsuits or we need to check their intent every time

 5   they make a motion to certify a class to see whether they're      21:19:15

 6   valid class action counsel.

 7           Similarly, if you are the guru of objecting to

 8   class action lawsuits, that doesn't seem to be an issue to

 9   me.  It's really what is your clients' intent.

10           If your clients know that, you know, you're the           21:19:35

11   greatest objector to class action and they want to object

12   and, therefore, they seek you out, so be it.  But it's their

13   intent that controls.

14           MR. PALMER:  In that case I'm quite excited about

15   the upcoming evidentiary hearing and I think it will be very      21:19:50

16   revealing.

17           THE COURT:  You must have a boring life then.  All

18   right.  So see if you can agree upon the language.

19           I'll get my order out probably by the end of next

20   week on this subject.  We have a date.                            21:20:04

21           And now what I suggest is assume for the moment

22   standing so we don't have to come back and redo this.  I

23   don't see any reason why we shouldn't entertain Mr. Palmer's

24   suggestions and advice and arguments at this point assuming

25   there is standing.  If there is no standing, then so be it.       21:20:28
```

1          MR. BLOOD:  Very good, your Honor.

2          THE COURT:  I would rather take care of this now.

3          MR. BLOOD:  That makes sense, your Honor.

4          MR. PALMER:  Thank you your Honor.

5          THE COURT:  Okay.  So let's get into it.  I think I    21:20:41

6   covered the issue about the notice, and you're pretty sure --

7          MR. TARANTINO:  Yes, I checked while this was going

8   on and we will file proof of service.

9          MR. BLOOD:  Your Honor, I remember them filing a

10  CAFA notice.                                                 21:21:03

11         THE COURT:  Because that's always like a little bit

12  of a hang-up that not many people think of, so I am impressed

13  you thought of it.  So I can check that off.

14         Okay.  Why don't we do this.  Why don't we cover

15  the things that I have some issues over, and not take up -- I  21:21:23

16  read the papers so there doesn't seem to be any necessity of

17  taking up time, you arguing all the different issues that I

18  don't disagree on, and then you can respond to Mr. Palmer's

19  concerns.

20         So the first thing is the attorney fee               21:21:48

21  distribution.  I'm always concerned -- the way it is in the

22  settlement is that -- which is the firm that is going to

23  control distribution?

24         MR. BLOOD:  I think probably that the money comes

25  to my firm, and then the distribution is made from there.    21:22:08

1              THE COURT:  Okay.  So one of my concerns is that

2    the other lawyers who have been involved, that they are not

3    treated fairly, and so there ought to be -- it's sort of a

4    theoretic concern because no one has ever actually litigated

5    that before me, but there ought to be some kind of safety          21:22:33

6    valve for them.

7              MR. BLOOD:  If I could make a suggestion.

8              THE COURT:  Sure.

9              MR. BLOOD:  I think the best way this works,

10   everybody always thinks that they're worth more than what          21:22:46

11   someone else may think they're worth.  And where you have a

12   situation here where the aggregate lodestar exceeds the

13   amount of fees that are being paid, somebody is not going to

14   be happy, and probably a number of somebodys may not be happy

15   with the ultimate amount of money that is allocated to them.       21:23:03

16        What I would suggest is to allow class counsel to

17   divvy up the fees and make a recommendation about how the

18   fees are divvied up, let everybody know what those numbers

19   are, and then if there is an issue with regard to that,

20   somebody can -- you know, we either all try to resolve it or       21:23:21

21   somebody can bring it to the court's attention, which the

22   court would always have the inherent authority to allocate

23   fees among lawyers anyway.

24        But having done this a number of times in the past,

25   there is usually a fair amount of work that goes into the          21:23:36

```
 1    initial allocation, and usually people are fine with it.

 2              THE COURT:  Right.

 3              MR. BLOOD:  I certainly have no problem --

 4              THE COURT:  More than usually.

 5              MR. BLOOD:  Usually everyone ends up being fine     21:23:50

 6    with it and I have absolutely no problem at all with somebody

 7    bringing an issue to the court's attention if there is a

 8    problem with it.

 9              THE COURT:  So how would you propose we modify the

10    settlement to provide that?  That there be an allocation, a    21:24:05

11    proposed allocation by class counsel?

12              MR. BLOOD:  Yes.

13              THE COURT:  And a right to object within 14 days

14    by filing an objection with the court?

15              MR. BLOOD:  Yes, your Honor.                          21:24:42

16              THE COURT:  And then the court would hold a

17    hearing.

18              MR. BLOOD:  It's probably implicit in it, but we

19    should probably add a meet and confer requirement before an

20    objection is filed.  As a matter of practice that's likely     21:24:53

21    what would happen anyway.

22              THE COURT:  Okay.  All right.  And then if there is

23    no objection within 14 days then the allocation would be

24    final.

25              MR. BLOOD:  Very good, your Honor.                    21:25:18
```

```
 1              THE COURT:  Are you going to draft an addendum?

 2              MR. BLOOD:  Yes, with something like this we can

 3    probably draft an addendum, or a modification of the

 4    settlement agreement.  I'll ask for defendants to look at it

 5    and sign off on it and we can submit it to the court.        21:25:39

 6              THE COURT:  Okay.  Did you, Mr. Palmer, did you

 7    have anything on that?

 8              MR. PALMER:  Would the 14 days to object provide --

 9              THE COURT:  The whole process.

10              MR. PALMER:  I would only ask that any addendums be 21:25:58

11    posted on the website along with any notice letting the class

12    members know that, if they want to comment on the allocation,

13    that they have the right to do so.

14              THE COURT:  Well, how would they know?  How would

15    they have any information to comment?                         21:26:21

16              MR. PALMER:  Well, if it was on the website.

17              THE COURT:  Even if it's on the website.

18              MR. PALMER:  If the addendum identifying what

19    lawyers are getting paid how much is on the website, then it

20    would certainly provide them the opportunity to compare the   21:26:33

21    amounts they are collecting with the amount of their lodestar

22    and comment on that.

23              I just don't think you can exclude class members

24    from -- or deny them the opportunity to comment about how

25    much their lawyers are being paid.                            21:26:51
```

```
 1              After all, one of the fundamental problems in these

 2   processes, your Honor, is this money, as soon as you give

 3   the green light, it belongs to the class, it no longer

 4   belongs to those guys over there, to Hydroxycut.  It all

 5   becomes class property.                                        21:27:05

 6              So what you are doing is that you are taking class

 7   property and you are paying the lawyers with it, and you have

 8   to include the class in this review process consistent with

 9   that.

10              THE COURT:  But it doesn't change the amount that    21:27:13

11   the class is getting and the amount that the lawyers are

12   getting.  All it does is change -- all it does is affect the

13   allocation amongst the lawyers.

14              MR. PALMER:  One of the things I was going to raise

15   is whether or not the court has considered the allocation in   21:27:28

16   conjunction with each recipient's actual multiplier.

17              In other words, are some -- are some firms

18   receiving a much greater multiplier than other firms?  The

19   firms simply that filed a tag-along lawsuit, why are they

20   getting paid at all?  Things like that.                       21:27:50

21              So those are just issues that I think -- you know,

22   one of the nice things about being objectors' counsel is,

23   your Honor, I don't necessarily have to propose the solution

24   to these difficult questions.  I just have to pose the

25   questions.                                                    21:28:03
```

1             MR. BLOOD:   And that deadline has passed and now he

2    wants to talk about allocation of attorney's fees which would

3    happen --

4             THE COURT:   Let me ask you this.   Is this something

5    that has to be done by modification of the settlement            21:28:13

6    agreement, or is this something that the court can do by

7    approving the settlement agreement subject to the following

8    conditions?

9             MR. BLOOD:   Well, I mean, if the defendants and the

10   plaintiffs agree, the court can do it subject to the            21:28:29

11   following conditions.   But let me -- I'm not sure it needs to

12   be so complicated.

13            We could certainly, if we haven't done it in this

14   case, we may well at some point, simply file a modification

15   to the settlement agreement, the settlement agreement          21:28:46

16   provides for that, that simply says with regard to the

17   allocation of attorney's fees here is what the process is.

18   And that addresses the court's concern that the court raised.

19            How those fees are ultimately allocated, who cares?

20   It's not something that any class member has any interest in.  21:29:03

21            It's not an objection that was raised by anyone,

22   not even by Mr. Palmer, and it doesn't really matter because,

23   as the court points out, the amount of attorney's fees --

24            THE COURT:   I agree with you there, and I'm not

25   inclined to place on the Internet what the different           21:29:18

1    attorneys are getting in terms of dollars and cents.

2           The class has an interest in knowing what of the

3    sum that could go into the settlement is going to attorney's

4    fees, but as to which lawyer -- because if that's the fair

5    sum, that means the lawyers as a group are entitled to this,     21:29:37

6    and if one lawyer is willing to accept less to give another

7    lawyer a little bit more, I just don't see that the class

8    really has an interest in that.

9           MR. BLOOD:  Right.

10          THE COURT:  So my question, though, is does this        21:29:52

11   have to be done as an addendum to the settlement agreement?

12   Or my inclination is what I would say is if I'm approving the

13   settlement I'm approving it property subject to the following

14   conditions.

15          MR. BLOOD:  And the latter is perfectly acceptable     21:30:05

16   as long as the parties agree.

17          MR. GONZALEZ:  The latter is fine with the

18   defendant, your Honor.

19          THE COURT:  That if I accept the settlement it's

20   subject to the following --                                   21:30:15

21          MR. GONZALEZ:  And I completely agree with the

22   court's sentiment that, from the perspective of notice to

23   class members, once the court makes a determination that the

24   lawyers as a group are entitled to X, I don't think that the

25   class members have a right to know which lawyer at which firm  21:30:26

1    is getting how much money.

2            THE COURT:  Right.

3            MR. PALMER:  I would forcefully disagree with that.

4    I thin k that there is every reason to disclose to clients

5    how much their lawyers are getting paid and transparency must    21:30:38

6    be maintained and there is simply no harm in doing it.

7            Particularly if you are not extending the objection

8    period, why not tell people this is what we are paying this

9    lawyer.  After all, it's their money that is getting paid to

10   the lawyer.                                                      21:30:53

11           THE COURT:  Well, I don't think that they have any

12   ability or right to object if they think one lawyer is

13   getting paid too much as long as the total amount -- because

14   if one lawyer is getting paid too much, another lawyer is

15   getting paid too little, and that lawyer doesn't mind.          21:31:09

16           And so it's really, since there is no obligation --

17   if there were an obligation, in other words, for a class

18   member to reimburse their lawyer for the difference between

19   their agreed-upon fee and what they obtain in the class

20   action, then there would certainly be standing to raise the     21:31:26

21   argument.

22           But I don't see that they have an interest in the

23   allocation amongst the lawyers so long as the ultimate amount

24   that the lawyers are getting has been approved.

25           MR. PALMER:  Well, your Honor, if one lawyer is         21:31:41

1    willing to take less why shouldn't the difference go to the

2    class instead of some other lawyer?  That's the question.

3            THE COURT:  Because they are only willing to take

4    less because they're valuing the contribution of another

5    lawyer greater than perhaps they might otherwise be valued.      21:31:56

6            So if I approve it, I will approve it subject to

7    the process that any allocation, proposed allocation -- that

8    there be a proposed allocation by class counsel of the

9    distribution of attorney's fees to the various lawyers

10   involved; that anyone who wanted to object to that can, but     21:32:20

11   they have to meet and confer with class counsel about it

12   first, and then they would have to file a brief statement of

13   objection.  It's a brief statement of objection within

14   14 days of receiving the notice of allocation.  And then the

15   court will set a briefing schedule.                             21:32:44

16           So the 14 days -- it's a one-page thing, I object

17   to the allocation.  So it's not going to be burdensome.  It's

18   not going to be anything that chills their right to make the

19   objection.

20           Okay?  Next I want to cover the $3,000 per named       21:32:56

21   class member.

22           MR. BLOOD:  And that is all within the discretion

23   of the court.  And we have made evidentiary submissions on

24   why people are entitled to any sort of payment.

25           $3,000 is on the low end of what currently is being    21:33:16

```
 1    awarded by courts to class members.
 2              THE COURT:  But is there evidence that all of the
 3    class members did something?
 4              MR. BLOOD:  Yes.  All of the class representatives?
 5              THE COURT:  How many are there?                       21:33:33
 6              MR. Blood:  I believe there is.  There are a number
 7    of them.  It's an MDL proceeding so there are quite a number
 8    of them.
 9              They would be in the attorney declarations.  In
10    other words if somebody from -- a lawyer in Alabama has a     21:33:46
11    client, it's their client and they would have provided the
12    evidentiary basis for that.
13              THE COURT:  And I didn't have a -off list for each
14    one of them.  Are you sure that there is something for each
15    one of them?                                                   21:34:03
16              MR. BLOOD:  I am not sure.  Let me -- I did not go
17    and look and see if everybody did one.  I could certainly do
18    that for the court.
19              THE COURT:  Mr. Palmer, I think you made an
20    objection on this.                                             21:34:19
21              MR. PALMER:  I think the Ninth Circuit is becoming
22    more critical of doling out funds.  I don't think the amount
23    necessarily is -- I mean, he's right, it's on the low end.
24              THE COURT:  Right.
25              MR. PALMER:  But whether or not there is sufficient  21:34:41
```

1   evidence to support that award for each and every one of

2   these, I don't know how many there are, but if there are 30

3   or 40 of them, then, you know, if the named plaintiffs in the

4   tag-along cases are getting the same amount as the named

5   plaintiffs in the principal cases, then I think it poses a          21:35:00

6   question.

7          Again I don't have the solution.  I just think it's

8   a question for inquiry.

9          THE COURT:  Well, here is how I come out.  Does the

10  defense want to say anything on this?                               21:35:16

11         MR. TARANTINO:  No, your Honor.  I mean, I second

12  that the amount is on the low end.  We believe there is

13  around 20 to 22 class representatives, but I also don't have

14  information on their particular activities.

15         MR. BLOOD:  Your Honor, I might also add that the          21:35:31

16  amount of money is being paid by the defendants.  It's not

17  come know out of the class fund.

18         So while the class would have an interest, they

19  would have a reduced interest in the aggregate amount that is

20  paid by the defendant for incentive awards.                        21:35:43

21         THE COURT:  This is sort of the flip side of your

22  concerns about Mr. Palmer.  My concerns are that people not

23  bring class actions for the wrong reason, that they bring it

24  because they are going to get X number of dollars.

25         So they have to do something.  If their lawyer          21:36:02

1    writes -- you know, talks to people in the community saying

2    anybody who bought Hydroxycut, there is a problem here, I'm

3    willing to bring a class action, and someone comes in and

4    says, "I bought it, here is my proof," I don't think that's

5    worth $3,000.  So they have to do something.                         21:36:21

6            On the other hand, a lot of the class, named class

7    members, did something, did something worth more than $3,000,

8    I bet several of them did.  The $3,000 really is a nominal

9    sum and it's one of the lower sums that I have considered for

10   class representatives.  But there needs to be proof that they   21:36:44

11   did something.

12           And so what I'll do is I'll go back and see if

13   there is the proof for each one of them.

14           MR. BLOOD:  And, your Honor, at a minimum all of

15   them by definition did step forward and bring a lawsuit.        21:36:58

16           Whether or not that's worth $3,000 -- I just would

17   like to note that somebody loaning themselves to a class

18   action lawsuit is in and of itself something that a lot of

19   other people would not do that's out there and that does

20   provide a benefit.                                              21:37:16

21           So even if there is no evidentiary record, the fact

22   that somebody did step forward and was willing to pursue a

23   class action lawsuit I think is worth something.

24           THE COURT:  Is there any case law that says just by

25   filing a class action lawsuit that that's enough to get a       21:37:30

1    premium in the settlement?

2          MR. BLOOD:  There is not really a whole lot of case

3    law discussing incentive awards generally, other than at the

4    very, very high end.  But not that I'm aware of.  Much more

5    what most people do when they come across a consumer wrong,          21:37:49

6    most people don't step forward.

7          MR. PALMER:  There is law that, in fact, the

8    Experian opinion, that just came down yesterday that talks

9    about the real trouble with incentivizing class members to

10   either, either on a sliding scale of the settlement amount or       21:38:07

11   as in Experian where they only got an award if they approved

12   and agreed to join in on the approval of the settlement.

13         The case law regarding the amount talks about

14   comparing what the class is getting with what the class reps

15   are getting.  So here you are comparing $25 with $3,000, and       21:38:27

16   it's a large difference, of course.

17         But I concur to some degree with what Mr. Blood

18   said about having some incentive of people risking a

19   deposition, putting their name in a public record forever,

20   that sort of thing, bringing these cases.  I think it's            21:38:51

21   important that people step forward to bring them.

22         I can't say that in this case I would be alarmed by

23   the $3,000 amount.  In another case I objected in recently

24   the lady wanted $400,000.  That was a serious problem.

25         MR. BLOOD:  I would agree with that, that that            21:39:12

 1    that's a problem.

 2            THE COURT:  I'll take a look at that.  Does anyone

 3    who is appearing by phone want to be heard on that issue?

 4    Okay.  Nope?  All right.

 5            The next one is the cy pres.  My understanding is    21:39:26

 6    that what is left over from the settlement would go to the

 7    personal injury fund because there is the settlement in that

 8    case, and then what's left over, and the high likelihood is

 9    there is not going to be anything left over, but what is left

10    over would then go to the, what's it called, the Change Lab?   21:39:44

11            MR. BLOOD:  Change Lab Solutions, yes.

12            THE COURT:  Change Lab Solutions.  So, Mr. Palmer,

13    do you want to go first on this?

14            MR. PALMER:  Thank you, your Honor.  I think I

15    mentioned this concept earlier, and that is, what we are       21:39:59

16    talking about is distributing money and property that belongs

17    to the class.  We are not distributing Hydroxycut's money

18    once we get to this cy pres process.

19            And so the case law, in particular Dennis v.

20    Kellogg.  Says that you have to provide some indirect benefit  21:40:17

21    for the class.  And I would submit that giving this money to

22    people who actually aren't class members, who are withdrawing

23    from the class and who are pursuing their own cases, is not

24    consistent with Dennis v. Kellogg, that it would be much more

25    consistent to give all of the residual funds to Change Lab,    21:40:39

1    who indeed might provide some directly to class members.

2            Otherwise all we are doing, instead of a reversion

3    of the money to Hydroxycut, we are doing a diversion to

4    benefit Hydroxycut by taking this leftover money and paying

5    damages that they should be directly responsible for.  So we          21:41:00

6    are using class money to pay damages suffered by these

7    personal injury claimants.

8            The other thing that I would have to say about the

9    cy pres is that there is this giveaway component, and I think

10   that is troubling.  And I think it's very troubling if you           21:41:19

11   read closely what the court examined in the Dennis v. Kellogg

12   case where Kellogg said, we are going to give $5 million

13   worth of food to hungry people.

14           And we raised the question of, well, you say it's

15   $5 million, but is that retail, or is that food you are              21:41:35

16   already giving away, you're just going to call part of it

17   part of this settlement?

18           And here what we are going to do is give coupons

19   away.  Well, how many coupons are they otherwise giving away?

20   And how do we measure the value of these products?  If you          21:41:50

21   are going to give products away, is it at cost, you know?

22           And there is just all these questions about what

23   that other $10 million is really costing Hydroxycut.  So I

24   don't want to confuse it too much, but I think there are some

25   serious questions about how we take the class's property and         21:42:10

```
 1   give it to somebody else, and I think that's really
 2   problematic here when we are giving it to these personal
 3   injury claimants who are completely separate from this
 4   lawsuit.
 5            THE COURT:  Before you get into -- before you get     21:42:22
 6   into the issue about the money going to the personal injury
 7   claimants, I just want to make sure I understand how this
 8   works dealing with the product.
 9            So it's easy if it's cash.  But if it's product,
10   essentially what people can get is they can get this product   21:42:56
11   bundle; right?
12            MR. BLOOD:  Yes.
13            THE COURT:  So there is $10 million of that; right?
14            MR. BLOOD:  Yes.
15            THE COURT:  I'm going to sneeze one more time.  I      21:43:08
16   must be allergic to this case.  One more.
17            MR. BLOOD:  One more reason to get rid of it, your
18   Honor.
19            THE COURT:  I'm not one to get rid of things.  And
20   it's like $4 million of this, of the $10 million product       21:43:25
21   side, could go over to the cash side; right?
22            MR. BLOOD:  Yes.
23            THE COURT:  And so that would leave $6 million on
24   the product side.  So if there is leftover product, how do we
25   apply the cy pres to that?                                     21:43:41
```

1          MR. BLOOD:  The leftover product gets cy pres'ed in

2     sort of an old-fashioned cy pres method.  The leftover

3     product is used, is given away to future purchasers of

4     Hydroxycut products, and the settlement agreement has

5     built-in safeguards so they can't use it for promotional          21:44:00

6     purposes.

7          It has to be separate and apart from ordinary

8     promotional purposes that they might use it for, and so

9     that's how it gets distributed, the notion being that class

10     members who have used it in the past, the products in the          21:44:14

11     past, may use it in the future.

12          THE COURT:  But how is that actually going to work?

13          MR. BLOOD:  Well, it's really left up to the

14     defendants on how to put them together.  It's sort of you go

15     in the store and you have, you know, one product and you have          21:44:29

16     another product packaged with it, and that other product they

17     don't pay anything for.  So it will literally be on the store

18     shelves as a free bottle.

19          THE COURT:  Am I correct that they have to submit

20     some sort of declaration to the court as to how they did          21:44:45

21     that?

22          I read this, and I don't want to kind of mix things

23     up, but I think the defendants have to submit certain

24     declarations to show compliance.  Was this one of the things

25     that they had to --          21:44:58

1          MR. BLOOD:  Yes, they have to show compliance.

2    Absolutely.  They have to show compliance on how they went

3    about distributing the product in a cy pres fashion.

4          THE COURT:  So there is not going to be any

5    distribution to the personal injury plaintiffs or to that          21:45:12

6    Change Lab Solutions for product.

7          MR. BLOOD:  Correct.

8          THE COURT:  So now deal with the other issue.  Why

9    should it go to the personal injury --

10         MR. BLOOD:  I think Mr. Palmer identified the issue     21:45:28

11   correctly, but I think he got the facts wrong.  And as he

12   just stated, you know, the problem with the cash portion of

13   the cy pres is that the group of people that would be

14   receiving it are, quote, completely separate from this

15   lawsuit.                                                            21:45:43

16         But, of course, they're not completely separate

17   from the lawsuit.  These are people that would be class

18   members except they suffered the personal -- the very

19   personal injuries that we allege resulted in the false

20   advertising.                                                       21:45:59

21         These are the people -- these are purchasers of

22   these Hydroxycut products who have been injured, as we allege

23   in the complaint, that made the representations about safety,

24   allegedly false.

25         So these are the folks that are directly related to    21:46:12

1    this lawsuit.  And the test for cy pres is not are the class

2    members receiving a direct benefit.  The reason for cy pres

3    --

4              THE COURT:  Why aren't they part of the class?  Why

5    wouldn't they be part of the class?                          21:46:29

6              MR. BLOOD:  They actually -- they could be.  It's

7    more the personal injury lawyers on the plaintiffs' side tend

8    to get nervous when there is a relief, with a class action.

9    They would rather have no relief whatsoever that touches

10   their clients.                                               21:46:44

11             But they certainly could be.  The class definition

12   could simply exclude from the exclusion portion anybody who

13   suffered personal injuries and then the relief, which does

14   already, excludes personal injury damages.

15             So the class, we could modify the class definition  21:46:59

16   right now and they would be class members.  They would be

17   entitled to submit claims for the purchase of the product and

18   then they would still have preserved the right to pursue

19   personal injury damages.

20             And I have spoken to the defendants and the        21:47:13

21   defendants would be fine with that change.

22             THE COURT:  But I think then that would really

23   require notice and renotice process because you are

24   extending -- you are bringing more people into the class.

25             MR. BLOOD:  Well, it wouldn't require renoticing.   21:47:24

1    What it would require, the effect would be it would require

2    renoticing of those people who are being brought in.  And

3    those who can participate in the cy pres distribution have to

4    have had a lawsuit on file within a date certain.

5           So everybody knows who those people are, who those          21:47:45

6    lawsuits are.  Certainly the defendants would know who those

7    people are because those people have already filed claims and

8    defendants would know about those claims.

9           So at most those folks would be told about it.

10   They are largely already on the phone right now, and they          21:48:02

11   have known about it because it's an MDL and they have been

12   involved in this case all along.

13          And those that have other state cases, as your

14   Honor is aware, those lawyers have been involved in

15   coordination proceedings with this MDL proceeding.                 21:48:16

16          THE COURT:  Let me ask you this:  Why don't you

17   tell me some more about Change Lab Solutions.

18          MR. BLOOD:  So Change Lab Solutions is an

19   organization that combats false advertising and deals with

20   nutritional issues, including and especially obesity.  And         21:48:30

21   they combat false advertising as one of their missions.  What

22   they want to do is to teach people to eat better and in a

23   more nutritious fashion.

24          The connection, the obvious connection, is they

25   combat false advertising which is right in the declaration         21:48:47

1    submitted by the declarant for Change Lab Solutions, and they

2    encourage healthy eating, including weight loss by healthy

3    eating as opposed to dietary supplements.

4              THE COURT:   Is there any connection between any of

5    the class action plaintiffs or their lawyers and Change Lab?   21:49:05

6              MR. BLOOD:   Not that I'm aware.   There is certainly

7    no connection to me or my firm or Ms. Ryan's firm, and there

8    is a lot of lawyers in this case.   I am not aware of any

9    connection whatsoever.

10             And Change Lab Solutions was somebody who had          21:49:21

11   contacted me because occasionally I will be contacted by

12   people who, organizations who, are looking for cy pres money,

13   and that's how I learned about them.

14             THE COURT:   In another case that I had, that dealt

15   with antitrust violations dealing with gasoline products, the  21:49:41

16   cy pres fund went to the State Attorney General, the

17   California Attorney General, but that case was limited to

18   California, and they have a litigation fund for antitrust

19   violations.

20             MR. BLOOD:   The money -- the case law says that the  21:50:01

21   money in a situation like this, because one of the purposes

22   of the statute is deterrence, it could actually go -- it

23   would go to the Federal Treasury, the U.S. Treasury, and then

24   would be escheated over to the government after four or five

25   years, something like that.                                     21:50:20

```
 1            I think that that would be a horrible waste of the
 2   money that could actually do some good for people who have
 3   been injured and need some good being done for them because
 4   they have -- because they believed the false advertising,
 5   took the product, and were injured as a result.          21:50:35
 6            THE COURT:  Mr. Palmer, did you want to say
 7   anything further on this?
 8            MR. PALMER:  This will not pass muster, giving the
 9   class's money to someone else.  And then there is a question
10   of are the plaintiffs' lawyers for the personal injury      21:50:52
11   victims, are they going to collect fees on that additional
12   distribution?
13            THE COURT:  I think the answer is clearly no.  Do
14   you agree with that?  Let me make sure they agree.
15            MR. BLOOD:  I don't know what the personal injury   21:51:05
16   lawyers are doing.  I assume they are going to -- I assume
17   that they would be paid for the work they did on those, from
18   whatever the source of the funds comes from.  I would assume.
19            THE COURT:  I guess if they have a contingency
20   agreement then, and, for example, if this money -- if someone 21:51:22
21   was getting $10,000 as opposed to $9,000 and there was a
22   25 percent contingency agreement, the lawyers would I guess
23   get another $250.
24            MR. BLOOD:  But they are not getting paid directly
25   from the class action.  They are not going to be paid as part 21:51:43
```

```
 1    of the attorneys' fees allocation that we were talking about

 2    earlier.

 3           MR. PALMER:  Right.  So the class would be paid

 4    fees, they would be paid fees twice on the same money.  So we

 5    are going to take leftover class money and give it away to      21:51:56

 6    somebody that just isn't in the class.

 7           That is the real problem, your Honor, is that these

 8    people have their own lawsuits and you are diverting the

 9    money.  It benefits nobody but Hydroxycut.  Likewise -- well,

10    that's really the sum of it.                                    21:52:13

11           MR. BLOOD:  But, your Honor, the test is not and

12    has never been that it goes to members of the class.  The

13    question is whether it's in the interest of the silent class

14    members, in their interest, which is why a whole wide range

15    of charities have been approved.                                21:52:33

16           Change Lab Solutions is a prototypical appropriate

17    charity, that any benefit that goes to class members would be

18    very indirect.

19           If you take a look at the Facebook decision, the

20    Ninth Circuit decision, there is no indication that any         21:52:48

21    member of that class is going to be even indirectly

22    benefitted by that cy pres distribution.

23           It simply has something to do with the case, and it

24    has some connection to the class.  Class members were on line

25    because they go on line for Facebook.  And the organization     21:53:07
```

```
 1   can work -- can work with regulators or businesses or

 2   individuals, they don't say which individuals, to work on

 3   on-line privacy issues.

 4          But it just has to be something interested in the

 5   class.  And these are all the same people.  These are people     21:53:26

 6   who walked into the store at the same time and bought the

 7   same products for the same reasons, including that false

 8   advertising that is alleged.

 9          And some of the people were injured and those are

10   the people that would be receiving these funds.                  21:53:41

11          THE COURT:  Mr. Palmer, I don't see how that helps

12   Hydroxycut anymore because Hydroxycut has settled with the

13   personal injury people so they are going to get a release.

14          So say there is, I don't know what the amount is

15   that went into that -- that is supposed to go into that fund,    21:53:56

16   but let's just say for easy math it's $10 million.  They're

17   done with that.

18          So this doesn't -- if there is $1 million left over

19   from the class action fund, all that does is it makes the

20   injured parties more whole.  It doesn't help Hydroxycut at       21:54:18

21   all.  Am I wrong?

22          MR. HOOD:  You are correct, your Honor.

23          MR. PALMER:  You're not wrong.  And you are a

24   federal judge.  Your Honor you're never wrong.  But --

25          THE COURT:  Certain judges on the Ninth Circuit           21:54:33
```

```
 1    have let me know that's not the case.
 2            MR. PALMER:  The question is what indirect benefit
 3    does it provide to the class, and it doesn't provide any
 4    indirect benefit to the class.  And that's the question
 5    posed.  That's the test posed in the Dennis v. Kellogg case.   21:54:51
 6    And it's not just that there is a connection.  It has to
 7    benefit the class.
 8            THE COURT:  I understand, but doesn't it benefit
 9    the class and the nature of the lawsuit, that is, to deter
10    false advertising, by compensating people who have suffered   21:55:09
11    injuries from that false advertising?
12            MR. PALMER:  No.
13            THE COURT:  Why not?  How does that deter?  That
14    just compensates people who have suffered injuries.  It
15    doesn't help the silent class members at all.                 21:55:23
16            And why -- and if we are going to compensate them,
17    that should be Hydroxycut's burden, not this class's burden,
18    and that's would we are doing.  We are taking class money and
19    giving it to personal injury victims.
20            What we should be doing is taking class money and     21:55:39
21    giving it to someone who actually did something to prevent
22    this sort of false advertising in the future.
23            THE COURT:  If I were to have a concern about this,
24    you're talking about changing the class?
25            MR. BLOOD:  We could change the class.  I would       21:55:56
```

1    like to address Mr. Palmer's point though.

2         THE COURT:  I think his point, and I had the same

3    thought when I was going through this, I'm not saying that I

4    agree with it, but it's a concern that I'm trying to work

5    through, is that you benefit the class if you give it to an          21:56:12

6    organization that is going to help deter false advertising,

7    false advertising in this market sector in the future.

8         And the concern is that you're not benefitting the

9    purposes of the class action by giving it to the injured

10   individuals.                                                          21:56:36

11        MR. BLOOD:  Except you're taking a large sum of

12   money from the alleged -- from the defendant, and you're

13   taking that money away from them.  That is a classic

14   deterrence purpose of these very statutes.  And what are you

15   do go with it?                                                       21:56:52

16        You can either give it to some chart, perfectly

17   fine to give it to charities, I'm a big fan of that, or you

18   can give it directly to the people who are actually injured

19   as a result of the problem.

20        These are the would-be class members.  These are          21:57:02

21   the fellow purchasers.  It's just -- there is a connection.

22   It's a direct connection.  It serves the underlying purpose

23   of the statute.

24        And it also sends a message to all the other

25   supplement manufacturers out there that you had better be      21:57:16

```
 1    careful or else you are going to end up like the market

 2    leader and you are going to end up paying a lot of money, and

 3    it's the class deterrence impact --

 4            THE COURT:  I understand.

 5            MR. Blood:  -- on a very closely connected group of   21:57:30

 6    people.

 7            MR. PALMER:  It's the classic perversion of.

 8    cy pres, and that is we take money from the wrongdoer and we

 9    put it to good use, and they'll never do it again.

10            That is not what cy pres is about.  Cy pres is        21:57:43

11    about taking money that belongs to the class, that can't be

12    reasonably distributed to the class, and using it for a

13    purpose to benefit the class.

14            It has nothing whatsoever to do with the defendant.

15    It has to do with benefitting the class.                     21:57:59

16            THE COURT:  I understand.

17            MR. BLOOD:  Future Hydroxycut purchasers --

18            THE COURT:  We are just going round and round.  You

19    wanted to say something before.  I didn't know if you still

20    wanted to.                                                   21:58:11

21            MR. HOOD:  Mr. Blood covered everything for me.  I

22    don't want to beat a dead horse, sir.

23            MR. BLOOD:  Thank you.

24            THE COURT:  Is there anyone on the phone that

25    wanted to add anything further on this?  Okay.               21:58:20
```

1          Now, if I have a problem with it, and I'm not

2     saying that I do, I want to go back and study the cases on

3     this, but if I do have a problem then -- and that was the

4     subject of the -- it was a condition of approval, that it not

5     go to the class members, that it go to some other -- excuse        21:58:48

6     me, that it not go to the personal injury members who are not

7     members of the class, is there some modifications that you

8     would want to make?

9          I'm trying to think of procedurally how this would

10    play out.                                                          21:59:06

11         MR. BLOOD:  If it didn't go to the purchasers who

12    suffered personal injuries?

13         THE COURT:  Right.

14         MR. BLOOD:  It could just go directly to Change Lab

15    Solutions.                                                         21:59:23

16         THE COURT:  It's not a situation where you would

17    want to modify the class?

18         MR. BLOOD:  I think modifying the class is

19    certainly -- is one option.  I mean, that literally seems

20    like form over substance, but form can be very important.         21:59:43

21         THE COURT:  If I get -- if I go down that -- if

22    that's the holding of the court, that it would not be proper

23    to pay it into the personal injury fund, then you would have

24    to -- I wouldn't say it's going to all go to the Change Lab

25    Solutions without further hearing, because that wasn't the        22:00:04

1    intent to begin with.

2              MR. BLOOD:  Right.  That's probably appropriate.

3              THE COURT:  So if you modify the class then we will

4    have to see where it goes from there.

5              MR. BLOOD:  If it modifies the class then it's          22:00:18

6    going to class members.

7              THE COURT:  Well, we will worry about that if I

8    reach that holding.  Okay.

9              Mr. Palmer, did you want to raise anything else,

10   your objections that we haven't covered so far?                    22:00:29

11             MR. PALMER:  Thank you, your Honor.  I would like

12   to discuss cy pres just a little bit more, particularly about

13   the product giveaway component.

14             What we are really talking about, your Honor, is

15   when you go to CVS and you want to buy some Advil and you          22:00:42

16   notice that this week you can get for the regular price,

17   instead of 200 Advil, you get the bonus amount of 250.  And

18   that's what is going to happen here.

19             They are simply going to give away a couple million

20   dollars' worth of product and say, okay, we have satisfied        22:00:59

21   it, and it's not necessarily going to the class.

22             The much more -- the more prudent thing would be to

23   force Hydroxycut to identify specifically what this product

24   giveaway is costing them and simply add that to the cy pres

25   fund and pay it as cash.  Otherwise it's just problematic,         22:01:19

```
 1   because the court simply will not be able to identify the

 2   value, nor will it be able to assure --

 3            THE COURT:  Doesn't that just change the whole

 4   structure of the settlement --

 5            MR. PALMER:  I don't think so.                    22:01:37

 6            THE COURT:  -- if they increase the amount of cash

 7   that they have to pay in?

 8            MR. PALMER:  It decreases it?

 9            THE COURT:  Increases.

10            MR. PALMER:  Well, whether they are paying their   22:01:46

11   workers to produce pills at their factory or taking that same

12   money and giving it to the class, what difference would it

13   make if they identify specifically what it costs them?

14            THE COURT:  Does Hydroxycut want to be heard on

15   that?                                                     22:02:01

16            MR. TARANTINO:  Your Honor, I do think it changes

17   the structure of the settlement.  In terms of cy pres, the

18   product giveaway was designed to identify members of the

19   class.  And the people that purchase Hydroxycut now are

20   likely going to be the people who purchase Hydroxycut in the 22:02:16

21   future.

22            So it's a matter of directly reaching out to people

23   that are the closest possible analogs to class members, and

24   giving them some concrete value as a result of the residual

25   cy pres.                                                  22:02:33
```

1          Converting it into cash, under Palmer's theory,

2    would just have it go to an additional charity, which is far

3    more tenuous in terms of its relationship to the class.

4          THE COURT:  Okay.  Anything else on this?

5          MR. BLOOD:  No.  Your Honor, I just direct that the        22:02:47

6    court has already alluded to it.  There are a number of

7    provisions in the settlement agreement that puts boundaries

8    on the product distribution, that I think make a lot of sense

9    and I think cover the waterfront, including the one that is a

10   legitimate issue, but it's addressed, and that is making sure     22:03:02

11   it doesn't turn into just a promotional offer.  And there is

12   provisions in there to prevent that.

13         And they also have to value it at 15 percent less

14   than the retail value.

15         THE COURT:  Okay.  Mr. Palmer, anything else you            22:03:18

16   want to be heard on on your objections?

17         MR. PALMER:  Thank you, your Honor.  The only other

18   thing that I wanted to be heard on was a small issue

19   regarding fees.  Right now what we have is a $15 million cash

20   fund, the $5 million in fees and $10 million in cash.            22:03:35

21         THE COURT:  Is this in your written objections?

22         MR. PALMER:  Yes, it is, your Honor.

23         THE COURT:  Where?  I'm sorry, which -- you mean on

24   page four, part eight?

25         MR. PALMER:  On page four of the objections, yes.          22:03:57

```
 1              THE COURT:  Okay.

 2              MR. PALMER:  Yes.

 3              THE COURT:  Go ahead.

 4              MR. PALMER:  Again, I would urge the court to not

 5    pay fees on the mark-up of Hydroxycut that is being given        22:04:13

 6    away either on a cy pres basis or distributed to class

 7    members directly as part of the distribution.

 8              I think that sums it up, your Honor, because if

 9    it's a $15 million cash fund, the lawyers are taking a third

10    of it.  If it's an $18 million cash fund, because these         22:04:36

11    products actually cost them $3 million, then the percentage

12    is a little less.

13              THE COURT:  But isn't -- aren't they entitled to a

14    percentage on the value to the class?  Isn't the value to the

15    class the retail value?                                         22:04:56

16              I see what you're saying.  You're saying that it's

17    a greater percentage on -- that they're talking about

18    21 percent and you're saying, well, if you reduce the value

19    of the product giveaway or compensation to its cost to

20    Hydroxycut, it's going to lower it.                             22:05:18

21              Say there is a 50 percent markup, so that changes

22    the fees to be divided, instead of 20 million, by 15 million,

23    but the question is not what the objective value to the

24    economy is, or the loss to the defendant.

25              The question is what is the value to the class.       22:05:41
```

```
 1    And isn't the value to the class the retail value?
 2              MR. PALMER:  I don't think so, particularly when
 3    you look at how much is going to go back into cy pres.  And I
 4    think you have to really ask the question why did Hydroxycut
 5    insist on $10 million cash and $10 million in product.           22:05:58
 6              Well, we know the answer to that.  Because the $10
 7    million in product is probably only costing them $3 million.
 8              THE COURT:  Well, that may be, and to them the
 9    value of the settlement is 13 million, and they're not
10    willing to settle for something that costs them 20 million.     22:06:14
11              MR. PALMER:  Then we shouldn't be paying the
12    lawyers on the $7 million markup, your Honor.
13              THE COURT:  But the difference is there is a
14    difference in costs to the defendant and value to the class.
15    They are entitled to the -- they are entitled to their         22:06:28
16    compensation on the value to the class.  It's like quantum
17    meruit.
18              You know, in terms of restitution, you know, the
19    old case that we all learned in law school, there is a
20    contract that fails and someone paints the house, and the      22:06:44
21    value given to the homeowner is $5000.  That's the value of
22    the increase in the property to the house.
23              But if you take away the profit, et cetera, of the
24    painter, it only costs painter $3,000.  The quantum meruit
25    recovery is the 5000, not the cost to the defendant.           22:07:05
```

1          MR. PALMER:  I think this gives us a glimpse into

2    the new frontier for class actions and the challenges for

3    class action lawyers, and that is, starting to move some of

4    the burden for distribution of settlements to their clients,

5    upon class members, opposed to simply letting the class                22:07:25

6    administrators doing the best job and paying -- and also the

7    question of whether or not class lawyers should be paid full

8    rate for cy pres distributions, for indirect benefit to their

9    client as opposed to a direct benefit to their client, and I

10   think the court should contemplate those questions.                    22:07:45

11         THE COURT:  My bigger concern is not to disrupt the

12   complex settlement negotiation result on -- you know, this is

13   a case that you disapprove a settlement and you force the

14   case to trial, the defendants could win.

15         This is no slam dunk for the plaintiffs.  And so                 22:08:04

16   everybody has made business decisions here, and the court

17   shouldn't substitute its business decision.

18         So, okay.  Anything else you want to add to your

19   objections that you --

20         MR. PALMER:  Thank you, your Honor.  Not at this                 22:08:21

21   time.

22         THE COURT:  And does the defense want to chime in

23   on anything?

24         MR. GONZALEZ:  I don't think we have anything to

25   add to what you've already stated on the record, your Honor.          22:08:30

1    Thank you.

2              THE COURT:   Okay.   How about those who are

3    appearing by telephone, does anyone want to add anything?

4    Nope.   Okay.

5              So we have a hearing date.   We'll resolve the        22:08:41

6    standing issue before I issue my opinion on approval or

7    disapproval of the class.   Is there anything else we need to

8    do?

9              MR. BLOOD:   Not from the class's perspective.

10   Thank you, your Honor.                                          22:08:58

11             THE COURT:   Does anyone know what the status is of

12   the personal injury cases?   I know there was a settlement

13   there.   There is supposed to be a settlement fund and I have

14   not seen any papers.   I don't know to what degree I get

15   involved.                                                       22:09:12

16             MR. HOOD:   Yes, your Honor.   We are moving right

17   along in the settlement process.   The plaintiffs' side had a

18   meeting with the counsel who have cases filed in both the

19   federal and the state court consolidation programs.

20             We are moving into identifying those plaintiffs,      22:09:25

21   getting them information so they can make an informed

22   decision about whether they want to participate in the

23   program.

24             And then we have also set up a number of different

25   mechanisms for them to participate and to move forward with    22:09:36

```
 1    their claim.  And that's pretty much where we are at the
 2    moment.
 3              THE COURT:  Okay.  Does anybody have anything else
 4    then?
 5              MR. TARANTINO:  Just on personal injury cases, we       22:09:49
 6    should probably set a further status conference to make sure
 7    the allocation process moves along.
 8              THE COURT:  Okay.  We will do that.  We will enter
 9    an order setting a date for that.  So if I approve it, and I
10    find standing or no standing, so there will be an order in      22:10:09
11    that regard, then what's the next step?
12              MR. BLOOD:  If the settlement is approved then we
13    will start implementation of the settlement process.
14              THE COURT:  And if I disprove it then you're back
15    to you are either appealing or back to the negotiation.         22:10:25
16              MR. Blood:  Right.  We probably need a status
17    conference at that point.
18              THE COURT:  I mean, I don't want to keep you in
19    great suspense.  In great terms, I think the settlement is a
20    fair, just, and reasonable settlement.                          22:10:45
21              I'm very familiar with these cases, and I
22    understand the risks that are involved in the litigation and
23    the costs and how long it would take to resolve the
24    litigation, and ultimately in terms of the -- and no one has
25    objected to the amount of the settlement.                       22:11:04
```

```
1              I think that it's a fair and reasonable and

2    adequate settlement, and I intend to so hold.  Whether there

3    are problems based upon some of the objections that Mr.

4    Palmer made or that I raised myself, that's a smaller issues,

5    but overall you can expect that I intend to approve the          22:11:27

6    settlement in general.

7              MR. BLOOD:  Thank you, your Honor.

8              THE COURT:  I didn't want you to worry about it for

9    a month.

10             MR. BLOOD:  I appreciate that.                          22:11:36

11             THE COURT:  All right.

12             MR. Blood:  Thank you.

13             THE COURT:  Anything further?

14             MR. GONZALEZ:  Thank you, your Honor.

15             THE COURT:  Okay.  Thank you.  And, Mr. Palmer,         22:11:41

16   anything you can do so we can resolve this case, this

17   standing issue, in the most expeditious way.

18             I'm sure you don't like depositions where everybody

19   is objecting and you have to get the judge on the phone and

20   this and that, and we would have all sorts of issues, if it      22:11:56

21   were in Texas, whether it's a judge in Texas who has to rule.

22             So anything you can do to make it smooth so we can

23   just do it in one sitting I think would be appropriate.  And

24   we can do videoconferencing if there is consent, but there

25   would have to be consent.  We have the facilities to do it.      22:12:19
```

1     We have done it.

2              MR. PALMER:  I'll meet with Mr. Blood and see what

3     we can work out, work out all the details.

4              THE COURT:  All right.  Thank you, everybody.

5     Thank you.  And you are going to file the proof of --          22:12:30

6              MR. TARANTINO:  Yes, I will do that no later than

7     tomorrow.

8              THE COURT:  Okay.  Thank you.

9              MR. BLOOD:  Thank you.

10              (This matter was in recess.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2
 3                          CERTIFICATION
 4
 5              I hereby certify that I am a duly appointed,
 6  qualified and acting official court reporter for the United
 7  States District Court; that the foregoing is a true and
 8  correct transcript of the proceedings had in the
 9  aforementioned cause; that said transcript is a true and
10  correct transcription of my stenographic notes; and that the
11  format used herein complies with the rules and requirements
12  of the United States Judicial Conference.
13
14  Dated:   May 28, 2013 2009 at San Diego, California
15
16
17
18  S/Barbara Harris
19
20  Barbara Harris, Official Reporter
21
22
23
24
25
```

Exhibit B

## Page 1

```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF LOUISIANA
 2
 3   *************************************************************
     IN RE:  OIL SPILL BY THE
     OIL RIG DEEPWATER HORIZON
     IN THE GULF OF MEXICO ON
     APRIL 20, 2010

         CIVIL ACTION NO. 10-MD-2179 "J"
         NEW ORLEANS, LOUISIANA
         THURSDAY, NOVEMBER 8, 2012, 8:30 A.M.

     THIS DOCUMENT RELATES TO:

     CIVIL ACTION #12-968,
     PLAISANCE, ET AL V. BP
     EXPLORATION & PRODUCTION,
     INC., ET AL
     CIVIL ACTION #12-970,
     BON SECOUR FISHERIES,
     INC., ET AL V. BP
     EXPLORATION & PRODUCTION,
     INC., ET AL

     *************************************************************

         TRANSCRIPT OF FINAL FAIRNESS HEARING PROCEEDINGS
         HEARD BEFORE THE HONORABLE CARL J. BARBIER
         UNITED STATES DISTRICT JUDGE

     APPEARANCES:

     FOR THE PLAINTIFFS'
     LIAISON COUNSEL:    DOMENGEAUX WRIGHT ROY & EDWARDS
         BY:  JAMES P. ROY, ESQUIRE
         556 JEFFERSON STREET
         LAFAYETTE, LA  70502

         HERMAN HERMAN & KATZ
         BY:  STEPHEN J. HERMAN, ESQUIRE
         820 O'KEEFE AVENUE
```

## Page 2

```
 1   APPEARANCES CONTINUED:
 2
 3   FOR THE PLAINTIFFS:  LIEFF CABRASER HEIMANN & BERNSTEIN
         BY:  ELIZABETH J. CABRASER, ESQUIRE
 4       275 BATTERY STREET, 29TH FLOOR
         SAN FRANCISCO, CA  94111
 5
 6
         WEITZ & LUXENBERG
 7       BY:  ROBIN L. GREENWALD, ESQUIRE
         700 BROADWAY
 8       NEW YORK CITY, NY  10003
 9
10
     FOR BP AMERICA INC.,
11   BP AMERICA PRODUCTION
     COMPANY, BP COMPANY
12   NORTH AMERICA INC.,
     BP CORPORATION NORTH
13   AMERICA INC.,
     BP EXPLORATION &
14   PRODUCTION INC.,
     BP HOLDINGS NORTH
15   AMERICA LIMITED,
     BP PRODUCTS NORTH
16   AMERICA INC.:    LISKOW & LEWIS
         BY:  DON K. HAYCRAFT, ESQUIRE
17       ONE SHELL SQUARE
         701 POYDRAS STREET
18       SUITE 5000
         NEW ORLEANS, LA 70139
19
20       KIRKLAND & ELLIS
         BY:  RICHARD C. GODFREY, ESQUIRE
21       J. ANDREW LANGAN, ESQUIRE
         300 N. LASALLE
22       CHICAGO, IL 60654
23
         KIRKLAND & ELLIS
24       BY:  ROBERT R. GASAWAY, ESQUIRE
         655 FIFTEENTH STREET, N.W.
25       WASHINGTON, DC  20005
```

## Page 3

```
 1   APPEARANCES CONTINUED:
 2
 3   SETTLEMENT OBJECTORS'
     REPRESENTATIVE
 4   COUNSEL:    STUART SMITH, ESQUIRE
         MARTHA CURTIS, ESQUIRE
 5       RONNIE PENTON, ESQUIRE
         JOEL WALTZER, ESQUIRE
 6       JOSEPH DARRELL PALMER, ESQUIRE
         ROBERT MCKEE, ESQUIRE
 7       JASON MELANCON, ESQUIRE
         WILLIAM ROBERTS, ESQUIRE
 8
 9
10   COURT-APPOINTED CLAIMS
     ADMINISTRATOR:    PATRICK A. JUNEAU
11       MICHAEL JUNEAU
12
13
14   OFFICIAL COURT REPORTER:  CATHY PEPPER, CRR, RMR, CCR
         CERTIFIED REALTIME REPORTER
15       REGISTERED MERIT REPORTER
         500 POYDRAS STREET, ROOM HB406
16       NEW ORLEANS, LA  70130
         (504) 589-7779
17       Cathy_Pepper@laed.uscourts.gov
18
19   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
     PRODUCED BY COMPUTER
20
21
22
23
24
25
```

## Page 4

```
 1             I N D E X
 2
                                    PAGE
 3
 4   THE COURT..........................    7
 5   #12-970, BON SECOUR VERSUS BP, WHICH IS THE ECONOMIC
 6   AND PROPERTY DAMAGE PROPOSED SETTLEMENT..............    7
 7   CIVIL ACTION #12-968, PLAISANCE VERSUS BP, AND THAT
 8   BEING THE MEDICAL BENEFITS CLASS SETTLEMENT.........    7
 9   PRELIMINARY COMMENTS.................................    9
10   LEGAL STANDARD......................    15
11   ARGUMENT FROM COUNSEL...............................    18
12   MR. ROY.............    20
13   MR. HERMAN..........................    31
14   MR. GODFREY.........................    49
15   MR. ROBERTS.........................    76
16   CLAIMS ADMINISTRATOR JUNEAU.........................    80
17   MR. MICHAEL JUNEAU..................    87
18   MR. PATRICK JUNEAU..................    93
19   OBJECTORS...........................    101
20   MR. SMITH...........................    101
21   DIFFERENT BUSINESSES IN DESTIN AND IN THE KEYS AND
22   ALONG THE FLORIDA COAST.............................    101
23   COASTAL AND WETLANDS PROPERTY ZONES.................    119
24   MS. CURTIS..........................    119
25   MR. PENTON..........................    130
```

Page 221

1 are somewhat contradictory and without basis. Some complain
2 it's almost too generous. Okay, we paid more than we wanted
3 to, but that's not an objection that's valid to set aside a
4 settlement.
5         Others say that they are paying a premium for
6 class members' claim. It's not a valid objection.
7         Others object that the compensation amounts are
8 inadequate. That's not the view of class counsel. When you
9 look at the case law, that's certainly not supported in the
10 case law that these are inadequate benefits.
11        Others object that they're not in the class, but
12 they want to be in class. Well, that's not a valid objection
13 either.
14        Then others provide either no evidence or
15 unreliable, unscientific evidence and, frankly, hearsay or
16 speculation.
17        Some complain that opting out of the settlement
18 is not a viable option because they have negative value claims.
19 That's not a value objection. That says I have a little or no
20 value claim, and so why should I opt out; I can't get any money
21 if I opt out. Not a valid objection.
22        Some say the proof standards are too high. Well,
23 they're a whole lot lower in the class settlement than they are
24 in a court of law.
25        Your Honor was right. Liability, for example,

Page 222

1 with specific causation, you know, general causation, this is a
2 good deal from that standpoint.
3         Some complain that the settlement does not
4 provide for interim claims under OPA, even through OPA doesn't
5 apply to personal injury claims. So that is an objection, but
6 it's not a valid objection under the law.
7         Bottom line, none of the objections, cumulatively
8 or singularly, come anywhere close to satisfying the burden of
9 establishing that the settlement is unreasonable, unfair and
10 inadequate.
11        Unless Your Honor has any questions, I have a
12 short rebuttal time after we hear from the objectors' counsel.
13 But, once again, I appreciate the time.
14        Your Honor, I neglected to do one thing this
15 morning because I did not use all my slides, but I would like
16 to tender my demonstratives as a court exhibit that I used this
17 morning. They're just the slides I used, so there is a few
18 pages that will be because I did not use all the
19 slides. If I could tender that to Mr. Allums now, I would
20 appreciate it.
21        THE COURT: That's fine.
22        MR. GODFREY: Thank you very much.
23        THE COURT: All right. Now we'll hear from the
24 objectors.
25        Is there an objection by Mr. Palmer, who has been

Page 223

1 allotted five minutes?
2         MR. PALMER: Thank you very much, Your Honor.
3 Darrell Palmer on behalf of James Kirby, IV, Mike and Patricia
4 Sturdivant, and Susan Forsyth.
5         THE COURT: Who are those folks that you claim to
6 represent?
7         MR. PALMER: Who are they?
8         THE COURT: Who are they?
9         MR. PALMER: They are residents of west Florida.
10        THE COURT: Are they in the class?
11        MR. PALMER: Yes, sir.
12        THE COURT: Are you the same Mr. Palmer who appeared as
13 an objector in the District Court of the District of Minnesota
14 in the --
15        MR. PALMER: Plumb-PEX case.
16        THE COURT: -- plumbing fittings product liability
17 litigation. Are you the same person is my question?
18        MR. PALMER: I never appeared in the district court. I
19 appeared in the appellate court.
20        THE COURT: Well, you apparently filed objections in
21 that case.
22        MR. PALMER: I did. Yes, I did. I filed objections in
23 many, many cases, Your Honor. I'll be completely up front.
24 Including --
25        THE COURT: Apparently you've been considered as a

Page 224

1 so-called serial objector, right?
2         MR. PALMER: Well, I think that's particularly
3 pertinent when you look at --
4         THE COURT: Just answer my question, please. Have you
5 been called a serial objector?
6         MR. PALMER: I have.
7         THE COURT: Did the district court find that your
8 objections were evidence of bad faith and vexatious conduct?
9         MR. PALMER: I think that's regrettable that that
10 happened; yes, it is.
11        THE COURT: It says, "The Palmer objectors appear to be
12 represented by an attorney who has not entered an appearance in
13 this case, who is believed to be a serial objector to other
14 class actions," and they cite some evidence of that and refer
15 to you, Darrell Palmer.
16        MR. PALMER: That's right, Your Honor. I'd be happy to
17 submit a brief outlining all of the judges that have expressed
18 appreciation for the things I brought to the attention of the
19 court, including the judge in the Enron case where we made
20 substantial improvements to the tune of several hundred million
21 dollars and increased the claims period. The list is quite
22 long.
23        THE COURT: Stop one second. I'm sorry to interrupt
24 you.
25        I'm told by the U. S. Marshal that there is

Page 225

1 someone in this courtroom that is still live streaming from the
2 courtroom. Whoever it is needs to get up and leave right now.
3 If not, we're just going to terminate this hearing and resume
4 another day. Do we know who it is?
5          THE MARSHAL: I have an idea.
6          THE COURT: That is against the rules of this Court.
7 You're violating the rules of the Court in the courtroom, and
8 you have to leave right now. You cannot live stream a
9 proceeding from federal court outside the courtroom.
10          THE MARSHAL: It's someone in the back row, Judge.
11          THE COURT: Would you all stand there and observe these
12 people, because if any of them appear to be trying to live
13 stream this in any way, we're just going to remove them from
14 the courtroom. Okay.
15               I'm sorry to have to do this, but people have to
16 follow the rules here; and, if you're here to observe, you're
17 welcome, but you can't play by your own rules.
18               Mr. Palmer, I'm sorry to interrupt you. You have
19 another cy pres objection?
20          MR. PALMER: I do. I have an objection to the medical
21 component, where money apparently has already been distributed
22 for the public use along the coastal region.
23               The problem is, Your Honor -- and if I may, I
24 would just like to read a short quote by Chief Judge
25 Edith Jones from the Klier case.

Page 226

1          THE COURT: I'm very familiar with that case, but go
2 ahead and read your quote, if you want.
3          MR. PALMER: Thank you.
4               "The use of cy pres simultaneously violates the
5 constitutional dictates of separation of powers by employing a
6 Federal Rule of Civil Procedure to alter the compensatory
7 enforcement mechanism dictated by the applicable substantive
8 law being enforced in class action proceedings. It has somehow
9 become common practice among many Courts, scholars and members
10 of the public to view the modern class action as a
11 free-standing device designed to do justice and police
12 corporate evil-doers. As nothing more than a Federal Rule of
13 Civil Procedure, however, the class action device may do no
14 more than enforce existing substantive law as promulgated
15 either by Congress or in a diversity suit by applicable state
16 statutory or common law. Yet, in no instance of which we are
17 aware does the applicable substantive law sought to be enforced
18 in a Federal Class Action direct the violator to pay damages to
19 an uninjured charity."
20               In this case, Your Honor, it is a purely legal
21 objection. It is not a criticism of all of the great benefits
22 that this medical settlement provides. But the fact is that we
23 are now calling millions of dollars part of the settlement,
24 which makes it the property of the class, and we are
25 distributing that --

Page 227

1          THE COURT: Well, it wouldn't exist, it wouldn't go to
2 your client or any of the class members, because they are going
3 to be fully compensated for whatever their claim is.
4               Do you have authority from your clients to be
5 standing here? Did they make claims in this class?
6          MR. PALMER: Yes, they did.
7          THE COURT: So you represent persons who have made
8 claims for medical benefits under this class settlement, while,
9 at the same time, you're here saying that they sent you here to
10 try to blow up this settlement?
11          MR. PALMER: It is not blowing up the settlement.
12          THE COURT: Well, if you object, that's what you would
13 be doing.
14          MR. PALMER: Absolutely not. That's the whole purpose
15 of --
16          THE COURT: How are they affected by this if this is
17 approved?
18          MR. PALMER: Your Honor, Rule 23 provides for
19 objections. It doesn't mean that we are evil people or trying
20 to --
21          THE COURT: No one said you're an evil person. I just
22 said you have what's called a conflict, it seems to me, here.
23               On one hand, you represent -- I have serious
24 doubts that your clients even know you're here making this
25 objection, frankly, Mr. Palmer. Did your clients expressly

Page 228

1 authorize you to come here and oppose this settlement?
2          MR. PALMER: Absolutely.
3          THE COURT: Name the clients that authorized you to
4 come here and oppose this settlement.
5          MR. PALMER: All of them, Your Honor. James Kirby, the
6 Sturdivants and Ms. Forsyth.
7          THE COURT: You are an attorney of record in this
8 court?
9          MR. PALMER: I am. I used to be -- at one point, I was
10 co-counsel with Ms. Cabraser in a case in San Diego where we
11 recovered over $150 million in a scripts case. So --
12          THE COURT: That's all well and good, but it has
13 nothing to do with what we're talking about.
14               So go ahead. You have another couple minutes.
15 Go ahead.
16          MR. PALMER: Thank you, Your Honor.
17               The point is simply that we are taking class
18 funds and distributing it to nonclass members. That's the
19 point of the objection.
20               We're not trying to blow up the objection [sic].
21 We're trying to make sure that the objection passes legal
22 muster and is not vulnerable to reversal, where in -- just like
23 in the Dennis v. Kellogg case, the entire --
24          THE COURT: What would be your solution? What are you
25 asking me to do?

Page 229

1    MR. PALMER: That is not my job as an objector.
2    THE COURT: Well, what do you think is going to happen
3 to that money if I uphold your objection? What would you
4 suggest?
5    MR. PALMER: Oh, I think BP will continue with the
6 program. They are just trying to slip that money in on this
7 settlement for PR purposes. That's what I think, personally.
8    But do I think they would withdraw the money?
9 Absolutely not. They've already spent the money. That's one
10 thing the record is clear on, Your Honor. They've spent the
11 20 million dollars. It's not part of this settlement.
12    THE COURT: I don't understand your objection, then. I
13 hear it, I don't understand it; but, I heard you.
14    MR. PALMER: Unless you have any other questions, I
15 don't think I have anything to add.
16    THE COURT: I do not. Thank you very much.
17    MR. PALMER: Thank you very much, Your Honor.
18    THE COURT: Mr. McKee, your objection relates to
19 Specified Physical Conditions Matrix, which you believe
20 provides inadequate compensation; is that correct?
21    MR. MCKEE: Correct, Your Honor. Good afternoon.
22 Robert J. McKee on behalf of objectors, and as well as
23 potential clients who I have not yet taken because of issues
24 that are being raised in this objection.
25    Good afternoon, Magistrate.

Page 230

1    THE COURT: The clients you represent are objectors.
2 Are they class members?
3    MR. MCKEE: I believe so, yes. I say that, and I'll
4 explain why.
5    The terms of the settlement make one question
6 whether you are, because it's not only whether you're a
7 resident of A and B or a cleanup worker, but you have to have
8 had your symptoms within 72 hours of a purported exposure,
9 which one is not made clear, and nor do you know whether you're
10 acute or chronic, because you may have been getting exposed and
11 sick every day, and are you able to make a claim as a member of
12 the class for each day under the acute manifestation?
13    So there is issues with the description that make
14 it questionable who is in or out of this class, such as when
15 we're seeing data about 200,000 potential claimants.
16    There has not been a shred of evidence that
17 suggests that any of them fit the matrix. There has not been
18 one showing that a group of people more than a few hundred or
19 thousands actually fit the time frames that would fit into the
20 class.
21    So, yes, I believe all of mine do. I have not
22 opted out all of them. Some have opted out, but there is a
23 protracted opt-out deal.
24    THE COURT: Did you file claims on behalf of any of
25 your clients?

Page 231

1    MR. MCKEE: Claims and lawsuits, Your Honor, yes, sir,
2 venued in Key West and transferred here.
3    THE COURT: Claims with the settlement program? That's
4 what I'm asking you.
5    MR. MCKEE: Yes, sir.
6    THE COURT: So, again, you're in a position where this
7 settlement that you believe should not be approved, you have
8 claims that you filed for some clients in the settlement, you
9 have other people that have opted out, you have other people
10 that have objected.
11    MR. MCKEE: Yes, on the basis of attorney-client
12 discussions, some want us to object, some do not believe there
13 is a conflict, others are waiving that conflict.
14    But, certainly, we have taken care in-house of
15 those --
16    THE COURT: I'm trying to get a feel. I don't know if
17 you have a legal conflict or not; but, you're standing here
18 asking me not to approve this settlement, while you have other
19 clients you represent who want it to be approved and are making
20 claims. They can't get paid unless this settlement is approved
21 in this settlement. You understand that, right?
22    MR. MCKEE: I do, Your Honor. But, if I may, there is
23 an aspect to this proceeding, as someone who does not typically
24 do class actions in a 20-year practice of nothing but exposure
25 cases, there's an aspect that we're hopeful, we're here with

Page 232

1 hope that for these sick folks -- and there are some very
2 grievously ill people -- that these sick folks who have not
3 received a dollar since they got sick, not an interim payment,
4 nothing, no help, and they still won't, even if this is
5 approved, until the appellate process is done, won't get a
6 dollar for their illnesses, for the impact on their lives --
7 I'm here because I'm hopeful that the Court might provisionally
8 approve this, if certain changes are made, or it would have to
9 destroy this particular part of the settlement, the medical
10 benefits settlement, if it can't be done by the parties.
11    If the Court would allow me to show why the
12 compensation framework does not work when applied to reality
13 here.
14    THE COURT: Go ahead.
15    MR. MCKEE: Thank you, Your Honor.
16    The social tragedy here is that all of these
17 people -- and there are thousands of them -- have not received
18 anything. They are hopeful that this system of law would get
19 them there. Many of them are illiterate. Many of them have no
20 job anymore, couldn't read this if they wanted to as a pro se
21 claimant. It was hard enough for me to read that book.
22    But the reality is --
23    Put on my first slide.
24    -- what is covered here is essentially eye health
25 effects, nasal and respiratory health effects and skin health

Exhibit C

4-25-2011 Poss

1

```
1    CASE NUMBER:              BC297438

2    CASE NAME:                DANA POSS VS. 21ST CENTURY

3                              INSURANCE COMPANY

4    LOS ANGELES, CALIFORNIA  MONDAY, APRIL 25, 2011

5    DEPARTMENT 309            HON. ANTHONY J. MOHR, JUDGE

6    REPORTER:                 CLAUDIA VECCHI-CORTEZ,

7                              CSR NO. 11630

8    TIME:                     A.M. SESSION

9

10

11                  (THE FOLLOWING PROCEEDINGS

12                  WERE HELD IN OPEN COURT:)

13

14

15        THE COURT:  OKAY.  GOOD MORNING, COUNSEL.  IN

16   MCKAY CAN I HAVE APPEARANCES OF COUNSEL, PLEASE.

17        MR. POMERANCE:  YES.  GOOD MORNING, YOUR HONOR.

18   DREW POMERANCE ON BEHALF OF THE CLASS.

19        MR. GOSHGARIAN:  MARK GOSHGARIAN ON BEHALF OF THE

20   CLASS.

21        MR. PALMER:  GOOD MORNING, YOUR HONOR.

22   DARRELL PALMER ON BEHALF OF THE OBJECTORS PICCIONELLI

23   AND AMAYA ALONG WITH MY COLLEAGUE KIRA RUBEL.

24        MR. RUBEL:  K-I-R-A, R-U-B-E-L.  GOOD MORNING,

25   YOUR HONOR.

26        MR. KELLER:  GOOD MORNING, YOUR HONOR.  KEN KELLER

27   ON BEHALF OF 21ST CENTURY INSURANCE COMPANY.

28        THE COURT:  OKAY.  WELL, THIS IS A MOTION TO
```

Page 1

4-25-2011 Poss

2

```
 1    ASSESS AN APPEAL BOND ON THE OBJECTORS.  I GUESS MY
 2    FIRST QUESTION, MORE FROM CURIOSITY THAN ANYTHING ELSE,
 3    WHY DIDN'T YOU SHOW UP AT THE FAIRNESS HEARING?
 4         MR. PALMER:  BECAUSE WE BELIEVE THAT THE MOST
 5    IMPORTANT ISSUE ON APPEAL IN THIS CASE IS THE TIMING OF
 6    THE ATTORNEY FEE APPLICATION.  AND WITHOUT THE
 7    APPROPRIATE OPPORTUNITY TO REVIEW THE ATTORNEY FEE
 8    APPLICATION BOTH BY THE OBJECTORS AND THE ENTIRE
 9    CLASS --
10         THE COURT:  SO HELP ME OUT HERE BECAUSE IT'S BEEN
11    A LONG TIME.
12         MR. PALMER:  YES.
13         THE COURT:  DID THE NOTICE TO THE CLASS SAY
14    NOTHING ABOUT THE ATTORNEY'S FEES?
15         MR. PALMER:  I DON'T RECALL WHAT IT SAID ABOUT THE
16    ATTORNEY'S FEES.
17         THE COURT:  WHAT DID THE NOTICE SAY ABOUT
18    ATTORNEY'S FEES?
19         MR. POMERANCE:  THE NOTICE SAID THAT WE WERE GOING
20    TO BE SEEKING AN ATTORNEY'S FEE AWARD OF $3.4 MILLION,
21    WHICH IS WHAT WE SOUGHT, WHAT WE GOT, WHICH WAS
22    SUBSTANTIALLY LESS THAN OUR LODESTAR.  IT DID NOTIFY
23    THEM.  AND MR. PALMER GOT A COPY OF THE ATTORNEY'S FEES
24    MOTION A WEEK BEFORE THE FINAL FAIRNESS HEARING, HAD AN
25    OPPORTUNITY TO COME IN HERE AND SAY ANYTHING HE WANTED
26    ABOUT THE FEES.
27         THE COURT:  BUT THE NOTICES THAT WENT OUT TO THE
28    CLASS DID TELL THEM THAT YOU WOULD BE APPLYING FOR THAT
```

3

4-25-2011 Poss

1   FEE?

2          MR. POMERANCE:  ABSOLUTELY.

3          MR. GOSHGARIAN:  ABSOLUTELY.

4          THE COURT:  WHAT'S THE BASIS OF YOUR OBJECTION?

5          MR. PALMER:  THE BASIS OF THE OBJECTION IS THAT

6   THE CLASS DIDN'T HAVE THE OPPORTUNITY TO ACTUALLY LOOK

7   AT THE ATTORNEY FEE APPLICATION.  AND JUST LIKE THE

8   NINTH CIRCUIT HAS HELD IN THE MERCURY INTERACTIVE CASE,

9   THE CLASS HAS TO BE GIVEN THE OPPORTUNITY TO REVIEW IN

10  DETAIL THAT APPLICATION; OTHERWISE HOW DOES THE CLASS

11  KNOW --

12         THE COURT:  IN OTHER WORDS, THEY SHOULD HAVE THE

13  OPPORTUNITY TO COME DOWN HERE TO THE COURT AND LOOK AT

14  THE PAPERWORK.

15         MR. PALMER:  ABSOLUTELY.

16         THE COURT:  AND YOU'RE SAYING THAT PAPERWORK

17  DIDN'T COME IN UNTIL THE DAY OF THE HEARING OR --

18         MR. PALMER:  NO.  IT CAME IN -- I DON'T KNOW THE

19  EXACT FILING DATE.  I THINK IT WAS ABOUT A WEEK BEFORE

20  THE HEARING.  IT CERTAINLY DIDN'T COMPLY WITH THE LOCAL

21  RULES THAT SAY WHEN YOU FILE A MOTION YOU HAVE TO GIVE

22  ALL PARTIES PROBABLY 20 DAYS NOTICE.  THAT WAS CERTAINLY

23  SOMETHING THAT THE MERCURY COURT MENTIONED; THAT THE

24  ATTORNEY FEE APPLICATION IN THAT CASE SIMPLY DIDN'T EVEN

25  COMPLY WITH THE LOCAL RULES IN THE NORTHERN DISTRICT;

26  SO --

27         THE COURT:  WELL, OUR RULES OF COURT STATEWIDE ARE

28  DIFFERENT FROM THE LOCAL RULES OF A U.S. DISTRICT COURT.

                                                              4

4-25-2011 Poss

1    YOU DO UNDERSTAND THAT?

2         MR. PALMER:  ABSOLUTELY I DO.  BUT I KNOW FOR A

3    FACT THAT THE LOCAL RULES HERE REQUIRE MORE THAN SEVEN

4    DAYS NOTICE.

5         THE COURT:  WHAT LOCAL RULES?  WE GO WITH THE

6    CALIFORNIA RULES OF COURT.

7         MR. PALMER:  OKAY.

8         THE COURT:  MR. KELLER, YOU STOOD UP.  DID YOU

9    WANT TO SAY ANYTHING?

10         MR. KELLER:  NO.  I'VE GOT NOTHING TO SAY IN THIS.

11         THE COURT:  OKAY.  I MEAN, YOU ARE FREE TO SIT,

12    STAND, WHATEVER YOU WANT TO DO.

13         MR. KELLER:  WELL, I JUST FELT THAT I WAS

14    IMPROPER.

15         THE COURT:  NO, YOU CAN SIT OR STAND.  IT'S OKAY

16    WITH ME EITHER ONE.

17              LOOK, I REALLY GAVE SOME THOUGHT TO THIS

18    MOTION.  I WENT THROUGH IT.  MY RESEARCH ATTORNEY WENT

19    THROUGH IT.  I PLOWED THROUGH IT YESTERDAY WHILE I WAS

20    AT HOME TRYING TO MAKE SOME HEADS OR TAILS OF THIS.  I

21    WENT THROUGH THE CASES, AND I GATHER THERE'S REALLY

22    NOTHING IN CALIFORNIA THAT DEALS WITH THIS.  AM I RIGHT

23    ABOUT THAT?

24         MR. POMERANCE:  WE COULD NOT FIND A CALIFORNIA

25    CASE DIRECTLY ON POINT.  CERTAINLY -- AND OBVIOUSLY

26    UNDER CALIFORNIA CLASS ACTION LAW ABSENT CALIFORNIA

27    AUTHORITY --

28         THE COURT:  YOU LOOKED TO THE FEDERAL LAW?

                                                            5

1         MR. POMERANCE:  RIGHT.

                        Page 4

4-25-2011 Poss

2    THE COURT:  MR. PALMER, DO YOU AGREE WITH THAT?

3      MR. PALMER:  I AGREE.  I THINK WE HAVE TO LOOK TO

4  AZIZIAN.  I THINK CLASS COUNSEL CITED A LOT OF NON-NINTH

5  CIRCUIT DECISIONS.

6     THE COURT:  WELL, THE NINTH CIRCUIT DOESN'T BIND

7  US.  WHEN YOU LOOK TO FEDERAL AUTHORITY, I DON'T THINK

8  THERE'S -- IS THERE SOMETHING THAT SAYS THAT THE NINTH

9  CIRCUIT WILL CONTROL?  I GRANT YOU IT'S OUR CIRCUIT, BUT

10  STILL IS THAT WHAT THE LAW IS?

11     MR. PALMER:  WELL, I ASSUMED THAT SINCE WE WERE IN

12  CALIFORNIA THAT IT WOULD MAKE MORE SENSE TO LOOK AT THE

13  NINTH CIRCUIT, YOUR HONOR.

14     THE COURT:  CASES ARE SPLIT.  WHEN YOU LOOK AT THE

15  FEDERAL COURTS AROUND THE COUNTRY, THE CASES ARE SPLIT.

16  AND, YOU KNOW, YOU'VE GOT CASES THAT BASICALLY TALK

17  ABOUT HOW IN A SITUATION LIKE THIS IT IS APPROPRIATE TO

18  ORDER AN APPEAL BOND.

19     MR. PALMER:  WELL, IF WE'RE GOING TO MOVE FROM THE

20  MERITS OF THE APPEAL, WHICH I WAS DISCUSSING WHEN WE

21  WERE TALKING ABOUT WHETHER OR NOT THE CLASS SHOULD HAVE

22  THE RIGHT TO LOOK AT THE ATTORNEY FEE APPLICATION TO THE

23  APPROPRIATENESS OF THE BOND, THEN I THINK THAT'S A

24  DIFFERENT TOPIC, AND I'D BE HAPPY TO ADDRESS THAT.

25     MR. POMERANCE:  YOUR HONOR, THERE'S ONLY ONE

26  PURPOSE FOR AN OBJECTOR EVER TO FILE AN APPEAL.  AND

27  IT'S BECAUSE THE OBJECTOR THINKS THAT THE CLASS CAN AND

28  SHOULD DO BETTER AND THAT SOMETHING WAS AMISS ABOUT THE

6

1  SETTLEMENT AND THAT THE CLASS CAN DO BETTER.  IT IS

2  ABSOLUTELY IMPOSSIBLE AS A MATTER OF LAW FOR ANY

Page 5

4-25-2011 Poss

3  ARGUMENT ON APPEAL TO APPROVE THIS SETTLEMENT AS A

4  RESULT OF THE COURT OF APPEAL DECISION.

5      THE COURT:  WELL, YES AND NO.  I MEAN, THE ANSWER

6  TO THAT IS YES AND NO.  AND HERE IS WHY.  AND I WAS

7  TRYING TO KIND OF PUT DOWN DECISION TREES AS I WAS

8  GOING, AND I DON'T THINK I PHRASED IT VERY WELL MYSELF.

9  BUT LET'S ASSUME THAT THE OBJECTOR WINS ON APPEAL.

10      MR. POMERANCE:  OKAY.  ON WHAT ISSUE?

11      THE COURT:  ON EVERY ISSUE OR ANY OF THE ISSUES.

12      MR. POMERANCE:  OKAY.

13      THE COURT:  THEY SAY "LOOK, THE SETTLEMENT IS NOT

14  FAIR TO THE CLASS."  OKAY.  THAT WOULD GENERALLY BE WHAT

15  AN OBJECTOR OBJECTS ON.  NOW, A COUPLE OF THINGS CAN

16  HAPPEN.  THE COURT OF APPEAL WOULD SEND IT BACK AND SAY

17  WE DON'T CONSIDER THIS AGREEMENT FAIR.

18          NOW, ONE OF TWO THINGS WILL HAPPEN.  ONE IS

19  THAT THE DEFENDANT IS GOING TO SAY, YOU KNOW, WE'VE GOT

20  THE MCKAY DECISION.  BASTA.  AND, YOU KNOW, THAT'S IT.

21  WE WALK AWAY, THE CLASS DOESN'T GET A THIN DIME.  OR

22  THEY MAY SAY "YOU KNOW, WE AGREED TO SETTLE.  LET'S SEE

23  IF WE CAN MAKE THE SETTLEMENT BETTER AND GET THIS THING

24  TO FLY THROUGH THE COURT OF APPEAL."  AND THEY, YOU

25  KNOW, TINKER WITH THE SETTLEMENT AGREEMENT, THEY DO WHAT

26  MR. PALMER WANTS THEM TO DO AND NOW -- GUESS WHAT -- THE

27  CLASS DOES BETTER.

28          SAME WITH THE ATTORNEY'S FEES.  THAT SEEMS

7

1  TO BE WHAT THEY THINK AT LEAST IS THEIR LONGEST AND

2  STRONGEST SUIT; THAT THE ATTORNEY FEE APPLICATION I

3  GUESS SHOULD HAVE BEEN POSTED ALONG WITH THE NOTICE OF

Page 6

4-25-2011 Poss

4   HEARING ON A FINAL APPROVAL OR SOMETHING LIKE THAT AS

5   OPPOSED TO A WEEK AHEAD.

6           SO THE COURT OF APPEAL SAYS YOU'RE RIGHT.

7   THE CLASS SHOULD HAVE BEEN ABLE TO REVIEW IT.  WE

8   REMAND.  WE WILL RESET A DATE FOR THE FAIRNESS HEARING

9   AND WE'LL GIVE THE CLASS 30 DAYS NOTICE; IN OTHER WORDS,

10  NOW IT'S POSTED.  OR IT'S NOT NECESSARILY POSTED.  IT'S

11  HERE IN THE COURT FILE.  ANYBODY CAN COME DOWN AND SEE

12  IT.  I DON'T THINK THERE'S ANY REQUIREMENT TO POST THESE

13  THINGS ON-LINE.  BUT IN ANY CASE, WHATEVER IT IS, IT IS.

14  BUT -- I MEAN, ISN'T THAT SOMETHING THE CLASS --

15          MR. POMERANCE:  NO.  LET ME ANSWER BOTH OF THE

16  QUESTIONS NO.

17          THE COURT:  OKAY.

18          MR. POMERANCE:  IN THE FIRST CASE -- AND I'M NOT

19  GOING TO SPEAK FOR MR. KELLER.

20          MR. KELLER:  BUT I'M HAPPY TO WHEN YOU'RE DONE.

21          MR. POMERANCE:  OKAY.  I CAN'T FATHOM WHERE A

22  DEFENDANT HAS A CHOICE OF EITHER PAYING A TOTAL OF $6,

23  7, 8 MILLION --

24          THE COURT:  OR NOTHING.

25          MR. POMERANCE:  -- OR NOTHING THAT THEY WOULD SAY,

26  YOU KNOW, WE HAVE A BINDING JUDGMENT AT THE COURT OF

27  APPEAL THAT SAYS THAT WE HAVE ABSOLUTELY NO LIABILITY SO

28  LET'S PAY $8 MILLION.  I MEAN, ANYTHING IS POSSIBLE.

8

1   BUT THAT'S ABSURD.

2           THE COURT:  I UNDERSTAND THAT.

3           MR. POMERANCE:  OKAY.  SO THEN MY SECOND ISSUE ON

4   THE ATTORNEY'S FEES, WHICH AS THE COURT REMARKED MIGHT

Page 7

4-25-2011 Poss

5  BE THEIR BEST ARGUMENT ON POSTING THIS THING, BUT EVEN

6  IF THAT WERE TO OCCUR AND EVEN IF THE CLASS COULD THEN

7  SEE OUR FEES AND EVEN IF CLASS MEMBERS COULD CONVINCE

8  YOUR HONOR THAT OUR FEES ARE EXCESSIVE, THAT CAN'T

9  BENEFIT THE CLASS BECAUSE THOSE FEES ARE PAID SEPARATE

10  AND APART FROM ANY BENEFITS GOING TO THE CLASS.

11      SO EVEN IF MR. GOSHGARIAN AND I GOT NOTHING

12  FOR TEN YEARS OF WORK AND $4 MILLION WORTH OF LODESTAR,

13  THE CLASS WOULDN'T GET A PENNY EXTRA, SO --

14      THE COURT: WELL, LET ME ASK YOU THIS, MR. PALMER.

15  I WANT YOU TO ASSUME YOU PREVAIL ON YOUR ATTORNEY'S FEES

16  ARGUMENT. NOW THE CLASS GETS TO LOOK AT THE ATTORNEY'S

17  FEES AND SOMEBODY OBJECTS, PROBABLY YOU OR SOMEBODY, AND

18  YOU WIN. AND I SAY, "YOU KNOW, YOU'RE RIGHT. THE FEES

19  ARE A LITTLE EXCESSIVE. I'M GOING TO LOWER THE FEE."

20  HOW DOES THE CLASS BENEFIT FROM THAT? HOW DOES ANYBODY

21  BENEFIT EXCEPT FOR 21ST CENTURY? YOU DON'T.

22      MR. PALMER: THEY BENEFIT FROM --

23      THE COURT: HOW?

24      MR. PALMER: DUE PROCESS. THEY HAVE HAD THE

25  OPPORTUNITY TO LOOK AT THE FEE APPLICATION.

26      THE COURT: AND TO WHAT END, THOUGH? BECAUSE THE

27  MONEY IS COMING FROM 20TH CENTURY. IF I CUT THE

28  ATTORNEY'S FEES IN HALF, YOU HAVE NOT BENEFITED AND,

9

1  FRANKLY, YOU WOULDN'T EARN ANY FEES ON THIS OBJECTION

2  BECAUSE THE CLASS HASN'T BENEFITED. YOU ARE A MEMBER OF

3  THE CLASS. IT'S NOT COMING OUT OF THE FUND LEAVING MORE

4  MONEY THERE FOR THE CLASS.

5      YOU ARE HELPING 21ST CENTURY, YOU KNOW, AND

Page 8

4-25-2011 Poss

6   IF YOU OWN STOCK IN THE COMPANY, MAYBE IT WILL RAISE

7   YOUR SHARE PRICE A PENNY OR TWO.  BUT I DON'T SEE HOW

8   IT'S GOING TO HELP THE CLASS.

9       MR. PALMER:  WHAT HAPPENED IN THE MERCURY CASE WAS

10  THAT THE NEW YORK STATE TEACHERS ASSOCIATION WAS A CLASS

11  MEMBER -- THEIR RETIREMENT FUND.  AND THE GENERAL

12  COUNSEL WROTE A LONG LETTER TO THE CLASS COUNSEL

13  OBJECTING AND SAYING WE HAVEN'T HAD THE OPPORTUNITY TO

14  REVIEW THIS APPLICATION AND WE THINK THAT'S VERY

15  IMPORTANT IN THIS CASE.  AND INDEED IT WENT TO THE

16  NINTH.  IT CAME BACK.  THERE WAS FULL DISCLOSURE --

17      THE COURT:  HANG ON, MR. PALMER.  WHERE IS MERCURY

18  IN YOUR APPENDIX OF AUTHORITY?

19      MR. POMERANCE:  AND MERCURY INTERACTIVE WAS A

20  COMMON FUND CASE, YOUR HONOR.  IT'S JUST COMPLETELY

21  DIFFERENT.

22      THE COURT:  BUT, I MEAN, IS THIS A REPORTED

23  DECISION SOMEWHERE?

24      MR. PALMER:  YES, IT IS.

25      THE COURT:  WHERE?  WHERE IN YOUR APPENDIX DID YOU

26  CITE IT?

27      MR. PALMER:  I DON'T HAVE THE APPENDIX WITH ME,

28  YOUR HONOR.

                                                    10


1       THE COURT:  I'VE GOT IT.  WOULD YOU LIKE TO SEE

2   IT?

3       MR. PALMER:  NO, SIR.

4       THE COURT:  I MEAN, YOU KNOW, I DON'T SEE IT IN

5   THE APPENDIX UNLESS IT'S UNDER ANOTHER NAME.  IT'S A

6   NINTH CIRCUIT CASE; CORRECT?

Page 9

4-25-2011 Poss

7    MR. PALMER:  THAT'S CORRECT.

8    THE COURT:  IS IT AZIZIAN VERSUS FEDERATED OR

9  DEWITT AGAINST WESTERN PACIFIC?

10    MR. PALMER:  ARE YOU LOOKING AT THE OBJECTION,

11  YOUR HONOR OR AT THE OPPOSITION TO THE BOND MOTION?

12    THE COURT:  I'M LOOKING AT THE APPENDIX OF

13  NON-CALIFORNIA AUTHORITY IN SUPPORT OF OPPOSITION TO

14  OBJECTORS GREGORY PICCIONELLI.  THAT'S WHERE IT WOULD BE

15  IF IT'S ANYWHERE.

16    MR. PALMER:  NO.  IT WAS IN THE ORIGINAL

17  OBJECTION, YOUR HONOR.  MERCURY ISN'T PART OF THE BOND

18  MOTION.  THAT HAS TO GO TO THE MERITS OF OUR APPEAL.

19    THE COURT:  WELL, WHAT HAPPENED THERE?

20    MR. PALMER:  PARDON ME?

21    THE COURT:  WHAT HAPPENED IN MERCURY?

22    MR. PALMER:  THE NEW YORK TEACHERS STATE

23  RETIREMENT FUND OBJECTED SAYING THAT THEY HAD NOT BEEN

24  GIVEN THE OPPORTUNITY TO REVIEW THE ATTORNEY'S FEE

25  APPLICATION.  THEN THE NINTH CIRCUIT SAID WE AGREE.  WE

26  THINK THAT UNDER RULE 23, THE CLASS HAS THE OPPORTUNITY

27  TO REVIEW THE ENTIRE DECISION.  AND IN THIS INSTANCE,

28  THE CLASS COUNSEL DIDN'T EVEN COMPLY WITH THE LOCAL

11

1  RULES WHICH REQUIRES THEM TO GIVE 14 DAYS NOTICE BEFORE

2  A MOTION.  AND THEY REMANDED IT SOLELY ON THE QUESTION

3  OF ATTORNEY'S FEES.

4    THE COURT:  WASN'T THAT A COMMON FUND CASE?

5    MR. PALMER:  IT WAS A COMMON FUND.

6    THE COURT:  DOESN'T THAT MAKE THIS SHARPLY

7  DIFFERENT FROM WHAT WE'RE DOING HERE?

Page 10

4-25-2011 Poss

8  MR. PALMER: I DON'T THINK SO. THE POINT OF THE
9  CASE WAS NOT WHETHER SOMEBODY WANTED TO REDUCE OR
10 ENLARGE. THE POINT OF THE CASE WAS TO GIVE THE CLASS
11 THE OPPORTUNITY TO REVIEW THE ATTORNEY FEE APPLICATION
12 TO SEE WHAT THESE LAWYERS WHO PROFESSED TO BE THE
13 CLASS'S LAWYERS HAVE DONE, WHAT THEY ARE BILLING TO
14 THEIR LODESTAR.

15       I MEAN, DID THEY BILL THAT ENTIRE APPEAL
16 WHICH WAS LARGELY DUE TO A VERY SERIOUS PROCEDURAL
17 MISTAKE? WAS THAT BILLED AS PART OF THE LODESTAR? WE
18 DON'T KNOW IN THIS INSTANCE. AND THOUSANDS OF CLASS
19 MEMBERS DIDN'T KNOW. THAT WAS THE POINT OF MERCURY.
20 AND IT HAS HAD -- SINCE THAT TIME, YOUR HONOR, IT HAS
21 HAD VERY IMPORTANT FAR-REACHING IMPLICATIONS IN THIS
22 BUSINESS.

23 MR. POMERANCE: YOUR HONOR, MERCURY INTERACTIVE
24 WAS DECIDED ON TWO BASIS. ONE, THERE WAS A FAILURE TO
25 COMPLY WITH AN EXPLICIT PROVISION OF FEDERAL RULE 23
26 WHICH WE DON'T HAVE IN CALIFORNIA. AND, TWO, YOU ARE
27 EXACTLY RIGHT. THE COURT EMPHASIZED THE COMMON FUND
28 NATURE OF THE CASE AND THE FACT THAT ON APPEAL A CLASS

                                                    12

1 MEMBER MAY POINT OUT SOMETHING IN THE ATTORNEY'S FEES
2 THAT COULD ULTIMATELY READ DOWN TO THE BENEFIT OF THE
3 CLASS, WHICH IS NOT PRESENT IN THIS CASE.

4  MR. PALMER: WELL, WE'RE ARGUING THE MERITS OF OUR
5  APPEAL AT THIS POINT.

6       THE COURT: INDEED. MR. PALMER, INDEED. THEY ARE
7  TELLING ME THAT YOUR APPEAL IS FRIVOLOUS; THAT YOU ARE
8  DOING THIS FOR YOUR OWN GAIN. AND THEY ARE SAYING --

                   Page 11

4-25-2011 Poss

9　AND THEY HAVE CITED ME AUTHORITY SAYING THAT I CAN AND

10　SHOULD IMPOSE AN APPEAL BOND IN A SITUATION LIKE THAT.

11　SO INDEED WE'RE ARGUING THE MERITS, AND YOUR OPPOSITION

12　IS BEREFT OF ANY AUTHORITY OR DISCUSSION OF THE MERITS.

13　YES, INDEED, WE'RE TALKING ABOUT THE --

14　　　MR. PALMER:  IT SHOULDN'T HAVE ANYTHING TO DO WITH

15　THE MERITS.  IN FACT, WE CITED CASES IN -- AZIZIAN SAYS

16　THE MERITS HAVE TO BE LEFT TO THE COURT ABOVE.

17　　　THE COURT:  YEAH.

18　　　MR. PALMER:  NOT HERE.

19　　　THE COURT:  AND THERE ARE OTHER CASES THAT THEY

20　HAVE CITED THAT HOLD TO THE OPPOSITE.  WE HAVE A

21　COMPETING LINE OF CASES.

22　　　MR. PALMER:  OKAY.  SO LET ME MOVE TO THE QUESTION

23　OF THE BOND.  BECAUSE I WILL TELL YOU THAT IN THIS CASE

24　THE RECORD IS GOING TO BE RELATIVELY SMALL.  THEIR

25　RECOVERABLE COSTS ON APPEAL ARE FAIRLY SMALL.  AND IF

26　IT'S REALLY IMPORTANT, I WILL GIVE THEM $2,500 TO PUT IN

27　THEIR TRUST FUND TO HOLD FOR THAT REASON.  BUT THAT'S

28　ABOUT ALL --

13

1　　　THE COURT:  BUT WHAT ABOUT THE FACT THAT THE

2　MEMBERS OF THE CLASS ARE GOING TO BE HELD UP ON THIS

3　SETTLEMENT AND THAT THE CLASS ADMINISTRATOR HAS BEEN

4　FROZEN, HE CAN'T DO ANYTHING?

5　　　MR. PALMER:  THERE'S NO AUTHORITY WHATSOEVER TO

6　SUGGEST THAT AN APPEAL BOND SHOULD COVER ANYTHING EXCEPT

7　THE ITEMS LISTED IN CRC8.278.

8　　　MR. GOSHGARIAN:  YOUR HONOR, I THINK THAT THE

9　COURT HAS SEEN OUR CASES.  THE COURT CAN SEE RIGHT

Page 12

4-25-2011 Poss

10   THROUGH WHAT IS GOING ON HERE.

11        THE COURT:  OH, IT'S CLEAR WHAT IS GOING ON.  IT'S

12   CLEAR THE QUESTION IS WHETHER I CAN DO ANYTHING ABOUT

13   IT.

14        MR. GOSHGARIAN:  ABSOLUTELY YOU CAN.

15        THE COURT:  BUT WHAT YOU SAY IN YOUR PAPERS, AS

16   FAR AS I'M CONCERNED, IS ABSOLUTELY TRUE.  EVERY WORD.

17        MR. GOSHGARIAN:  THIS COURT HAS THE DISCRETION AND

18   THE ABILITY TO STOP THIS NONSENSE.  THAT'S WHAT HAS TO

19   HAPPEN.  THIS COURT HAS THE AUTHORITY TO --

20        THE COURT:  MR. GOSHGARIAN.  I DON'T KNOW.

21        MR. GOSHGARIAN:  WE HAVE TO PROTECT THE CLASS.

22        THE COURT:  THIS IS ONE OF THOSE CASES -- AND

23   EVERY JUDGE GETS ONE AND WE'VE SEEN MOVIES MADE ABOUT

24   THEM WHERE, YOU KNOW, THE JUDGE WOULD LIKE TO DO

25   SOMETHING WHICH THE JUDGE WOULD REGRET LATER ON BECAUSE

26   IT LOOKS LIKE A HORRIBLE INJUSTICE IS IN PROGRESS.  BUT

27   QUERY UNDER THE LAW CAN THE JUDGE DO IT?  AND THAT'S

28   WHERE I'M STRUGGLING.  I ABSOLUTELY AGREE WITH YOU THAT

                                                        14

1   THIS OBJECTION WAS DONE FOR A VERY IMPROPER PURPOSE.  IT

2   LOOKS TO ME ON THE FACE OF IT AS IF IT'S AN ABUSIVE

3   PROCESS.  I MEAN, IT LOOKS TORTUOUS, TO BE FRANK WITH

4   YOU.

5        MR. GOSHGARIAN:  WE AGREE.

6        MR. POMERANCE:  I THINK YOUR HONOR THERE'S ENOUGH

7   CASE AUTHORITY IN THE FEDERAL COURTS TO CERTAINLY GIVE

8   YOUR HONOR COMFORT THAT YOU ARE NOT STRIKING OUT ON

9   SOMETHING THAT'S JUST COMPLETELY CRAZY.  I THINK UNDER

10   CALIFORNIA --

                    Page 13

4-25-2011 Poss

11          THE COURT:  EVEN IF IT'S A LITTLE CRAZY, I HAVE TO

12   BE CAREFUL.

13          MR. POMERANCE:  NO, I DON'T THINK IT'S A LITTLE

14   CRAZY.  LOOK, OTHER COURTS HAVE DONE IT.  OTHER COURTS

15   HAVE ASSESSED BOND --

16          THE COURT:  STATE COURTS?

17          MR. POMERANCE:  FEDERAL COURTS.

18          THE COURT:  OKAY.

19          MR. POMERANCE:  OKAY.  BUT OTHER FEDERAL COURTS

20   HAVE ASSESSED BONDS OF HUNDREDS OF THOUSANDS OF DOLLARS

21   AGAINST MR. PALMER AND HIS PARTNER MR. SIEGEL.

22          MR. PALMER:  NO, NO, NO.  CAREFUL.

23          MR. POMERANCE:  SO THIS ISN'T OUTRAGEOUS; AND,

24   TWO, YOU HAVE THE AUTHORITY AND THE DUTY TO PROTECT THE

25   ABSENT CLASS MEMBERS.  OF THAT MUCH I'M SURE.

26          THE COURT:  WELL, I HAVE TO BE CAREFUL BECAUSE,

27   YOU KNOW, YOU'VE GIVEN ME A VERY LONG AND SORTED HISTORY

28   OF WHAT THESE PEOPLE HAVE BEEN DOING.  AND, YOU KNOW, I

                                                          15

1    READ THE OPINION FROM THE JUDGE IN MINNESOTA REFERRING

2    TO THE PARASITE FISH, AND I REMEMBER THERE WAS A SECOND

3    OPINION.  WHEN I READ THOSE --

4           MR. PALMER:  WITH ALL DUE RESPECT, YOUR HONOR,

5    THAT IS COMPLETELY IRRELEVANT.  WOULD YOU LIKE --

6           THE COURT:  MR. PALMER, IF YOU WOULD REFRAIN FROM

7    INTERRUPTING ME, WHICH YOU KNOW IS INAPPROPRIATE IN AN

8    ORAL ARGUMENT, MAYBE I WOULD HAVE SAID SOMETHING THAT

9    COULD HAVE HELPED YOU OUT.  OKAY?  BUT NOW YOU HAVE

10   BROKEN MY TRAIN OF THOUGHT.

11          MR. KELLER:  YOUR HONOR, COULD I JUST SAY, YOU

                         Page 14

4-25-2011 Poss

12  RAISE THE QUESTION OF THE APPEAL BEING SUCCESSFUL,

13  COMING BACK DOWN AND MAYBE 21ST CENTURY WOULD MODIFY THE

14  SETTLEMENT.  AS MR. POMERANCE HAS SAID, NOT A CHANCE.

15  WE'VE FOUGHT THIS THING FOREVER.  WHILE THERE WAS NO

16  PETITION FOR A HEARING TO THE SUPREME COURT, EVERYBODY

17  AND THEIR BROTHER FILED A PETITION FOR DE-PUBLICATION.

18        THE COURT:  OH, I REMEMBER THAT.

19        MR. KELLER:  YES.  HARVEY ROSENFIELD LINED UP THE

20  WORLD.  I GOT TIRED -- I FINALLY STARTED WRITING LETTERS

21  SAYING, YOU KNOW, I REPRESENT 21ST CENTURY TO THE

22  SUPREME COURT.  HAVING GONE THROUGH THAT PROCESS, THIS

23  IS IT.  WE'RE HONORING THE SETTLEMENT.  WE CUT A DEAL.

24        THE COURT:  BUT WHAT HAPPENS?  WHAT HAPPENS?  IF

25  MR. PALMER WINS ON THE ATTORNEY FEE ISSUE AND BACK IT

26  COMES WITH A REQUEST AND THE REQUIREMENT THAT THEY GIVE

27  THE CLASS FULL NOTICE, IF YOU WILL, OF THE FEE

28  APPLICATION, I MEAN, WHAT DO YOU DO?  AT THAT POINT DO

16

1  YOU SAY "I'M SORRY.  WE HAVE NO DEAL?"  IT ONLY CAN HELP

2  YOU.  BECAUSE IF I FIND THE FEES ARE TOO HIGH, I'M GOING

3  TO CUT THEM AND YOU ARE GOING TO DO BETTER THAN YOU DID.

4        MR. KELLER:  I SUSPECT THAT AT BEST IT WOULD BE A

5  WASH; THAT WHEN WE GET DONE WITH RUST SENDING NOTICE TO

6  ALL OF THESE PEOPLE, I'M JUST ASSUMING THAT YOU ARE NOT

7  WHACKING IT IN HALF OR SOMETHING; THAT IF THERE WAS

8  ANY --

9        THE COURT:  I MEAN, RUST WOULD HAVE TO SEND OUT

10  ANOTHER NOTICE.  THERE'S NO QUESTION ABOUT IT.

11        MR. KELLER:  YEAH.  I DON'T, FRANKLY, KNOW THE

12  ANSWER ON THE ATTORNEY FEE.  BUT IN TERMS OF IN ANY WAY

Page 15

4-25-2011 Poss

13   MODIFYING SOMETHING THAT WOULD HELP THE CLASS, THAT IS

14   MORE MONEY TO THE CLASS, THAT'S NOT GOING TO HAPPEN.

15        MR. GOSHGARIAN:  AND, YOUR HONOR, NOT TO

16   INTERRUPT.

17        MR. KELLER:  I'M DONE.

18        MR. GOSHGARIAN:  THE NOTION THAT THE CLASS DIDN'T

19   GET NOTICE IS FALSE.  THE NOTION THAT THE MOTION WASN'T

20   ON FILE PURSUANT TO THIS COURT'S ORDER AND THIS COURT'S

21   BRIEFING SCHEDULE IS FALSE.  THE NOTION THAT WE ARE

22   SOMEHOW REQUIRED TO COMPLY WITH RULE 23(H) IS FALSE.

23        THE COURT:  AND 23(H) SAYS...

24        MR. GOSHGARIAN:  FIRST OF ALL, 23(H) DOESN'T EVEN

25   STATE WHAT THESE OBJECTORS HAVE STATED IT STATES.  BUT

26   THAT'S NOT REQUIRED IN CALIFORNIA.  THIS COURT SET ITS

27   OWN BRIEFING SCHEDULE, WHICH IT HAS THE DISCRETION TO

28   DO.  THIS COURT REVIEWED AND ANALYZED OUR FEES.  THE

17

1    CLASS HAD NOTICE OF OUR FEE REQUEST FOR MONTHS.  THE

2    MOTION ITSELF WAS ON FILE.  THE OBJECTORS HAD IT IN

3    THEIR HANDS.  THE OBJECTORS DIDN'T FILE ANY MORE PAPERS.

4    THE OBJECTORS DIDN'T EVEN MAKE A PHONE CALL TO THIS

5    COURT.  THE OBJECTORS DIDN'T APPEAR.  NOW THERE'S

6    540,000 PEOPLE THAT THESE OBJECTORS ARE HOLDING HOSTAGE

7    AND WHAT THEY ARE DOING IS WRONG.  THIS COURT HAS THE

8    POWER.

9         THE COURT:  HAVE YOU NOTIFIED THE STATE BAR ABOUT

10   THIS?

11        MR. GOSHGARIAN:  NO.

12        MR. POMERANCE:  WE HAVE NOT DONE THAT YET, NO.

13        MR. GOSHGARIAN:  THIS COURT HAS THE POWER TO DO

Page 16

4-25-2011 Poss

14  WHAT WE'RE ASKING IT TO DO.  WHATEVER HAPPENS IN THE

15  FUTURE WILL HAPPEN.  BUT THESE CLASS MEMBERS NEED TO BE

16  PROTECTED FROM THESE OBJECTORS.  THIS IS WRONG.  WE NEED

17  TO STAND UP AND SAY IT'S WRONG.  AND IF THE COURT OF

18  APPEALS WANTS TO SAY THAT WHAT THEY ARE DOING IS RIGHT,

19  LET THEM SAY IT.  THEY ARE NOT GOING TO DO THAT.

20          THEY ARE GOING TO SAY THE SAME THING THAT

21  THE OTHER COURTS HAVE SAID, WHAT THIS COURT HAS SAID.

22  THIS COURT KNOWS ABOUT THIS PARTICULAR SETTLEMENT.

23  WE'VE BEEN HERE FOR TEN LONG YEARS.  WE'VE GOT A

24  FANTASTIC RESULT.  THIS IS NOT COMING BACK; THIS IS NOT

25  COMING BACK.  OUR FEES ARE NOT GOING TO GET CUT.

26      THE COURT:  HAVE THEY TRIED TO NEGOTIATE WITH YOU

27  ON THIS?  ACCORDING TO YOU, THAT --

28      MR. GOSHGARIAN:  I HAVEN'T SPOKEN TO THEM.

18

1   MR. POMERANCE HAS.

2       MR. POMERANCE:  NO.

3       MR. PALMER:  MAY I SPEAK.

4       THE COURT:  YES.  GO AHEAD.

5       MR. PALMER:  I THINK IT'S SO UNFAIR THAT YOU ARE

6   MAKING THAT SORT OF ASSUMPTION.

7       THE COURT:  WHAT ASSUMPTION?

8       MR. PALMER:  THAT WE'RE HERE FOR SOME ILLICIT OR

9   UNETHICAL PURPOSE.

10      THE COURT:  COUNSEL, THE CIRCUMSTANTIAL EVIDENCE

11  IS OVERWHELMING.  NOW, THE PROBLEM I HAVE IS I DON'T

12  WANT ANY BOND ORDER I MAKE OR ANYTHING I DO TO PUNISH

13  YOU FOR PAST CONDUCT.  IT'S LIKE THERE'S AN OLD CASE

14  CAROL RICHARDS VERSUS SUPERIOR COURT, WHICH SAYS YOU

Page 17

4-25-2011 Poss

15   DON'T SANCTION COUNSEL FOR PRIOR CONDUCT.

16                IF YOU IMPOSE A SANCTION, YOU SANCTION THE

17   CONDUCT THAT IS BEFORE THE COURT.  AND BEFORE YOU

18   INTERRUPTED ME, THAT'S WHERE I WAS GOING.  OKAY?  SO I'M

19   NOT GOING TO SIT HERE AND SAY I'M IMPOSING A BOND

20   BECAUSE I DON'T LIKE WHAT YOU'VE DONE IN A NUMBER OF

21   EARLIER CASES.

22                ON THE OTHER HAND, I CANNOT SHIELD MY EYES

23   FROM THAT.  OKAY?  THERE IS A HISTORY HERE, AND THE

24   HISTORY IS NOT ONE THAT YOU SHOULD BE PROUD OF.  AND THE

25   QUESTION BECOMES NOT WHAT HAPPENED IN THOSE CASES BUT

26   WHAT IS GOING ON IN THIS PARTICULAR CASE.

27                NOW, ONE THING IN YOUR FAVOR.  WHEN I LOOK

28   AT -- I THINK IT WAS -- IT WAS ONE OF THE CASES THAT YOU

                                                    19

1    CITED WHERE A BOND WAS IMPOSED.  I THINK IT WAS OUT OF

2    WISCONSIN.

3         MR. PALMER:  WELL, WE CITED THE COMMENTS FROM A

4    WISCONSIN JUDGE, BUT WE CITED VULNER.

5         THE COURT:  OKAY.  WELL, THERE WAS A JUDGE WHO

6    SAID, "LOOK, THE OBJECTION GAVE NO GROUNDS WHATSOEVER."

7    AND THAT WAS ONE OF THE REASONS THE JUDGE FOUND THE

8    APPEAL TO BE FRIVOLOUS.  THIS OBJECTION IS DETAILED.  IT

9    GIVES FOREGROUND AND IT ARTICULATES THEM FAIRLY WELL.

10   SO THAT'S THE DISTINGUISHING POINT THAT I HAVE TO THINK

11   ABOUT.

12        MR. GOSHGARIAN:  CAN I MAKE --

13        THE COURT:  NOW, I HAVE TO BE VERY CAREFUL OF

14   SAYING I KNOW THE APPEAL IS FRIVOLOUS BECAUSE OBVIOUSLY,

15   YOU KNOW, SOMEBODY LOOKING IN FROM THE OUTSIDE COULD

                        Page 18

4-25-2011 Poss

16  SAY, "WELL, NATURALLY THE TRIAL JUDGE HAS A STAKE IN
17  THIS.  HE DOESN'T WANT TO GET REVERSED.  HE'S GOING TO
18  CALL THE APPEAL FRIVOLOUS."  SO I HAVE TO BE VERY
19  CAREFUL ABOUT THAT.
20       MR. GOSHGARIAN:  CAN I MAKE A SUGGESTION?
21       THE COURT:  YES.
22       MR. GOSHGARIAN:  IF YOU LOOK AT OUR MOTION --
23       THE COURT:  I HAVE.
24       MR. GOSHGARIAN:  WE TOOK A LOT OF TIME AND EFFORT
25  TO DETERMINE WHAT AMOUNT OF THE BOND SHOULD BE IMPOSED.
26       THE COURT:  BUT I'M NOT THERE YET.  I'M TALKING
27  ABOUT SHOULD I IMPOSE THE BOND, ASSUMING I EVEN HAVE THE
28  AUTHORITY.  THIS IS A DISCRETIONARY ACT OF THIS COURT.

20

1        MR. GOSHGARIAN:  OF COURSE IT'S DISCRETIONARY.
2        THE COURT:  AND I HAVE TO REALLY THINK LONG AND
3   HARD ABOUT IT.  THERE'S A LOT OF ABSENCE OF LAW AND I
4   HAVE TO FIGURE OUT WHAT IS THE LAW.  REMEMBER WHEN YOU
5   THINK ABOUT WHAT A LAW SHOULD BE, IMAGINE THE LAW IN THE
6   HANDS OF YOUR ENEMIES.  AND IF A TRIAL JUDGE HAS THE
7   AUTHORITY TO IMPOSE A BOND BECAUSE AN APPEAL IS
8   FRIVOLOUS, THE WRONG TRIAL JUDGE IS GOING TO IMPOSE A
9   WHOPPING BOND IN A CASE WHERE THE JUDGE JUST DOESN'T
10  WANT TO BE REVERSED EVEN THOUGH THE JUDGE MAY KNOW IN
11  HIS HEART OF HEARTS THE APPEAL IS VERY GOOD.  AND, YOU
12  KNOW, QUERY DO WE WANT THAT LAW IN CALIFORNIA?  THE
13  ANSWER IS THERE'S SOME DANGER.
14       MR. GOSHGARIAN:  OBVIOUSLY.  BUT HERE IS WHAT I'M
15  GOING TO SUGGEST.
16       THE COURT:  YEAH.

Page 19

17    MR. GOSHGARIAN:  THE BOND THAT IS BEING REQUESTED,

18  IF THE COURT EXERCISES ITS DISCRETION TO IMPOSE A BOND,

19  WHICH WE URGE THE COURT TO DO, DOES NOT TAKE INTO

20  ACCOUNT ANY ATTORNEY'S FEES.  THAT'S PUT ASIDE.  IT'S

21  SIMPLY TO PROTECT THE CLASS.  THE CLASS RELIEF.  IF THE

22  ATTORNEY'S FEES GO TO ZERO, MR. POMERANCE AND I WORKED

23  FOR TEN YEARS FOR NOTHING, THE AMOUNT THAT WE'VE

24  REQUESTED IS SOLELY DESIGNED TO PROTECT THE CLASS.

25  THAT'S IT.

26    THE COURT:  NO, I UNDERSTAND THAT.

27    MS. RUBEL:  YOUR HONOR --

28    THE COURT:  ALL RIGHT.  GO AHEAD, MR. PALMER.

21

1    MR. PALMER:  ALL RIGHT.  I DON'T DISPUTE THAT YOU

2  HAVE THE AUTHORITY TO IMPOSE A BOND, YOUR HONOR.  THAT'S

3  NOT A QUESTION.  I AM VERY WORRIED ABOUT THE COURT'S

4  INDICATION THAT YOU ARE RELYING ON UNSUBSTANTIATED

5  HEARSAY EVIDENCE THAT IS SO ARGUMENTATIVE THAT IT'S

6  OBSCENE TALKING ABOUT HISTORY AND THINGS IN OTHER CASES.

7  AND I DID NOT ADDRESS THAT BECAUSE, ONE, IT'S

8  IRRELEVANT; TWO, IT'S TOTALLY INADMISSIBLE HEARSAY.

9  AND, THREE, I'VE BEEN HERE BEFORE, AND I JUST DIDN'T

10  THINK THAT WOULD SWAY YOU.

11    BUT IF YOU WOULD LIKE TO HEAR A RESPONSE TO

12  THAT, EVEN THOUGH I THINK IT'S IRRELEVANT, I CAN TELL

13  YOU ABOUT ALL THE CASES THAT I'VE MADE SUBSTANTIAL

14  IMPROVEMENTS IN THIS PROCESS IN INCLUDING ENRON,

15  RODRIGUEZ VERSUS WEST.  AND, IN FACT, IN THAT CASE, I

16  THINK IF THIS CASE CAME BACK, YOU WOULD HAVE TO

17  CAREFULLY CONSIDER AS TO WHETHER OR NOT THE RULE IN

Page 20

4-25-2011 Poss

18    RODRIGUEZ WOULD PROHIBIT ANY AWARD OF ATTORNEY'S FEES.

19           BUT I'M NOT PREPARED TO ARGUE THAT TODAY.

20    BUT I WILL TELL YOU THIS, YOUR HONOR.  IN TERMS OF THE

21    SETTLEMENT TO THE CLASS, I WILL SAY ON THE RECORD WE'RE

22    NOT GOING TO APPEAL THAT.  AND, IN FACT, AS FAR AS I'M

23    CONCERNED, THAT PART COULD BE DISPERSED.  WHAT WE'RE

24    APPEALING --

25           THE COURT:  WAIT, WAIT.  OKAY.  SO TELL ME WHAT

26    YOU'RE APPEALING?

27           MR. PALMER:  WE'RE APPEALING THIS QUESTION OF

28    NOTICE TO THE CLASS TO THE ATTORNEY'S FEES.  I'VE SAID

                                                    22

1    THIS TO MR. POMERANCE.  I'VE TRIED TO BE CRYSTAL CLEAR.

2           THE COURT:  SO THE OTHER THREE GROUNDS ARE

3    BASICALLY GOING TO BE ABANDONED?

4           MR. PALMER:  THAT'S RIGHT.

5           MR. POMERANCE:  IT STILL DOESN'T CHANGE ANYTHING.

6    UNDER THE AGREEMENT NOTHING CAN HAPPEN IN THE SETTLEMENT

7    IF THERE'S AN APPEAL PENDING.  WE DON'T KNOW WHAT THE

8    COURT OF APPEAL IS GOING TO DO.  IT MIGHT LOOK AT

9    SOMETHING ELSE.

10           MR. GOSHGARIAN:  EVEN MORE IMPORTANT.

11           MR. POMERANCE:  IT'S STILL -- HE CAN'T CONTROL

12    WHETHER THE CLASS GETS BENEFITS BY TAILORING HIS APPEAL.

13    THERE'S STILL A HOLD UP.

14           THE COURT:  LET ME DO THIS.  COUNSEL, I'VE GOT A

15    TRIAL IN THE MIDST.  I'M ALREADY LATE FOR IT.  WHAT I

16    WOULD LIKE TO DO -- YOU CAN DO ONE OF TWO THINGS.  YOU

17    CAN COME BACK, OR IF YOU WANT, I'LL GIVE YOU LIKE 10 OR

18    14 DAYS TO FILE CLOSING BRIEFS ON ANY MATTER YOU WANT TO

                          Page 21

4-25-2011 Poss

19  FILE THEM ON AND THEN I'LL TAKE THE MATTER UNDER

20  SUBMISSION.  WHAT'S YOUR PLEASURE?

21      MR. GOSHGARIAN:  WE'LL COME BACK THIS AFTERNOON.

22      THE COURT:  NO, NO, NO.  I'M IN TRIAL ALL DAY.

23      MR. GOSHGARIAN:  OKAY.  WHATEVER IS THE COURT'S

24  PLEASURE.  IF THE COURT WOULD THINK IT WOULD BE MORE

25  HELPFUL TO BE HERE OR FILE CLOSING ARGUMENTS.

26      THE COURT:  I TEND TO THINK A CLOSING BRIEF WOULD

27  BE BETTER.  AND IF THEN I WANT ANOTHER HEARING, WE'LL

28  CALL YOU AND ASK YOU IN.  OTHERWISE, I'LL JUST TAKE IT

                                                    23

1  UNDER SUBMISSION.  HOW MUCH TIME WOULD YOU LIKE?

2      MR. POMERANCE:  WHATEVER IS THE COURT'S

3  PREFERENCE.

4      MR. GOSHGARIAN:  A WEEK.

5      THE COURT:  MAKE IT EASY ON YOURSELVES.

6      MR. GOSHGARIAN:  WE WOULD LIKE TO GET IT DONE AS

7  QUICKLY AS POSSIBLE.

8      THE COURT:  OKAY.  LET'S SAY 10 DAYS.

9      MR. PALMER:  TEN DAYS WOULD BE GREAT.

10      THE COURT:  ALL RIGHT.  TEN DAYS FILE BRIEFS ON

11  ANY TOPIC YOU WANT.  DON'T MAKE IT TOO LONG, PLEASE.

12  MAYBE 15 PAGES MAX.  AND THEN THE MATTER WILL STAND

13  SUBMITTED.  THANK YOU ALL VERY MUCH.

14      IN UNISON:  THANK YOU, YOUR HONOR.

15

16      (THE PROCEEDINGS WERE CONCLUDED.)

17                  -oOo-

18

19

                    Page 22

4-25-2011 Poss

20
21
22
23
24
25
26
27
28

♀

1       SUPERIOR COURT OF THE STATE OF CALIFORNIA
2           FOR THE COUNTY OF LOS ANGELES
3
        DEPARTMENT 309              HON. ANTHONY J. MOHR, JUDGE
4
5       DANA POSS,                  )
                                    )
6              PLAINTIFF,           )   NO. BC297438
                                    )
7          VS.                      )
                                    )
8       21ST CENTURY INSURANCE      )   REPORTER'S
        COMPANY                     )   CERTIFICATE
9                                   )
               DEFENDANT.           )
10      _____)
11
12
13          I, CLAUDIA VECCHI-CORTEZ, OFFICIAL REPORTER OF THE
14      SUPERIOR COURT OF THE STATE OF CALIFORNIA, FOR THE
15      COUNTY OF LOS ANGELES, DO HEREBY CERTIFY THAT I DID
16      CORRECTLY REPORT THE PROCEEDINGS CONTAINED HEREIN AND
17      THAT THE FOREGOING PAGES 1 THROUGH 23, INCLUSIVE,
18      COMPRISE A FULL, TRUE, AND CORRECT TRANSCRIPT OF THE
19      PROCEEDINGS AND TESTIMONY TAKEN IN THE MATTER OF THE
20      ABOVE-ENTITLED CAUSE ON MONDAY, APRIL 25, 2011.

Page 23

4-25-2011 Poss

21

22      DATED THIS 14TH DAY OF JUNE, 2011.

23

24

25                ———

          CLAUDIA VECCHI-CORTEZ, CSR NO. 11630
26              OFFICIAL REPORTER

27

28

---

1        SUPERIOR COURT OF THE STATE OF CALIFORNIA

2          FOR THE COUNTY OF LOS ANGELES

3  DEPARTMENT 309        HON. ANTHONY J. MOHR, JUDGE

4

5  DANA POSS,           )
                    )
6      PLAINTIFF,    )  NO. BC297438
                    )
7     VS.            )
                    )
8  21ST CENTURY INSURANCE   )
  COMPANY             )
9                 )
       DEFENDANT.    )
10 _____)

11

12

13      REPORTER'S TRANSCRIPT OF PROCEEDINGS

14        MONDAY, APRIL 25, 2011

15

16  APPEARANCES:

17  FOR PLAINTIFF:     ROXBOROUGH POMERANCE NYE & ADREANI
                 BY:  DREW E. POMERANCE, ESQ.
18             5820 CANOGA AVENUE, SUITE 250
             WOODLAND HILLS, CALIFORNIA 91367
19
                   -AND-
20
             GOSHGARIAN & MARSHALL
21           BY:  MARK GOSHGARIAN, ESQ.
             23901 CALABASAS ROAD, SUITE 2073

Page 24

4-25-2011 Poss
22               CALABASAS, CALIFORNIA 91302

23   FOR DEFENDANT:      BARGER & WOLEN LLP
                        BY:  KENT R. KELLER, ESQ.
24                    633 WEST FIFTH STREET
                    FORTY-SEVENTH FLOOR
25                    LOS ANGELES, CALIFORNIA 90071

26
              (APPEARANCES CONTINUED ON NEXT PAGE.)
27

28            CLAUDIA VECCHI-CORTEZ, CSR NO. 11630
                  OFFICIAL REPORTER

♀

1   APPEARANCES OF COUNSEL (CONTINUED):

2   FOR OBJECTOR/APPELLANT
     PICCIONELLI AND AMAYA:
3
                    LAW OFFICES OF DARRELL PALMER
4                  BY:  DARRELL PALMER, LL.M.
                    603 NORTH HIGHWAY 101, SUITE A
5                  SOLANA BEACH, CALIFORNIA 92075

6                        -AND-

7                  LAW OFFICES OF KIRA M. RUBEL
                    BY:  KIRA M. RUBEL, ESQ.
8                  4041 MACARTHUR BOULEVARD
                    SUITE 350
9                  NEWPORT BEACH, CALIFORNIA 92660

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 25

Exhibit D

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  | CIVIL ACTION |
|---|---|
| IN RE HERLEY INDUSTRIES INC.<br>SECURITIES LITIGATION | No. 06-2596 (JRS)<br><br>CLASS ACTION |

## ORDER DENYING OBJECTION AND REQUIRING APPEAL BOND

WHEREAS:

A.      As of June 23, 2010, Lead Plaintiff, Norfolk County Retirement System ("Lead

Plaintiff"), acting on behalf of itself and the Settlement Class, entered into an agreement of

settlement with the Settling Defendants in this action (the "Litigation").

B.      Pursuant to the Preliminary Approval Order Providing for Notice and Hearing in

Connection With Proposed Class Action Settlement entered July 2, 2010 (the "Preliminary

Approval Order"), the Court scheduled a hearing for September 13, 2010, at 9:00 a.m. (the

"Settlement Hearing") to, *inter alia*: (a) determine whether the proposed settlement of the

Litigation on the terms and conditions provided for in the Stipulation is fair, reasonable and

adequate, and should be approved by the Court; (b) determine whether the proposed Plan of

Allocation should be approved; (c) determine whether Lead Counsel should be awarded

attorneys' fees and reimbursement of expenses; and (d) determine whether Class Representative's

should be awarded expenses.

C. The Court ordered that the Notice and the Summary Notice be disseminated to Class Members. Any objections to the Settlement or request for attorneys' fees were required to be filed with the Court and served on counsel for the Settling Parties by August 30, 2010.

D. The Court has received one objection, "Objection of Pamela Newmark Reed Defined Benefit PL & TR DTD 11/30/02," Docket No. 284 (the "Objection").

E. This Court has duly considered the Lead Plaintiff's motion for approval of the Settlement, Lead Counsel's motion for attorneys' fees and reimbursement of expenses, the affidavits, declarations and memorandum of law submitted in support thereof, the Objection, the September 3, 2010 declaration of Jonathan Gardner ("Gardner Objector Decl.") with annexed exhibits including: (1) a copy of the Notice of Proposed Class Action Settlement, (2) compendiums of preliminary approval orders from the 3rd Circuit following a schedule similar to that proposed by Class Counsel (3) a declaration from the Claims Administrator discussing the benefits incurred by a class from using a de minimus provision, (4) Palmer's objection in *In re Broadcom Corp Sec. Litig.*, No. 06-cv-5036-R (CWx) (N.D. Cal.) (Docket No. 348), and (5) the Judge's decision in *In re Broadcom Corp Sec. Litig.*, No. 06-cv-5036-R (CWx) (N.D. Cal.) (Docket No. 356), and all of the submissions and arguments presented.

NOW, THEREFORE, after due deliberation, IT IS ORDERED, ADJUDGED AND DECREED that:

1. This Order incorporates by reference the definitions in the Stipulation, and all capitalized terms used herein shall have the same meanings as set forth in the Stipulation.

2. The Objection is overruled in its entirety.

2

3.    If Pamela Newmark Reed Defined Benefit PL & TR DTD 11/30/02 appeals from

the denial of its Objection, it will be required to post a $10,000 bond, pursuant to Fed. R. App.

P. 7.

IT IS SO ORDERED.

DATED: _September 13 2010_

_____
THE HONORABLE JUAN R. SÁNCHEZ
UNITED STATES DISTRICT JUDGE

Exhibit E

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

*IN RE: NETFLIX PRIVACY LITIGATION*

Case No. 5:11-cv-00379-EJD

**DECLARATION OF KATHERINE STROHLEIN**

[Hon. Edward J. Davila]

Pursuant to 28 U.S.C. § 1746, I hereby declare and state as follows:

1. I am over the age of eighteen and am fully competent to make this declaration. If called upon to testify to the matters attested to herein, I could and would competently do so.

2. I make this declaration based upon personal knowledge unless otherwise indicated. I do so for the purpose of advising the Court of the fact that my name has been used without authorization by attorney Darrell Palmer to both lodge an objection to the class action settlement reached in this case and also appeal this Court decision granting approval of the settlement. As set forth below, I do not wish to be involved in this case, including as an objector in this Court (the Northern District of California) or an appellant in the Appellate Court (the Ninth Circuit Court of Appeals).

3. I understand that in documents filed in this court, I have been identified as a

class member, who has lodged an objection to the class action settlement reached in this case.

4.     I first became aware of my involvement in this case as a supposed objector to the settlement when on Tuesday, February 25, 2014, I was served with a subpoena to produce documents to Plaintiffs' counsel by March 19, 2014, and appear for an oral deposition to take place on April 1, 2014.

5.     Prior to my receipt of the above-described subpoena, I had absolutely no awareness of or understanding about this case or the settlement reached in it.  Shortly after I was served with the subpoena, but later the same day, I telephoned my sister to discuss the subpoena because I noticed that an individual named Darrell Palmer—who used to be my sister's employer—was identified on the document as my attorney. I informed my sister that Mr. Palmer was not my attorney, and that I was unaware of the case, did not want to be involved in it, and never authorized anyone, including Mr. Palmer to take any action in the case on my behalf.

6.     Following my conversation with my sister, on Thursday, February 27, 2014, Mr. Palmer telephoned me to discuss my involvement in the case.  During that call, I informed Mr. Palmer that, among other things, I never authorized him to act as my attorney, never instructed him to take any action on my behalf in this case, and that I wanted no involvement in the case.  He responded that, among other things, my involvement in the case was the result of a misunderstanding as he claimed that he intended to represent my sister, who as I mentioned above, was a former employee of his.  Mr. Palmer then quickly ended the phone call and said that he would call me back to clear up the misunderstanding.

7.     Following my conversation with Mr. Palmer, I subsequently spoke to my sister by telephone to inquire as to whether Mr. Palmer was telling the truth and whether Mr. Palmer was supposed to be representing her in this case and whether my involvement was just the result of Mr. Palmer confusing my name with that of my sister.  In response, my sister informed me that she too had no knowledge of the case and had not retained Mr. Palmer or anyone else to represent her.

8.    The next day, on Friday, February 28, 2014, Mr. Palmer again telephoned me to discuss my involvement in the case.  I once again informed him that I did not want to be involved in the case, that he had no authority to take any action in the case on my behalf, and that I wanted to be removed from the case entirely.  In response, Mr. Palmer became agitated and proceeded to address me in a condescending manner, claiming among other things, that I didn't understand the legal profession, that he was the only person that could dismiss me from the case, and that I was making a mistake because if I just allowed the objection and appeal to play out, I would stand to gain a lot of money.  In response, I advised Mr. Palmer that I didn't care about making any money, that I was upset that he had acted in my name without authority, and again, that I did not want to be involved in the case.

9.    I understand that Mr. Palmer has filed documents in this Court on my behalf, including a so-called objection wherein he states that I am a member of the settlement class who took issue with and objected to the class action settlement reached in the case.  I am further aware that Mr. Palmer has filed documents in the Ninth Circuit Court of Appeals on my behalf, including notices of appeal of various decisions rendered by this Court.

10.    I have never before in my life met Darrell Palmer, I never retained Mr. Palmer or anyone else to act as my attorney in this case, never authorized anyone to file any documents on my behalf either in this Court or in the Ninth Circuit Court of Appeals, and every act that Mr. Palmer or anyone else associated with him has undertaken in my name in this case, has done so without conferring with or getting authorization from me.

11.    Prior to my telephone conversation with Mr. Palmer on February 27, 2014, I had never before spoken with Mr. Palmer.

12.    I do not wish to continue with my objection, do not wish to continue with my appeal and desire instead to have it dismissed, and I do not wish to be part of this case in any way.  I hereby request that I be immediately dismissed from this case.

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 3, 2014, at Los Angeles, California.

1                                   _s/_

2                                   Katherine Strohlein

3

4

5

6

7   *Prepared by:*

8   Mark Eisen (SBN - 289009)
    meisen@edelson.com

9   EDELSON PC
    555 West Fifth Street, 31st Floor

10  Los Angeles, California 90013
    Tel: 213.533.4100

11  Fax: 213.947.4251

12

13  Jay Edelson (Admitted *Pro Hac Vice*)
    jedelson@edelson.com

14  Rafey S. Balabanian (Admitted *Pro Hac Vice*)
    rbalabanian@edelson.com

15  J. Dominick Larry (Admitted *Pro Hac Vice*)
    nlarry@edelson.com

16  EDELSON PC
    350 North LaSalle Street, Suite 1300

17  Chicago, Illinois 60654
    Tel: 312.589.6370

18  Fax: 312.589.6378

19

20  *Attorneys for Plaintiffs JEFF MILANS
    and PETER COMSTOCK and the CLASS*

21

22

23

24

25

26

27

28

DECLARATION OF KATHERINE STROHLEIN     4         CASE NO. 5:11-CV-00379-EJD

# CERTIFICATE OF SERVICE

The undersigned certifies that, on March 7, 2014, I caused this document to be electronically filed with the Clerk of the Court using the CM/ECF system, thus effectuating service of such filing on all ECF registered attorneys in this case. I further certify that I caused the foregoing document to be sent by USPS first class mail to the following participants, postage prepaid, at the address listed below:

Thomas L. Cox
4934 Tremont
Dallas, Texas 75214
tcox009@yahoo.com

*Attorney for Objector Tracey Cox Klinge*

Anthony Calero
1999 Harrison Street, 26th Floor
Oakland, California 94612

*Attorney for Objectors Denis Bonneau and Judith Mallory*

Dated: March 7, 2014                              s/ J. Dominick Larry

---

DECLARATION OF KATHERINE STROHLEIN                         CASE NO. 5:11-cv-00379-EJD

Exhibit F

THE HONORABLE JAMES L. ROBART

1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

8

9

| | |
|---|---|
| MARK A. ARTHUR, CIRILO MARTINEZ, and PARI NAJAFI on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SALLIE MAE, INC.,<br><br>Defendant. | CLASS ACTION<br><br>NO. 10-cv-00198-JLR<br><br>**DECLARATION OF JONATHAN D. SELBIN IN OPPOSITION TO INTERVENOR JUDITH HARPER'S MOTION TO LIFT STAY** |

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

LIEFF CABRASER HEIMANN & BERNSTEIN
250 HUDSON STREET, 8TH FLOOR
NEW YORK, NY 10013
TEL. 212.355.9500 • FAX 212.355.9592

1    I, JONATHAN D. SELBIN, declare as follows:

2        1.    I am a member of the law firm of Lieff, Cabraser, Heimann & Bernstein,

3    LLP ("LCHB"), counsel of record for Plaintiffs and the Class in this matter.  I am admitted *pro*

4    *hac vice* to this Court and am a member in good standing of the bars of the States of California

5    and New York, and the bar of the District of Columbia.  Except as otherwise noted, I have

6    personal knowledge of the facts set forth in this declaration, and could testify competently to

7    them if called upon to do so.

8        2.    I am the lead partner at LCHB on this case, and have been involved in

9    every aspect of it from inception through the present.

10        3.    I submit this declaration in opposition to Intervenor Judith Harper's motion

11    to lift the stay of proceedings ordered by this Court on September 17, 2010. ("Mot. to Lift Stay")

12    (Dkt. No. 198); *see also* Dkt. No. 39 at 7-8 (Stay Order).

13        4.    On October 14, 2011, I attended the afternoon sessions of the 15th Annual

14    National Institute on Class Actions in New York City.  Intervenor's primary counsel in this case,

15    Darrell Palmer, presented on a panel entitled "Melee in Manhattan!  Class-Action Objectors - Are

16    The Protectors of Absent Class Members of Merely Gadflies?"  Relevant excerpts of the panel

17    transcript are attached hereto as Exhibit A.

18        5.    During the course of the session, Mr. Palmer stated that objecting to class

19    action settlements was not his "day job," but a "hobby."  *See* Ex. A at 47.  At one point, the panel

20    moderator asked the panelists how much money they had accepted over the years to drop appeals

21    from denials of objections filed to class settlements.  Mr. Palmer responded "a lot."  Ex. A at 59,

22    61.

23        6.    Upon the Court's request, I will provide a complete transcript of the panel

24    discussion.  A recording of the panel discussion also may be accessed at following location:

25    http://apps.americanbar.org/abastore/products/digital/media/ppv/cen11cac1aud.zip.

26

1          I declare under penalty of perjury of the laws of New York and the United States that the

2   foregoing is true and correct, and that this declaration was executed in New York, New York on

3   November 28, 2011.

4

5                                                          _/s/ Jonathan D. Selbin_
                                                           Jonathan D. Selbin

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

# EXHIBIT A

INTRODUCTION


      Welcome to the National Institute on Class Actions, presented by the American Bar Association, Center For Continuing Legal Education in the section of litigation, held on October 14th, 2011.  We now join this session:  Melee in Manhattan, Class Action Objectors. Are they protectors of absent class action members or merely gadflies? Recorded live from New York.

October 14, 2011

Page 46

```
 1          of these because the incentives

 2          that shape these settlements are

 3          reflected in the settlement.  So I

 4          think you can always find

 5          something to tell a judge about

 6          that's legitimate; that if the

 7          judge corrected it, it would make

 8          this process work better for class

 9          members.

10               MR. PALMER:  I don't think

11          so.  I don't think that there are

12          -- that 95 percent of the cases

13          are objectionable.  That's -- if

14          you follow the rules and you have

15          some consideration for the actual

16          class -- listen, I'm happy that

17          some of my friends make millions

18          of dollars on these cases.  That's

19          great.

20               JUDGE ATLAS:  They take you

21          on their yachts.

22               MR. PALMER:  I have my own

23          yacht.

24               MR. ESADES:  So what
```

October 14, 2011

Page 47

1      about...

2           MR. PALMER:  And by the way,

3      this isn't my day job, in case

4      anybody wondered.  Objecting is

5      not what I principally do, but I'm

6      not going to tell you what I do,

7      because God knows what would

8      happen then, but... yeah, it's

9      just like a hobby for me.

10          MR. ESADES:  So -- I'm

11     sorry.  Go ahead.

12          MR. FRANK:  That was

13     mysterious.

14          JUDGE ATLAS:  Yeah, really.

15     I'll make one sort of comment as a

16     footnote, since there's so many

17     class action lawyers in the room.

18          It -- I understand there are

19     a lot of requirements for notice,

20     but there is no reason that

21     notices cannot be drafted in ways

22     that are both legible and

23     comprehensible to the lay person.

24     This was mentioned earlier, but

Case 2:11-cv-08276-JAK-PLA Document 206-2 Filed 04/11/14 Page 133 of 220  Page ID
#:3350

Page 59

1          that.  I think I can speak loudly

2          enough.

3              So going to something that

4          Vince touched upon earlier, this

5          notion of professional objectors

6          essentially selling their appeal.

7          Maybe the preview (inaudible) are

8          not type of professional objector,

9          but going to something in

10         Mr. Schoenbrun mentioned, who

11         complained bitterly about the

12         excessive fees that counsel

13         receive.  I'm curious how much

14         each of you has accepted to sell

15         appeals of class action

16         settlements over the last decade.

17              MR. FRANK:  Zero.

18              COMMENTER:  Fair enough.

19              MR. SCHOENBRUN:  I'm not

20         going to answer the question, but

21         what I would say to you is this:

22         I don't mind disclosure.  What I

23         would like to see is plaintiff

24         class action lawyers disclose

Case 2:11 Case 02 276-JAK-PLA JDR Documen 296 203 Filed File 09/14 28 Page Page 6 of 228 Page ID #:3351

```
 1          every case in which they received
 2          a fee, how much they got, and how
 3          much the class members got.
 4          Because the incident that he
 5          talked about, two million for the
 6          -- I don't know what the static
 7          was -- there's a famous case in
 8          California, 25 million for the
 9          lawyers and $75,000 for the class.
10          And so that's the kind of static
11          that I think should be disclosed.
12          I don't have a problem with
13          disclosure if it goes both ways.
14               COMMENTER:  You realized
15          that information is disclosed in
16          the final approval.
17               MR. SCHOENBRUN:  No, it
18          isn't.  It's typically kept
19          hidden.
20               COMMENTER:  It absolutely
21          is.
22               MR. SCHOENBRUN:  It is
23          typically kept hidden.
24
```

October 14, 2011

Page 61

```
 1            MR. ESADES:  Let me just --
 2            MR. FRANK:  It varies from
 3       judge to judge, but there are
 4       many, many settlements out there
 5       where you never know how much is
 6       disclosed -- how much is
 7       distributed to the class, and it
 8       -- there's a settlement fund set
 9       up.  The class takes a tiny little
10       portion of it, the rest reverts to
11       the defendants, or in coupon
12       cases, especially in coupon cases,
13       you don't find that out.  And I've
14       tried to find that out and the
15       claims administrator will hang up
16       on you.
17            MR. ESADES:  Darrell, I
18       don't want to rob you of the
19       opportunity to answer this
20       question.
21            MR. PALMER:  A lot.
22            UNIDENTIFIED: He said a lot.
23            MR. ESADES:  I want to touch
24       on an opinion and I meant to touch
```

Page 79

```
 1                    CERTIFICATE

 2

 3              I, CONSTANCE E. PERKS, a

 4         Notary Public and Certified Court

 5         Reporter of the State of New

 6         Jersey, do hereby certify that

 7         that the foregoing audio recording

 8         was transcribed by me to the best

 9         of my ability.

10              I DO FURTHER CERTIFY that I

11         am neither a relative nor employee

12         nor attorney nor counsel of any of

13         the parties to this matter, and

14         that I am neither a relative nor

15         employee of such attorney or

16         counsel, and that I am not

17         financially interested in the

18         matter.

19

20

21         _____

22         CONSTANCE E. PERKS, CRR, CCP, CLR, CCR
           Notary License #2381708

23         Notary Expiration: January 21, 2014
           CCR License #30XI00142900

24         Dated:  October 31, 2011
```

Exhibit G

1  FRANCIS O. SCARPULLA (41059)
   CRAIG C. CORBITT (83251)
2  CHRISTOPHER T. MICHELETTI (136446)
   ZELLE HOFMANN VOELBEL & MASON LLP
3  44 Montgomery Street, Suite 3400
   San Francisco, CA 94104
4  Telephone: (415) 693-0700
   Facsimile: (415) 693-0770
5  fscarpulla@zelle.com
   ccorbitt@zelle.com
6
   *Lead and Liaison Counsel for*
7  *Indirect-Purchaser Class*

8

9

10

11              **UNITED STATES DISTRICT COURT**

12            **NORTHERN DISTRICT OF CALIFORNIA**

13                    **OAKLAND DIVISION**

14  | IN RE STATIC RANDOM ACCESS | Case No. 4:07-md-1819 CW |
    | MEMORY (SRAM) ANTITRUST | |
15  | LITIGATION | MDL No. 1819 |
16  | | **NOTICE OF MOTION AND MOTION FOR** |
    | | **AN ORDER TO SHOW CAUSE REGARDING** |
17  | | **FINDING OF CIVIL CONTEMPT AND** |
    | | **AWARD OF SANCTIONS AGAINST** |
18  | This Document Relates to: | **OBJECTORS BARBARA COCHRAN AND** |
    | | **KELSEY FOLIGNO; MEMORANDUM IN** |
19  | ALL INDIRECT-PURCHASER ACTIONS | **SUPPORT THEREOF** |
20  | | Hearing Date: October 6, 2011 |
    | | Time: 2:00 p.m. |
21  | | Courtroom: 2, 4th Floor |
    | | Judge: Hon. Claudia Wilken |
22

23

24

25

26

27

28

<u>**NOTICE OF MOTION AND MOTION**</u>

**TO ALL PARTIES AND COUNSEL OF RECORD, PLEASE TAKE NOTICE** that, on October 6, 2011, or as soon thereafter as the Court deems appropriate and the Court's calendar permits, before the Honorable Claudia Wilken, United States District Court, Northern District of California, 1301 Clay Street, Suite 400S, Oakland, California, Indirect-Purchaser ("IP") Plaintiffs will and hereby do move, pursuant to Federal Rules of Civil Procedure 26, 30, 34, 37 and 45, for an Order finding Objector Barbara Cochran ("Cochran") and Objector Kelsey Foligno ("Foligno") in civil contempt and sanctioning them for their failure to comply with the Court's September 23, 2011 Order Granting Indirect Purchaser Plaintiffs' Motion To Compel Discovery From Objectors ("Order") (DE 1393). IP Plaintiffs request that the Court issue an order to show cause, directed to Cochran and Foligno and their counsel, as to why Cochran and Foligno should not be found in civil contempt and sanctioned.

This motion is made on grounds that (1) the Court ordered Cochran and Foligno, who have filed objections and have voluntarily injected themselves into these proceedings, to appear for depositions by October 3, 2011; and (2) Cochran and Foligno and their counsel have refused to appear for any such deposition and have provided no excuse or justification for their complete disregard of the Court's Order. This motion is based upon this Notice and Motion, the following Memorandum of Law, the supporting Declaration of Christopher T. Micheletti in Support of Motion For an Order to Show Cause Regarding Finding of Civil Contempt and Award of Sanctions Against Objectors Barbara Cochran and Kelsey Foligno ("Micheletti Contempt Decl."), and such other arguments that may be presented to the Court.

///

///

///

///

///

Case 2:07-md-01819-DW Document 206-1 Filed 09/08/11 Page 140 of 220

1                                     **MEMORANDUM OF LAW**

2 **STATEMENT OF ISSUES TO BE DECIDED:**

3          Whether Cochran and Foligno and their counsel should be found to be in civil contempt

4 and sanctioned for failing to comply with the Court's Order?

5 **I.     INTRODUCTION**

6          IP Plaintiffs have served discovery on objectors Cochran and Foligno to obtain relevant

7 information regarding: their alleged standing as Settlement Class members to assert objections,

8 the underlying bases for their objections, and their relationships with the "professional" or

9 "serial" objector counsel representing them. Cochran and Foligno refused to appear for their

10 depositions or produce relevant documents, and IP Plaintiffs moved to compel that discovery

11 from them. This Court decided the motion and ordered Cochran and Foligno to appear for a

12 deposition and produce documents by October 3, 2011. Cochran and Foligno have ignored the

13 Order and have refused to be deposed or produce documents. Neither objector nor their counsel

14 has provided any reason or justification for not appearing for a deposition or producing

15 documents. For the reasons detailed below, the Court should issue and order to show cause

16 directed to Cochran and Foligno and their counsel as to why they should not be found in civil

17 contempt for their failure to comply with this Court's Order, and/or sanction them by ordering

18 that they pay IP Plaintiffs' attorneys fees and expenses incurred in connection with pursuit of this

19 discovery.

20 **II.    STATEMENT OF FACTS**

21          IP Plaintiffs have been seeking the depositions of and document discovery from Cochran

22 and Foligno since August 29, 2011. IP Plaintiffs sought discovery from the objectors only a few

23 days after they filed their objections and more than seven weeks prior to the upcoming October

24 6, 2011 Fairness Hearing. IP Plaintiffs' efforts to obtain this discovery have been set out in

25

26

27

28

NOTICE OF MOTION AND MOTION FOR AN ORDER TO SHOW CAUSE REGARDING FINDING OF
CIVIL CONTEMPT AND AWARD OF SANCTIONS AGAINST OBJECTORS BARBARA COCHRAN AND
KELSEY FOLIGNO; MEMORANDUM IN SUPPORT THEREOF
Case No. 4:07-md-1819 CW; MDL No. 1819

detail in their Motion to Compel Discovery from Objectors and supporting papers,[1] and for brevity, will not be repeated here.  In sum, after Cochran and Foligno attempted to evade service and after IP Plaintiffs incurred significant costs and expenses in serving them, they refused to appear for depositions or produce documents, and IP Plaintiffs moved to compel that discovery.  *See supra* note 1.  Cochran and Foligno opposed the motion (*see* DE 1391), and on September 23, this Court granted IP Plaintiffs' motion, ordering as follows:

> Objectors Barbara Cochran and Kelsey Foligno shall each appear for a deposition not to exceed three hours in length, on or before October 3, 2011 (or by such other date as may be agreed to by IP Plaintiffs and Cochran and Foligno), at a location within 25 miles of their place of residence (or at such other location as may be agreed to by IP Plaintiffs and Cochran and Foligno). Cochran and Foligno shall also produce the documents requested in IP Plaintiffs' Attachment A, Requests For Production, attached to their subpoenas two days prior to their respective depositions (or at such other time as may be agreed to by IP Plaintiffs and Cochran and Foligno). To the extent Cochran and Foligno withhold any documents on grounds of privilege, a detailed privilege log shall also be produced (at the same time as the documents referenced in the prior sentence), providing the information required by Fed. Rule Civ. Proc. 26(b)(5) and requested by IP Plaintiffs in the Attachment A, Instructions (¶3) attached to their subpoenas.

Order (DE 1393).

On September 23, 2011, shortly after entry of the Order, IP Plaintiffs Counsel sent the Order to Darrell Palmer, counsel for Cochran, by email, and to both Foligno and her counsel Christopher Bandas, by email and by courier.  Micheletti Contempt Decl. ¶2, Exs. 1 and 2; DE 1394 (proof of service).  IP Plaintiffs also served the Order on Foligno by email and by courier at her email and home addresses listed in her objection.  DE 1394.  In the email communications, IP Plaintiffs' Counsel requested that Palmer and Bandas immediately provide available dates (on or prior to October 3) for Cochran's deposition and Foligno's deposition, respectively.  Micheletti Contempt Decl. Exs. 1 and 2.  IP Plaintiffs' Counsel asked Palmer and Bandas to

---

[1] Motion For Administrative Relief with attached Motion to Compel Discovery From Objectors (DE 1386, 1386-1), Appendices A and B thereto (DE 1386-2, 1386-3); Micheletti Declaration in Support of Administrative Motion and Motion to Compel (DE 1386-4) ("Micheletti Admin. Mot. Decl.").  All of these papers are incorporated herein by this reference.

3

NOTICE OF MOTION AND MOTION FOR AN ORDER TO SHOW CAUSE REGARDING FINDING OF CIVIL CONTEMPT AND AWARD OF SANCTIONS AGAINST OBJECTORS BARBARA COCHRAN AND KELSEY FOLIGNO; MEMORANDUM IN SUPPORT THEREOF
Case No. 4:07-md-1819 CW; MDL No. 1819

provide a location for the deposition, if they desired.  *Id.*  Attorney Palmer responded by email to

IP Plaintiffs' Counsel's email, indicating that he had not seen the order as of yet.  Palmer cc'ed

attorney Bandas in his response.  Upon receipt of that email, IP Plaintiffs' Counsel sent the text

of the order by email to Palmer and Bandas in a further email sent at 1:43 p.m. on September 23,

2011.  *See* Micheletti Contempt Decl. Ex. 1.

By Monday, September 26 at 6:00 p.m., neither Palmer nor Bandas responded to IP

Plaintiffs' Counsel's request for a deposition date.  As a result, IP Plaintiffs Counsel sent emails

to Palmer, and to Bandas with a cc to Foligno, as follows:

> It has been three days and I have received no response from you regarding [Ms.
> Cochran's/Foligno's]  compliance  with  the  Court's  order  referenced  below.
> October 3, 2011 is one week from today, and I request that you provide me with
> one or more proposed deposition dates on or before that date.  If you do not intend
> to produce your client for a deposition, please advise me immediately and explain
> the basis for your and your client's non-compliance with the Court's order.  We
> reserve  all  rights  under  the  Federal  Rules  of  Civil  Procedure  and  any  other
> applicable rules to seek all appropriate sanctions or remedies for failure to comply
> with the order.

Micheletti Contempt Decl. ¶3, Exs. 3 and 4.  Palmer responded to the email, indicating that he

would respond further by Wednesday, September 28, but no response was forthcoming.  *Id.* ¶3.

On Friday, September 30, 2011, having received no communication whatsoever from Bandas or

Foligno, and no promise to comply with the Order at any time from Palmer, IP Plaintiffs'

Counsel advised Palmer, Bandas and Foligno that this motion would be filed on Monday,

October 3, 2011, that an expedited briefing schedule would be sought, and that IP Plaintiffs

would seek to have the motion heard at the October 6, 2011 Fairness hearing.  Micheletti

Contempt Decl. ¶4, Exs. 5 and 6.  This information was sent to Foligno by overnight courier on

Friday, September 30 as well.  *Id.* Ex. 7.

In connection with pursuing this discovery from Cochran and Foligno, IP Plaintiffs

Counsel have spent well-over ten hours of work on preparation and service of subpoenas,

preparation of communications with the objectors and their counsel in an effort to obtain the

requested discovery and compliance with the subpoenas, and preparation of the administrative

NOTICE OF MOTION AND MOTION FOR AN ORDER TO SHOW CAUSE REGARDING FINDING OF
CIVIL CONTEMPT AND AWARD OF SANCTIONS AGAINST OBJECTORS BARBARA COCHRAN AND
KELSEY FOLIGNO; MEMORANDUM IN SUPPORT THEREOF
Case No. 4:07-md-1819 CW; MDL No. 1819

motion and motion to compel. IP Plaintiffs' Counsel devoted well-over five additional hours to communications with objectors and their counsel in an effort to obtain their compliance with the Order, and in preparation of this motion. While IP Plaintiffs' Counsel's fees for such work significantly exceed $5,000, solely for purposes of this motion, IP Plaintiffs limit their request for fees to $2,500 each from Cochran and Foligno. IP Plaintiffs' Counsel also incurred costs associated with the service of the subpoenas on Cochran and Foligno in the amount of $2003.15 and $763.00, respectively. *See* Micheletti Contempt Decl. ¶5, Ex. 8.

## III. ARGUMENT

### A. The Applicable Legal Standard

A non-party's failure to comply with a court order mandating attendance at a deposition without adequate excuse is a contempt of court. *See* Fed. R. Civ. P. 45(e); *Pennwalt Corp. v. Durand-Wayland, Inc.*, 708 F.2d 492, 494 (9th Cir. 1983) (court may impose sanctions under Rule 45(e) for failure to comply with court order requiring compliance with a subpoena). Similarly, "Rule 37(b)(1) provides [an] appropriate means to sanction a nonparty" for failure to appear at a deposition. *See Gen. Insur. Co. of Am. v. E. Consol. Util., Inc.*, 126 F.3d 215, 220 (3d Cir. 1997) (citing *Miller v. Transamerica Press, Inc.*, 709 F.2d 524, 531 (9th Cir. 1983) (under Rule 37(b)(1), "a deponent who fails to be sworn or answer after being directed to the by the court may be held in contempt")). "Whether to impose discovery sanctions is a matter of the district court's sound discretion." *Miller*, 709 F.2d at 532.[2]

---

[2] Because these cases have been coordinated in the Northern District of California by the Judicial Panel on Multidistrict Litigation, the subpoenas at issue are properly enforced in this court. Under 28 U.S.C. 1407(b), the transferee court "may exercise the powers of a district judge in any district for the purpose of conducting pretrial depositions in such coordinated or consolidated pretrial proceedings." In addition, it is well settled that the enforcement of a third-party subpoena by the transferee court is proper. *See In re Napster, Inc. Copyright Litig.*, No. C MDL-00-1369 MHP, 2006 U.S. Dist. LEXIS 5748, at *10 (N.D. Cal. Feb. 15, 2006) (MDL-transferee court had jurisdiction to consider defendants' motions to compel) ("Courts considering the question have uniformly held that the MDL judge may enforce a deposition subpoena issued in another district, including a subpoena duces tecum."); *In re Welding Rod Prods. Liability Litig.*, 406 F. Supp. 2d 1064, 1067 (N.D. Cal. 2005) (referral of discovery dispute to MDL-transferee court was proper where the MDL action was complex, the assigned judge was "readily familiar

5

NOTICE OF MOTION AND MOTION FOR AN ORDER TO SHOW CAUSE REGARDING FINDING OF CIVIL CONTEMPT AND AWARD OF SANCTIONS AGAINST OBJECTORS BARBARA COCHRAN AND KELSEY FOLIGNO; MEMORANDUM IN SUPPORT THEREOF
Case No. 4:07-md-1819 CW; MDL No. 1819

Additionally, some courts have held that "absent class members are parties to an action, properly before the court, and subject to its judicial orders." *McCubbrey v. Boise Cacade Home & Land Corp.*, 71 F.R.D. 62, 72 (N.D. Cal. 1976). Under Rule 37(b)(2)(A), a wide range of sanctions are available against a party for "fail[ure] to obey an order or to provide or permit discovery[.]" *See* Fed. R. Civ. P. 37(b)(2)(A)(i)–(vii) (nonexclusive list of sanctions).

Finally, "[c]ourts are invested with inherent powers that are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Unigard Sec. Insur. Co. v. Lakewood Eng. & Mfg., Corp.*, 982 F.2d 363, 368 (9th Cir. 1992) (*citing Chambers v. NASCO, Inc.*, 501 U.S. 32, 111 S. Ct. 2123, 2132 (1991) (quotations omitted)).

A civil contempt sanction "is designed to force the contemnor to comply with an order of the court" and effect discovery conduct. *Cunningham v. Hamilton Cty.*, 527 U.S. 198, 207 (1999). Courts possess inherent power to enforce orders through civil contempt, including "disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply." *Aguilar v. Cty. of Fresno*, No. 1:08-cv-1202 AWI GSA, 2010 U.S. Dist. LEXIS 27136, *5 (E.D. Cal. Mar. 23, 2010). Further, "[a] district court has wide latitude in determining whether there has been a contemptuous defiance of one of its orders." *Id.* (citing *Stone v. City of San Francisco*, 968 F.2d 850, 856 (9th Cir. 1992)).

The party seeking civil contempt must show "by clear and convincing evidence that the contemnors violated a specific and definite order of the court." *FTC v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999). The contemnors must then demonstrate that they "took every reasonable step to comply" or why they cannot comply. *Aguilar*, 2010 U.S. Dist. LEXIS 27136,

---

with the underlying issues," and spent "considerable time and effort coordinating the pretrial proceedings"); *In re Asbestos Prods. Liability Litig.*, 256 F.R.D. 151, 154 (E.D. Pa. 2009) (MDL-transferee court had jurisdiction to address motions to compel compliance with subpoenas and to quash subpoenas).

NOTICE OF MOTION AND MOTION FOR AN ORDER TO SHOW CAUSE REGARDING FINDING OF
CIVIL CONTEMPT AND AWARD OF SANCTIONS AGAINST OBJECTORS BARBARA COCHRAN AND
KELSEY FOLIGNO; MEMORANDUM IN SUPPORT THEREOF
Case No. 4:07-md-1819 CW; MDL No. 1819

1    *7.  Factors the court may consider include: (1) history of noncompliance; and (2) failure to

2    comply despite pendency of a contempt motion.  *Id.*

3        Sanctions in civil contempt may (1) coerce compliance with a court's order or (2)

4    "compensate the complainant for losses sustained as a result of the contumacious behavior."

5    *FTC v. Productive Mktg., Inc.*, 136 F. Supp. 2d 1096, 1112 (C.D. Cal. 2001).  When a contempt

6    order is issued to obtain compliance, "the court must 'consider the character and magnitude of

7    the harm threatened by continued contumacy, and the probable effectiveness of any suggested

8    sanction in bringing about the result desired."  *Aguilar*, 2010 U.S. Dist. LEXIS 27136, *8.

9    Courts have found payment of expenses and attorney's fees caused by noncompliance, (*Gen.*

10   *Insur. Co. of Am. v. E. Consol. Util., Inc.*, 126 F.3d 215, 220 (3d Cir. 1997)), per diem fines,

11   (*Productive Mktg.*, 136 F. Supp. 2d at 1112), and incarceration (*Aguilar*, 2010 U.S. Dist. LEXIS

12   27136, *10), appropriate to compel compliance.

13       **B.    An Order to Show Cause Why Cochran and Foligno, and Their Counsel, Should Not Be Found in Contempt, and Why Sanctions Should Not Be Awarded, Should Be Issued By the Court**

14

15       Here, Cochran, Foligno, Palmer and Bandas have voluntarily injected themselves into

16   this litigation by objecting to the Settlements and the Plan of Distribution.  Cochran and Foligno

17   have been ordered to appear for depositions and have not only refused to appear, but have

18   refused to communicate with IP Plaintiffs' Counsel on the topic, and have provided no reason for

19   their failure to comply with this Court's Order.  Despite formally appearing on behalf of

20   Cochran, Palmer has refused to respond to IP Plaintiffs' request for a deposition date or indicate

21   whether his client refuses to comply with the Order.  Similarly, despite acknowledging that he

22   represents Foligno regarding IP Plaintiffs' efforts to serve and depose her in Texas, attorney

23   Bandas has refused to respond to IP Plaintiffs' requests in any fashion, and direct contacts with

24   Foligno have gone unanswered as well.  Thus, it is unclear whether Cochran and Foligno are

25   ignoring the Court's Order under advice of counsel; whether they are ignoring it on their own

26

27

28

7

NOTICE OF MOTION AND MOTION FOR AN ORDER TO SHOW CAUSE REGARDING FINDING OF
CIVIL CONTEMPT AND AWARD OF SANCTIONS AGAINST OBJECTORS BARBARA COCHRAN AND
KELSEY FOLIGNO; MEMORANDUM IN SUPPORT THEREOF
Case No. 4:07-md-1819 CW; MDL No. 1819

1  and contrary to advice of their counsel; and what the purported basis is (if any) for their current

2  refusal to comply with the Court's Order.

3       Cochran, Foligno, Palmer and Bandas have already engaged in dilatory conduct

4  regarding discovery in this matter.  As noted in prior filings, Cochran listed an address in her

5  objection at which she did not then live; Foligno attempted to evade service at her home and was

6  only served when it was attempted at her law office; and Palmer and Bandas ignored IP

7  Plaintiffs' communications in the hopes that their involvement in this case would avoid

8  detection.  Since Palmer and Bandas surfaced here, they have steadfastly refused to respond to

9  communications from IP Plaintiffs' Counsel or otherwise ensure their clients' compliance with

10  their discovery obligations pursuant to the Court's Order.

11       In light of the above conduct, IP Plaintiffs request that the Court enter an Order to Show

12  Cause why Cochran and Foligno and their respective counsel should not be found in civil

13  contempt, and why Cochran and Foligno should not be sanctioned.[3]  IP Plaintiffs have incurred

14  well-over $5,000 in attorneys' fees in connection with pursuing this discovery, as well as costs of

15  $2003.15 and $763.00 in connection with serving Cochran and Foligno, respectively.  IP

16  Plaintiffs therefore seek sanctions in the amount of $4503.15 from Cochran and $3,263.00 from

17  Foligno.  Inasmuch as Cochran and Foligno have engaged in dilatory conduct for over a month,

18  and have had notice of the Fairness hearing for a lengthy time period, the Court should require

19  them to appear and respond to the Order to Show Cause at the October 6, 2011 Fairness hearing;

20

21

22

23  _____

24  [3] IP Plaintiffs respectfully submit that it is within this Court's inherent power to sanction Cochran

25  and Foligno by dismissing or striking their objections because, *inter alia*, they have voluntarily
    appeared in the action and have engaged in contemptuous conduct.  IP Plaintiffs, nevertheless,

26  submit that because Cochran and Foligno have failed to show that they are Settlement Class
    members and therefore lack standing, and because their objections otherwise lack merit, the

27  Court should also separately overrule the objections on those grounds.

28
    _____
    NOTICE OF MOTION AND MOTION FOR AN ORDER TO SHOW CAUSE REGARDING FINDING OF
    CIVIL CONTEMPT AND AWARD OF SANCTIONS AGAINST OBJECTORS BARBARA COCHRAN AND
    KELSEY FOLIGNO; MEMORANDUM IN SUPPORT THEREOF
    Case No. 4:07-md-1819 CW; MDL No. 1819

1  alternatively, they should be ordered to appear and respond at a time and date that the Court's

2  schedule permits.[4]

3  **IV.   CONCLUSION**

4         For all of the foregoing reasons, IP Plaintiffs respectfully requests that the Court grant the

5  relief requested herein.

6

7  Dated:  October 3, 2011                    **ZELLE HOFMANN VOELBEL & MASON LLP**

8                                             By: _____*/s/ Christopher T. Micheletti*_____
                                                   Christopher T. Micheletti
9
                                             FRANCIS O. SCARPULLA (41059)
10                                           CRAIG C. CORBITT (83251)
                                             CHRISTOPHER T. MICHELETTI (136446)
11                                           ZELLE HOFMANN VOELBEL & MASON LLP
                                             44 Montgomery Street, Suite 3400
12                                           San Francisco, CA 94104
                                             Telephone:  (415) 693-0700
13                                           Facsimile:   (415) 693-0770
                                             fscarpulla@zelle.com
14                                           ccorbitt@zelle.com

15                                           *Lead and Liaison Counsel for*
                                             *Indirect-Purchaser Class*
16

17  #3225712

18

19

20

21

22

23

24  _____

25  [4] To the extent the notice requirements of Local Rule 7-2 and 7-8 are applicable to this motion,
    IP Plaintiffs submit that, given the dilatory conduct of the objectors and their counsel, as well as
26  the upcoming Fairness hearing, notice of which has already been provided, good cause exists for
    entering the Order to Show Cause and requiring the objectors and their counsel to appear and
27  respond on an expedited basis on October 6, 2011.

28
                                                   9
─────────────────────────────────────────────────────────────────
NOTICE OF MOTION AND MOTION FOR AN ORDER TO SHOW CAUSE REGARDING FINDING OF
CIVIL CONTEMPT AND AWARD OF SANCTIONS AGAINST OBJECTORS BARBARA COCHRAN AND
KELSEY FOLIGNO; MEMORANDUM IN SUPPORT THEREOF
Case No. 4:07-md-1819 CW; MDL No. 1819

Exhibit H

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

IN RE HYDROXYCUT
MARKETING AND SALES
PRACTICES LITIGATION

_____

ANDREW DREMAK, on Behalf of
Himself, All Others Similarly
Situated and the General Public,

                    Plaintiff,

    v.

IOVATE HEALTH SCIENCES
GROUP, INC., et al.,

                  Defendants.

CASE NO. 09md2087 BTM (KSC)

CASE NO.  09cv1088 BTM (KSC)

**ORDER STRIKING
OBJECTIONS DUE TO
OBJECTORS' LACK OF
STANDING**

     On March 22, 2013,Sasha McBean and Tim Blanchard ("Objectors") filed objections to the proposed Class Action Settlement.  For the reasons discussed below, the Court finds that the Objectors lack standing to raise objections to the proposed settlement and therefore **STRIKES** the objections.

## I.  BACKGROUND

     On March 8, 2013, Co-Lead Class Counsel ("Class Counsel") filed a Motion for Final Approval of Class Action Settlement.

     On March 22, 2013, Joseph Darrell Palmer, on behalf of Objectors Tim Blanchard and Sasha McBean, filed Objections to Proposed Settlement.  In a

broad-brush fashion, the objections generally challenged various aspects of the proposed settlement, including the claims deadline, the claims process, cy pres distribution, a confidentiality provision, failure to satisfy Rule 23 class requirements, lack of individualized notice, and attorneys' fees and expenses.

On April 8, 2013, Objectors and Mr. Palmer filed a motion to quash deposition subpoenas served on them by Co-Lead Class Counsel. On April 23, 2013, the Court entertained oral argument on the motion to quash. In an order filed on April 29, 2013, the Court granted in part and denied in part the motion to quash. The Court quashed the subpoena directed to attorney Mr. Palmer. However, the Court determined that limited discovery of the Objectors was warranted.

Given Mr. Palmer's frequent representation of objectors, the fact that Ms. McBean and Mr. Blanchard had filed objections in other cases, and uncertainty regarding whether Ms. McBean resided at the address listed on her claim form, the Court found that Class Counsel's concern regarding the standing of the Objectors was justified. Accordingly, the Court ordered the Objectors to appear at an evidentiary hearing on May 29, 2013. The Court explained that at the hearing, Class Counsel could ask the Objectors questions regarding standing (e.g., questions regarding the alleged purchase of Hydroxycut products) as well as questions regarding objections made by the Objectors in other cases within the past five years, rulings made regarding the objections, and any monetary compensation received by the Objectors in connection with the objections. The Court also ordered Objectors to produce on or before May 22, 2013:

> 1. All documents evidencing a purchase of a Hydroxycut Product [1] between May 9, 2006 and May 1, 2009.

---

[1] The term "Hydroxcut Products" is defined by the Stipulation of Settlement (Doc. 1607) as the fourteen Hydroxycut-branded products identified in paragraph 23 of the Stipulation.

09md2087

2. All documents relating to any objection filed by Ms. McBean or Mr. Blanchard in any class action proceeding within the last five years.

3. All documents relating to monetary compensation received by Ms. McBean or Mr. Blanchard in connection with any objection filed within the past five years.

On May 29, 2013, the day of the scheduled evidentiary hearing, Mr. Palmer filed a motion to withdraw as attorney for Mr. Blanchard and Ms. McBean. According to Mr. Palmer, Mr. Blanchard and Ms. McBean had terminated his employment as their attorney and planned to retain new counsel. Mr. Blanchard and Ms. McBean themselves did not appear at the evidentiary hearing. In an order filed on May 30, 2013, the Court granted Mr. Palmer's motion to withdraw and continued the evidentiary hearing to June 13, 2013.

On June 13, 2013, Ms. McBean appeared at the evidentiary hearing with a new attorney, Kendrick Jan, and testified. Mr. Blanchard did not appear or file any request to continue the hearing. At the evidentiary hearing, David Reid, an attorney with Newport Trial Group, also testified. Mr. Reid's testimony continued on June 20 and July 16, when the evidentiary hearing concluded.

## II. DISCUSSION

Under Fed. R. Civ. P. 23(e)(5), any *class member* may object to a proposed class settlement. Thus, "non-class members have no standing to object." Gould v. Alleco, Inc., 883 F.2d 281, 284 (4th Cir. 1989). The party seeking to invoke the Court's jurisdiction – in this case, the Objectors – has the burden of establishing standing. Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 103-04 (1998). For the reasons discussed below, the Court finds that neither Mr. Blanchard nor Ms. McBean have satisfied their burden of establishing that they are class members and therefore have standing to object to the proposed class settlement.

09md2087

A. <u>Tim Blanchard</u>

According to Mr. Palmer, Tim Blanchard, a resident of Corpus Christi, Texas, was referred to him by Christopher Bandas, a Corpus Christi attorney who frequently represents objectors challenging class action settlements. When the Court granted Mr. Palmer's motion to withdraw as attorney for the Objectors and continued the evidentiary hearing to June 13, 2013, the Court ordered that Mr. Palmer serve a copy of the Court's order on the Objectors. Mr. Palmer filed a Proof of Service that the Objectors were served with the Court's order by U.S. mail on June 3, 2013. (09cv1088 - Doc. No. 226.) Mr. Blanchard did not appear at the evidentiary hearing on June 13, 2013, nor did he file any request to continue the evidentiary hearing. In fact, since Mr. Palmer's withdrawal, the Court has not heard anything from Mr. Blanchard or anyone representing Mr. Blanchard. It appears that Mr. Blanchard has abandoned his Objection. Therefore, because he has not established that he in fact purchased a Hydroxycut Product, he has not carried his burden of proving standing as a class member, and the Court **STRIKES** Mr. Blanchard's Objection.

B. <u>Sasha McBean</u>

Ms. McBean testified at the evidentiary hearing on June 13, 2013. Although Ms. McBean testified that she took a Hydroxycut Product during the Class Period, the Court does not find her credible for the reasons detailed below.

Ms. McBean testified that she regularly used "Hydroxycut" between 2005 and 2008. The proposed Settlement Class includes persons who purchased any of the specified Hydroxycut Products between May 9, 2006 and May 1, 2009. (Stipulation of Settlement (Doc. 1607) ¶ 46.) Ms. McBean testified that she used the product daily but did not know the exact name of the product. (Tr. of June 13, 2013 Hearing ("6/13/13 Hr'g"), 22:14-22.) She thought that the product could have been "Hydroxycut Gold" and that the product had "guarana" in it. (<u>Id.</u> at

22:8-11.) She said it was the "main" Hydroxycut product that you would get if you went into GNC and asked for Hydroxycut. (Id. at 47:6-9.) She could not describe the packaging with any specificity, testifying that it was a bottle with a label that said "Hydroxycut" and had some warnings on it. (Id. at 22:24-23:1.) She testified that she received notice of the proposed settlement through a postcard in the mail that said, "Class action regarding Hydroxycut." (Id. at 25:8-16.)

The Court finds it incredible that Ms. McBean, an obviously intelligent woman, could take Hydroxycut multiple times a day for three years and not know the name of the product or be able to describe the packaging. Hydroxycut "Gold" is not one of the listed Hydroxycut Products. (Stip. of Settlement ¶ 23.) The best-selling Hydroxycut Product was a rapid release caplet that did not contain "guarana." (Doc. 1609-5, p. 21.) Furthermore, although Ms. McBean was ordered to produce "[a]ll documents evidencing a purchase of a Hydroxycut product between May 9, 2006 and May 1, 2009," Ms. McBean did not produce any documents and did not bring any documents to Court. Given her years of alleged Hydroxycut use, it is surprising that she could not produce a single receipt, credit card statement, product carton, or other documentation showing that she purchased a Hydroxycut product. It is also telling that Ms. McBean said that she received notice of the proposed settlement by way of a postcard. However, the notice program in this case did not involve direct mailings.

Ms. McBean's credibility is further undermined by her relationship with Mr. Palmer and her peculiar involvement in litigation regarding objections to class action settlements. According to Ms. McBean, Mr. Palmer has been a friend of hers for four or five years. (Tr. of 6/13/13 Hr'g, 9:13-19.) She used to help Mr. Palmer with office errands in her free time, although she was never an employee of his. (Id. at 10:22-23.) Mr. Palmer previously represented Ms. McBean in objecting to a proposed class action settlement in Arthur v. Sallie Mae, Inc., No. 10cv198 (W.D. Wash.) (Ex. N to Opp. to Motion to Quash (Doc. No. 1648).)

09md2087

Although Ms. McBean seemed to know that she had been an objector in the Sallie Mae case, she did not know any specifics about the objection. (Tr. of 6/13/13 Hr'g, 20:8-25.) She explained that she "referred" the Sallie Mae notice to Mr. Palmer and didn't know what happened in the case after that. (Id. at 20:19-21:9.)

In addition to making her own objections, it appears that Ms. McBean has been involved in trying to recruit other people to be objectors to proposed class action settlements. On April 16, 2012, Ms. McBean posted on her Facebook webpage: "Looking for someone who was (or knows someone) employed by H&R block [sic] June 9, 2006 through May 15, 2011 as a seasonal non-exempt tax professional. There is easy money to be made here in a class action lawsuit if anyone can get me a name!!." (Evidentiary Hr'g Ex. 1.) On March 23, 2012, Ms. McBean posted on her Facebook web page: "[L]ooking for anyone with a Discover card who enrolled in one of four fee based products - Discover payment protection, Identity theft protection, Wallet protection, or Credit score tracker . . . I need a class member for a case, you don't need to do anything, and I can compensate you . . . . generously : )" (Id.) One of Ms. McBean's Facebook friends made the following comment regarding her Discover card post: "[W]hats the compensation? I'll go get a card!!!" (Tr. of 6/13/13 Hr'g, 34:25.) Ms. McBean responded: "Real funny Jerry! . . . I just set myself up for that didn't I.!!!! I'm sure we can work something out . . . On a more serious note, ill [sic] throw down a grand . . . Find someone!!!!" (Id. at 35:4-7.)

Ms. McBean claims that she was just trying to help friends of hers in the legal field (Tr. of 6/13/13 Hearing, 19:11-16) and that the only compensation she was talking about was lift tickets or gift certificates (id. at 18:13-20). She explains that "easy money" referred to compensation any class member would receive from the settlement. (Id. at 19:17-21.) Ms. McBean denies helping Mr. Palmer to locate clients to object in class action lawsuits (id. at 11:6-8) and denies that

6

09md2087

1  she was trying to obtain compensation herself by finding objectors (id. at 19:8-
2  10).

3  However, Ms. McBean's innocent explanations of her Facebook postings
4  do not ring true.  Ms. McBean's post regarding H&R Block was dated April 16,
5  2012, the last day for objections to be filed in Lemus v. H&R Block Enter., LLC,
6  09cv3179 SI (N.D. Cal.), and the day when, coincidentally, Mr. Palmer filed an
7  objection on behalf of Jay W. Brandenburg (only one other objection was filed).[2]
8  Similarly, Ms. McBean's post regarding Discover was made on the last day for
9  objections to be made in Walker v. Discover Financial Services, Inc., 10cv6994-
10  JWD (N.D. Ill.).  Mr. Palmer did not file any objections in that case.  It is apparent
11  that Ms. McBean was not just helping friends find class members who could claim
12  settlement funds; her posts were aimed toward finding *objectors*, whether for Mr.
13  Palmer or another attorney.  Although Ms. McBean claims that she was joking
14  when she said that she would "throw down a grand" if her friend found a class
15  member, the Court is not so sure.

16  Clearly, Ms. McBean works closely with others who seek to represent
17  objectors in class action lawsuits.  Her solicitation of objectors for financial
18  compensation in other cases makes the Court question Ms. McBean's motives
19  in objecting in this case.  The Court's suspicions are further aroused by Ms.
20  McBean's over-eager desire to appear at the evidentiary hearing.  According Ms.
21  McBean, she missed her daughter's seventh grade graduation and attendant
22  activities to come to the hearing (at her own expense), even though she could
23  have asked the Court for a continuance, which the Court certainly would have
24  granted.  (Tr. of 6/13/13 Hr'g, 49:6-12.)

25
26
27
28

---

[2] The Court takes judicial notice of the Order Granting Motion for Preliminary Approval (Doc.120) and the Objections to Proposed Settlement and Notice of Intent to Appear by Jay W. Brandenburg (Doc. 129) filed in the Lemus action.

09md2087

Further evidence that Ms. McBean's objection was not made in good faith comes from the testimony of Mr. Reid. Mr. Reid testified that his firm was retained by Iovate to approach the Objectors' attorneys, find out what the Objectors' issues were with respect to the settlement, and determine whether any kind of resolution could be reached. (Tr. of Hearing on July 16, 2013 (7/16/13 Hr'g), 63:15-21.) On April 12, 2013, Mr. Reid spoke with Mr. Palmer on the telephone. Mr. Reid told Mr. Palmer that he was calling to find out what his clients' objections to the class action settlement were and to see if there was a way in which those concerns might be addressed. (Id. at 66:2-9,16-20.) Mr. Palmer told Mr. Reid that Mr. Reid would have to speak with Mr. Bandas regarding the substance of the objections filed by Ms. McBean and Mr. Blanchard. (Tr. of Hearing on June 20, 2013 (6/20/13 H'rg), 37:18-24; 38:14-20.) Mr. Palmer indicated that it was Mr. Bandas's "show" and that Mr. Bandas was the person best equipped to answer Mr. Reid's questions. (Id. at 37:10-14.)

Accordingly, Mr. Reid contacted Mr. Bandas and spoke with him on the telephone on or about April 22, 2013. (Tr. of 6/20/13 H'rg, 19:16-18.) Mr. Bandas assured Mr. Reid that he spoke for himself and Mr. Palmer and would make sure that Mr. Palmer would get his cut of any settlement payment. (Id. at 21:9-14.) When Mr. Reid asked Mr. Bandas what his issues were with the proposed settlement, Mr. Bandas said that he didn't care about changing one word of the settlement and that he filed the objections because it was a large settlement and Plaintiff's counsel stood to make millions of dollars. (Id. at 21:21-25.) Mr. Bandas said that he was willing to wager that Mr. Reid's client would gladly pay him somewhere in the neighborhood of $400,000 to make his objection go away - otherwise, he could hold the settlement process up for two to three years through the appeal process. (Id. at 22:1-13.) Mr. Bandas explained that the objections filed in this case were particularly valuable given his success in

09md2087

Dennis v. Kellogg, 697 F.3d 858 (9th Cir. 2012), which probably made Timothy Blood very angry. (Tr. of 7/16/13 H'rg,94:4-8.)

On May 28, 2013, the day before the evidentiary hearing was originally scheduled, Mr. Bandas called Mr. Reid because Mr. Bandas had heard that Mr. Reid had been supboenaed to testify. (Tr. of 6/20/13 H'rg, 23:8-11.) Mr. Bandas said several times during that conversation that he wasn't sure whether he was having a "senior moment" or something, but it was very difficult for him to even recall the details of their prior conversation regarding settlement and numbers, and that it was most likely that both of them couldn't remember what they had talked about. (Id. at 23:21-24:4.)

According to Mr. Reid's testimony, which the Court finds credible, Mr. Bandas was attempting to pressure the parties to give him $400,000 as payment to withdraw the objections and go away. Mr. Bandas was using the threat of questionable litigation to tie up the settlement unless the payment was made.[3] Even though Ms. McBean was Mr. Palmer's client, it is clear that Mr. Bandas was authorized to speak for Mr. Palmer on Ms. McBean's behalf.

In light of Mr. Bandas's scheme, the Court finds that Ms. McBean's objections were filed for the improper purpose of obtaining a cash settlement in

---

[3]   Unfortunately, this type of abuse of the objection process is not uncommon. As explained in the Manual for Complex Litigation § 21.643 (4th ed.): "Some objections, however, are made for improper purposes, and benefit only the objectors and their attorneys (e.g., by seeking additional compensation to withdraw even ill-founded objections). An objection even of little merit, can be costly and significantly delay implementation of a class settlement." See also In re Checking Account Overdraft Litig., 830 F. Supp. 2d 1330, 1362 n. 30 (S.D. Fla. 2011) ([P]rofessional objectors can levy what is effectively a tax on class action settlements, a tax that has no benefit to anyone other than to the objectors. Literally nothing is gained from the cost: Settlements are not restructured and the class, on whose benefit the appeal is purportedly raised, gains nothing.") (Internal quotation marks omitted).
    Of course, objections can play an important role in the improvement of settlements when raised by actual class members who wish to change the settlement for the benefit of the class. The Court does not suggest that all objectors or objectors' attorneys are engaged in improper conduct.

exchange for withdrawing the objections. Although the bad motive does not necessarily mean that the objections themselves are invalid, the motive does bear upon the credibility of Ms. McBean. The bad motive provides a reason – i.e., financial gain – for Ms. McBean to insert herself into this litigation and lie about her class membership and reinforces the Court's belief that she was not telling the truth when testifying about her purchase and use of Hydroxycut.

Because the Court does not find Ms. McBean's testimony regarding her Hydroxycut use to be credible, Ms. McBean has not established that she is member of the class who has standing to file an objection. Therefore, the Court strikes Ms. McBean's objections as well.

## III. **CONCLUSION**

For the reasons discussed above, the Court **STRIKES** the Objections filed by Tim Blanchard and Sasha McBean (09md2087- Doc. 1640).

**IT IS SO ORDERED.**

DATED: September 17, 2013

BARRY TED MOSKOWITZ, Chief Judge
United States District Court

cc:     Kendrick Jan
        Jan & Jan
        402 West Broadway, 27th Floor
        San Diego, CA 92101

09md2087

Exhibit I

THE HONORABLE JOHN C. COUGHENOUR

1

2

3

4

5

6

7      UNITED STATES DISTRICT COURT
       WESTERN DISTRICT OF WASHINGTON
8      AT SEATTLE

9    ALYSON HERFERT, et al.,                    CASE NO. C11-1301-JCC

10                                              ORDER DENYING APPLICATION
                      Plaintiffs,               OF CLAIMANT'S COUNSEL
11                                              DARRELL PALMER TO APPEAR
              v.                                PRO HAC VICE
12
     CRAYOLA, LLC,
13
                      Defendant.
14

15          The application of Claimant's counsel, Darrell Palmer, to appear pro hac vice (Dkt. No.

16   59, as amended (Dkt. Nos. 72, 73)) is denied for failure to appear at a prior hearing and for

17   material nondisclosures in his application. Mr. Palmer falsely declared under penalty of perjury

18   that he had not been disbarred or formally censured by a court of record or by a state bar

19   association. (Dkt. No. 59). In fact, Mr. Palmer was temporarily suspended from the Colorado Bar

20   Association, the State Bar of Arizona, and the State Bar of California as a result of a Colorado

21   felony conviction. Mr. Palmer has submitted a letter to the Court attributing his failure to

22   disclose these suspensions to an oversight on the part of his assistant. Any professional should

23   know better than to blame his assistant for such a serious misstatement in a document containing

24   his own signature. The Court relies on an attorney's signature as his personal attestation that the

25   information submitted is true and complete. It was Mr. Palmer's responsibility, and his alone, to

26   ensure the accuracy of his application.

1    For the foregoing reasons, the application of Claimant's Counsel, Darrell Palmer, to

2  appear pro hac vice is DENIED, and the portion of the Court's August 10th order (Dkt. No. 71)

3  requiring Mr. Palmer to appear in person before the Court on August 21st is VACATED.

4    DATED this 17th day of August 2012.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

John C. Coughenour
UNITED STATES DISTRICT JUDGE

ORDER DENYING APPLICATION OF
CLAIMANT'S COUNSEL DARRELL PALMER
TO APPEAR PRO HAC VICE
PAGE - 2

Exhibit J

THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ALYSON HERFERT,

        Plaintiff,

    v.

CRAYOLA, LLC,

        Defendant.

CASE NO. C11-1301 JCC

MINUTE ORDER

The following Minute Order is made by direction of the Court, the Honorable John C. Coughenour, United States District Judge:

On July 31st, 2012, the Court issued a minute order granting the parties' motion for an appeal bond. (Dkt. No. 67). The minute order referred to Amber Pederson with two different titles, and did not impose a deadline to file the bond. The order is amended as follows:

> This matter comes before the Court on the parties' motion for an appeal bond. (Dkt. No. 56). The Court held oral argument on the motion on July 31, 2012. Claimant's counsel did not appear. The motion is therefore GRANTED. Claimant Amber Pederson is ORDERED to file an appeal bond in the amount of $20,000 no later than August 31, 2012.

The Court also addresses a more serious matter. Darrell Palmer, Claimant's counsel, submitted a *pro hac vice* application in which he declared under penalty of perjury that he had not been disbarred or formally censured by a court of record or by a state bar association. (Dkt. No. 59). The California Bar Association web site states that Mr. Palmer was suspended and publicly reproved as a result of a conviction. The Court would like to give Mr. Palmer an opportunity to explain his

MINUTE ORDER, C11-1301 JCC
PAGE - 1

1  statements. He is therefore ORDERED to appear in person before the Court on August 21, 2012 at

2  9:30 a.m. and show cause why he should not be sanctioned. Failure to attend for any reason will

3  result in the loss of his *pro hac vice* status.

4        DATED this 10th day of August 2012.

5

             William M. McCool
6               Clerk of Court

7               s/Tim Farrell_____
             Deputy Clerk
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

MINUTE ORDER, C11-1301 JCC
PAGE - 2

Exhibit K

CLOSED,JURYDEMAND,STAYED

# U.S. District Court
# United States District Court for the Western District of Washington (Seattle)
# CIVIL DOCKET FOR CASE #: 2:10-cv-00198-JLR

Arthur v. SLM Corporation
Assigned to: Judge James L. Robart
Cause: 47:0227 Telephone Consumer Protection Act

Date Filed: 02/02/2010
Date Terminated: 09/17/2012
Jury Demand: Plaintiff
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Diversity

**Plaintiff**

**Mark A Arthur**                    represented by    **Alison Stocking**
LIEFF CABRASER HEIMANN &
BERNSTEIN (NY)
250 HUDSON ST
8TH FLOOR
NEW YORK, NY 10013-1413
212-355-9500
Email: astocking@lchb.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Beth E Terrell**
TERRELL MARSHALL DAUDT &
WILLIE PLLC
936 NORTH 34TH STREET
STE 300
SEATTLE, WA 98103-8869
206-816-6603
Fax: 206-350-3528
Email: bterrell@tmdwlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel M. Hutchinson**
LIEFF CABRASER HEIMANN &
BERNSTEIN
275 BATTERY STREET
29TH FLOOR
SAN FRANCISCO, CA 94111
415-956-1000
Email: dhutchinson@lchb.com

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David P Meyer**
MEYER WILSON CO LPA
1320 DUBLIN RD
STE 100
COLUMBUS, OH 43215
866-827-6537
Email: dmeyer@dmlaws.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jonathan D Selbin**
LIEFF CABRASER HEIMANN &
BERNSTEIN (NY)
250 HUDSON ST
8TH FLOOR
NEW YORK, NY 10013-1413
212-355-9500
Email: jselbin@lchb.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew R Wilson**
MEYER WILSON CO LPA
1320 DUBLIN RD
STE 100
COLUMBUS, OH 43215
866-827-6537
Email: mwilson@dmlaws.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Abbas Kazerounian**
KAZEROUNI LAW GROUP APC
245 FISCHER AVE STE D1
COSTA MESA, CA 92626
800-400-6806
Fax: 800-520-5523
Email: ak@kazlg.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Douglas J. Campion**
LAW OFFICES OF DOUGLAS J.
CAMPION
409 CAMINO DEL RIO SOUTH, STE
303
SAN DIEGO, CA 92108-3507
619-299-2091
Email: doug@djcampion.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer Rust Murray**
TERRELL MARSHALL DAUDT &
WILLIE PLLC
936 NORTH 34TH STREET
STE 300
SEATTLE, WA 98103-8869
206-816-6603
Fax: 206-350-3528
Email: jmurray@tmdwlaw.com
*ATTORNEY TO BE NOTICED*

**Joshua Swigart**
HYDE & SWIGART
411 CAMINO DEL RIO SOUTH
STE 301
SAN DIEGO, CA 92108-3551
619-233-7770
Email: josh@westcoastlitigation.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Marc C Cote**
TERRELL MARSHALL DAUDT &
WILLIE PLLC
936 NORTH 34TH STREET
STE 300
SEATTLE, WA 98103-8869
206-816-6603
Fax: 206-350-3528
Email: mcote@tmdwlaw.com
*ATTORNEY TO BE NOTICED*

**Michael Duane Daudt**
TERRELL MARSHALL DAUDT &
WILLIE PLLC

936 NORTH 34TH STREET
STE 300
SEATTLE, WA 98103-8869
206-816-6603
Fax: 206-350-3528
Email: mdaudt@tmdwlaw.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Cirilo Martinez**                    represented by    **Abbas Kazerounian**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Beth E Terrell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Douglas J. Campion**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua Swigart**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Pari Najafi**                        represented by    **Abbas Kazerounian**
*on behalf of themselves and all others*                 (See above for address)
*similarly situated*                                     *PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Beth E Terrell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Douglas J. Campion**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua Swigart**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Heather McCue**                         represented by  **Beth E Terrell**
(See above for address)
*ATTORNEY TO BE NOTICED*


V.

**Intervenor Plaintiff**

**Judith Harper**                         represented by  **Darrell Palmer**
*Individual*                                             LAW OFFICES OF DARRELL PALMER
603 NORTH HIGHWAY 101
SUITE A
SOLANA BEACH, CA 92075
858-792-5600
Email:
darrell.palmer@palmerlegalteam.com
*ATTORNEY TO BE NOTICED*

**Steve Dashiak**
WASHINGTON LAW CENTER
14900 INTERURBAN AVENUE SOUTH
STE 271
TUKWILA, WA 98188
206-595-6311
Email: steve@washingtonlawcenter.com
*ATTORNEY TO BE NOTICED*


V.

**Defendant**

**SLM Corporation**                       represented by  **Julia B Strickland**
*TERMINATED: 04/05/2010*                                  STROOCK & STROOCK & LAVAN
*doing business as*                                       (CA)
Sallie Mae                                               2029 CENTURY PARK E
*TERMINATED: 04/05/2010*                                  STE 1600
LOS ANGELES, CA 90067
310-556-5800
Email: jstrickland@stroock.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lisa M Simonetti**
STROOCK & STROOCK & LAVAN
(CA)

2029 CENTURY PARK E
STE 1600
LOS ANGELES, CA 90067
310-556-5800
Email: LSimonetti@stroock.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kenneth E Payson**
DAVIS WRIGHT TREMAINE (SEA)
1201 THIRD AVENUE STE 2200
SEATTLE, WA 98101-3045
206-622-3150
Email: kenpayson@dwt.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Sallie Mae Inc**                      represented by **Lisa M Simonetti**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**ARROW FINANCIAL SERVICES,
LLC**

**Objector**

**Patrick Sweeney**                     represented by **Brian Trenz**
LAW OFFICES OF DAVID SCHAFER,
PLLC
7800 IH-10 WEST
SUITE 830
SAN ANTONIO, TX 78230
210-348-0500
Email: brian@helpingtexas.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Darrell Palmer**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David Schafer**
LAW OFFICES OF DAVID SCHAFER
7800 IH-10 WEST
SUITE 830
SAN ANTONIO, TX 782230

210-348-0500
Email: david@helpingtexas.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Steve Dashiak**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Objector**

**Sasha McBean**                      represented by **Brian Trenz**
*Individual*                                    (See above for address)
                                        *PRO HAC VICE*
                                        *ATTORNEY TO BE NOTICED*

                                        **Darrell Palmer**
                                        (See above for address)
                                        *PRO HAC VICE*
                                        *ATTORNEY TO BE NOTICED*

                                        **David Schafer**
                                        (See above for address)
                                        *PRO HAC VICE*
                                        *ATTORNEY TO BE NOTICED*

                                        **Steve Dashiak**
                                        (See above for address)
                                        *ATTORNEY TO BE NOTICED*

**Objector**

**Sara Sibley**                        represented by **Thomas L Cox**
                                        4934 Tremont
                                        Dallas, TX 75214
                                        469-531-3313
                                        Fax: 214-855-7878
                                        *LEAD ATTORNEY*
                                        *ATTORNEY TO BE NOTICED*

**Objector**

**Judith Brown**                       represented by **Thomas L Cox**
                                        (See above for address)
                                        *LEAD ATTORNEY*
                                        *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|
|            |   |             |

| 09/12/2012 | 261 | SUPPLEMENT re 232 MOTION for Attorney Fees *Supplemental Summary of Evidence Regarding Standing* by Intervenor Plaintiff Judith Harper. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Palmer, Darrell) (Entered: 09/12/2012) |
|---|---|---|
| 09/12/2012 | 262 | NOTICE *of Class Plaintiffs of Filing of Supplemental Authority* re 237 Response to Motion, 251 MOTION for Revocation of Court's Order Granting Admission Pro Hac Vice to Darrell Palmer ; filed by Plaintiffs Mark A Arthur, Cirilo Martinez, Heather McCue, Pari Najafi. (Terrell, Beth) (Entered: 09/12/2012) |
| 09/14/2012 | 263 | RESPONSE by Defendant Sallie Mae Inc re 261 Supplement *on Evidence Pertaining to Issue of Standing*. (Simonetti, Lisa) (Entered: 09/14/2012) |
| 09/14/2012 | 264 | MINUTE ENTRY for proceedings held before Judge James L. Robart- Dep Clerk: *Casey Condon*; Pla Counsel: *Jonathan Selbin, Beth Terrell, Alison Stocking, Matthew Wilson*; Def Counsel: *Julia Strickland, Lisa Simonetti, Eric Reicin, Darrell Palmer, Brian Trenz*; CR: *Kari McGrath*; **Motion Hearing** held on 9/14/2012. For the reasons stated on the record, the court rules on the following motions: The court grants the motion for revocation of courts order granting admission pro hac vice to Darrell Palmer, Dkt. #251. The court denies the motion for attorney fees by intervenor Judith Harper, Dkt. #232. The court hears argument from counsel on the motion for final approval of amended class action settlement, Dkt. #219. The court takes the matter under advisement. The court hears argument from counsel on the motion for attorney fees and costs, Dkt. #225. The court takes the matter under advisement. (CC) (Entered: 09/14/2012) |
| 09/17/2012 | 265 | ORDER granting 225 Class Counsels' Motion for Attorney Fees and costs and service awards in connection with amended settlement, by Judge James L. Robart.(MD) (Entered: 09/17/2012) |
| 09/17/2012 | 266 | ORDER - Settlement Order and Final Judgment 219 Motion for final approval of the proposed amended class settlement, by Judge James L. Robart.(MD) (Entered: 09/17/2012) |
| 09/17/2012 | 267 | JUDGMENT BY COURT - THE COURT HAS ORDERED THAT The Court Granted final approval of the amended class settlement. (MD) (Entered: 09/17/2012) |
| 09/21/2012 | 268 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Motion Hearing held on 9/14/2012 before Judge James L. Robart.<br><br>Parties have ten (10) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Information regarding the policy can be found on the court's website at www.wawd.uscourts.gov.<br><br>To purchase a copy of the transcript, contact court reporter Kari McGrath by |

Exhibit L

1    STATE BAR OF CALIFORNIA
     OFFICE OF THE CHIEF TRIAL COUNSEL **PUBLIC MATTER**
     JAYNE KIM, No. 174614
2    CHIEF TRIAL COUNSEL
     JOSEPH R. CARLUCCI, No. 172309 **FILED**
3    DEPUTY CHIEF TRIAL COUNSEL
     ALAN B. GORDON, No. 125642
4    ASSISTANT CHIEF TRIAL COUNSEL    **DEC 06 2013**
     CHRISTINE SOUHRADA, No. 228256
5    SENIOR TRIAL COUNSEL    STATE BAR COURT
     1149 South Hill Street    CLERK'S OFFICE
6    Los Angeles, California 90015-2299    LOS ANGELES
     Telephone: (213) 765-1162

7

8

9             STATE BAR COURT

10       HEARING DEPARTMENT - LOS ANGELES

11

12    In the Matter of:           )    Case No. 12-O-16924
                               )
13    JOSEPH DARRELL PALMER,      )    NOTICE OF DISCIPLINARY CHARGES
     No. 125147,                    )
14                                 )
     A Member of the State Bar       )
15

16         **NOTICE - FAILURE TO RESPOND!**

17      **IF YOU FAIL TO FILE A WRITTEN ANSWER TO THIS NOTICE WITHIN 20 DAYS AFTER SERVICE, OR IF YOU FAIL TO APPEAR AT THE STATE BAR COURT TRIAL:**

18

19      **(1) YOUR DEFAULT WILL BE ENTERED;**
     **(2) YOUR STATUS WILL BE CHANGED TO INACTIVE AND YOU WILL NOT BE PERMITTED TO PRACTICE LAW;**
20      **(3) YOU WILL NOT BE PERMITTED TO PARTICIPATE FURTHER IN THESE PROCEEDINGS UNLESS YOU MAKE A TIMELY MOTION AND THE DEFAULT IS SET ASIDE, AND;**
21

22      **(4) YOU SHALL BE SUBJECT TO ADDITIONAL DISCIPLINE. SPECIFICALLY, IF YOU FAIL TO TIMELY MOVE TO SET ASIDE OR VACATE YOUR DEFAULT, THIS COURT WILL ENTER AN ORDER RECOMMENDING YOUR DISBARMENT WITHOUT FURTHER HEARING OR PROCEEDING. SEE RULE 5.80 ET SEQ., RULES OF PROCEDURE OF THE STATE BAR OF CALIFORNIA.**
23

24

25    ///
     ///
26    ///

27                  kwiktag *  152 145 629

28                -1-

The State Bar of California alleges:

## JURISDICTION

1.  Joseph Darrell Palmer ("Respondent") was admitted to the practice of law in the State of California on December 15, 1986, was a member at all times pertinent to these charges, and is currently a member of the State Bar of California.

## COUNT ONE

Case No. 12-O-16924
Business and Professions Code, section 6106
[Moral Turpitude - Misrepresentation]

2.  On or about June 2, 2010, Respondent filed an Affidavit in support of a Motion for Admission Pro Hac Vice in *Gemelas v. The Dannon Co., Inc.*, case no. 1:08-CV-00236, in United State District Court, Northern District of Ohio, Eastern Division, in which Respondent declared under oath "I have never been the subject of disciplinary action of any kind before any bar or court" when, in fact, Respondent knew or was grossly negligent in not knowing the declaration was false, and thereby committed an act involving moral turpitude, dishonesty or corruption in willful violation of Business and Professions Code, section 6106.

## COUNT TWO

Case No. 12-O-16924
Business and Professions Code, section 6106
[Moral Turpitude - Misrepresentation]

3.  On or about January 7, 2011 Respondent filed an Application for Leave to Appear Pro Hac Vice in *Mark A. Arthur et.al. v. Sallie Mae, Inc.*, case no. 10-CV-00198-JLR in United State District Court, Western District of Washington, in which Respondent declared under penalty of perjury "I have not been disbarred or formally censured by a court of record or by a state bar association...," when, in fact, Respondent knew or was grossly negligent in not knowing the declaration was false, and thereby committed an act involving moral turpitude, dishonesty or corruption in willful violation of Business and Professions Code, section 6106.

<u>COUNT THREE</u>

Case No. 12-O-16924
Business and Professions Code, section 6106
[Moral Turpitude - Misrepresentation]

4.   On or about July 5, 2012 Respondent filed an Application for Leave to Appear Pro

Hac Vice in *Alyson Herfert, et al. v. Crayola, LLC*, case no. 11-CV-1301-JCC, in United State

District Court, Western District of Washington, in which Respondent declared under penalty of

perjury "I have not been disbarred or formally censured by a court of record or by a state bar

association…," when, in fact, Respondent knew or was grossly negligent in not knowing the

declaration was false, and thereby committed an act involving moral turpitude, dishonesty or

corruption in willful violation of Business and Professions Code, section 6106.

### NOTICE - INACTIVE ENROLLMENT!

**YOU ARE HEREBY FURTHER NOTIFIED THAT IF THE STATE BAR
COURT FINDS, PURSUANT TO BUSINESS AND PROFESSIONS CODE
SECTION 6007(c), THAT YOUR CONDUCT POSES A SUBSTANTIAL
THREAT OF HARM TO THE INTERESTS OF YOUR CLIENTS OR TO
THE PUBLIC, YOU MAY BE INVOLUNTARILY ENROLLED AS AN
INACTIVE MEMBER OF THE STATE BAR.   YOUR INACTIVE
ENROLLMENT WOULD BE IN ADDITION TO ANY DISCIPLINE
RECOMMENDED BY THE COURT.**

### NOTICE - COST ASSESSMENT!

**IN THE EVENT THESE PROCEDURES RESULT IN PUBLIC
DISCIPLINE, YOU MAY BE SUBJECT TO THE PAYMENT OF COSTS
INCURRED BY THE STATE BAR IN THE INVESTIGATION, HEARING
AND REVIEW OF THIS MATTER PURSUANT TO BUSINESS AND
PROFESSIONS CODE SECTION 6086.10.**

Respectfully submitted,

THE STATE BAR OF CALIFORNIA
OFFICE OF THE CHIEF TRIAL COUNSEL

DATED: December 6, 2013     By: _____

Christine Souhrada
Senior Trial Counsel

-3-

# DECLARATION OF SERVICE BY CERTIFIED MAIL

**CASE NUMBER:  12-O-16924**

    I, the undersigned, over the age of eighteen (18) years, whose business address and place of employment is the State Bar of California, 1149 South Hill Street, Los Angeles, California 90015, declare that I am not a party to the within action; that I am readily familiar with the State Bar of California's practice for collection and processing of correspondence for mailing with the United States Postal Service; that in the ordinary course of the State Bar of California's practice, correspondence collected and processed by the State Bar of California would be deposited with the United States Postal Service that same day; that I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date on the envelope or package is more than one day after date of deposit for mailing contained in the affidavit; and that in accordance with the practice of the State Bar of California for collection and processing of mail, I deposited or placed for collection and mailing in the City and County of Los Angeles, on the date shown below, a true copy of the within

## NOTICE OF DISCIPLINARY CHARGES

in a sealed envelope placed for collection and mailing as certified mail, return receipt requested, Article No.: 7196 9008 9111 6410 5893, at Los Angeles, on the date shown below, addressed to:

**Joseph D. Palmer**
**PO Box 548**
**Cardiff, CA 92007**

**And Courtesy Regular U.S. Mail:**

**Susan Lynn Margolis**
**Margolis & Margolis LLP**
**2000 Riverside Dr**
**Los Angeles, CA 90039**

in an inter-office mail facility regularly maintained by the State Bar of California addressed to:

    **N/A**

    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed at Los Angeles, California, on the date shown below.

DATED: <u>December 6, 2013</u>       Signed: _____
                                       Max Carranza
                                       Declarant

Exhibit M

JOSEPH J. TABACCO, JR.  #75484
Email:  jtabacco@bermandevalerio.com
NICOLE LAVALLEE  #165755
Email:  nlavallee@bermandevalerio.com
**BERMAN DeVALERIO**
One California Street, Suite 900
San Francisco, CA 94111
Telephone:  (415) 433-3200
Facsimile:   (415) 433-6382

*Liaison Counsel for Lead Plaintiff New Mexico*
*State Investment Council and the Class*

THOMAS A. DUBBS (admitted *pro hac vice*)
Email:  tdubbs@labaton.com
JOSEPH A. FONTI (admitted *pro hac vice*)
Email:  jfonti@labaton.com
STEPHEN W. TOUNTAS (admitted *pro hac vice*)
Email:  stountas@labaton.com
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York  10005
Telephone:  (212) 907-0700
Facsimile:  (212) 818-0477

*Lead Counsel for Lead Plaintiff New Mexico*
*State Investment Council and the Class*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

|  |  |
|---|---|
| In re BROADCOM CORPORATION CLASS ACTION LITIGATION | Lead Case No.:  CV-06-5036-R (CWx) |
|  | **ORDER DENYING OBJECTION AND REQUIRING APPEAL BOND** |
|  | **Honorable Manuel L. Real** |

**WHEREAS:**

A.     As of April 30, 2010, Lead Plaintiff, New Mexico State Investment Council ("Lead Plaintiff"), acting on behalf of itself and the Settlement Class, entered into a Stipulation and Agreement of Settlement With Broadcom Defendants (the "Stipulation") with the Settling Defendants in these consolidated actions (the "Litigation").

B.     Pursuant to the Preliminary Approval Order Providing for Notice and Hearing in Connection With Proposed Class Action Settlement With Broadcom Defendants, entered June 1, 2010 (the "Preliminary Approval Order"), the Court scheduled a hearing for August 2, 2010, at 10:00 a.m. (the "Settlement Hearing") to, *inter alia*: (a) determine whether the proposed settlement of the Litigation on the terms and conditions provided for in the Stipulation is fair, reasonable and adequate, and should be approved by the Court; (b) determine whether the proposed Plan of Allocation should be approved; and (c) determine whether Lead Counsel should be awarded attorneys' fees and reimbursement of expenses.

C.     The Court ordered that the Notice and the Summary Notice be disseminated to Class Members.  Any objections to the Settlement or request for attorneys' fees were required to be filed with the Court and served on counsel for the Settling Parties by July 16, 2010.

D.     The Court has received one objection, "Objection of Smokestack Lightening Ltd 'Marisco' to Proposed Settlement and Notice of Intent to Appear," Docket No. 348 (the "Objection").

E.     This Court has duly considered the Lead Plaintiff's motion for approval of the Settlement, Lead Counsel's motion for attorneys' fees and reimbursement of expenses, the affidavits, declarations and memorandum of law submitted in support thereof, the Objection and all of the submissions and arguments presented.

1    NOW, THEREFORE, after due deliberation, IT IS ORDERED,

2    ADJUDGED AND DECREED that:

3        1.    This Order incorporates by reference the definitions in the Stipulation,

4    and all capitalized terms used herein shall have the same meanings as set forth in

5    the Stipulation.

6        2.    The Objection is overruled in its entirety.

7        3.    If Smokestack Lightening Ltd "Marisco" appeals from the denial of

8    its Objection, it will be required to post a $10,000 bond, pursuant to Fed. R. App.

9    P. 7.

10

11   Dated: August 11, 2010

12

13                                        _____
                                          Honorable Manuel L. Real
14                                        UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit N

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE JOHN A. KRONSTADT

UNITED STATES DISTRICT JUDGE PRESIDING

- - -

```
NATALIE PAPPAS, ET AL.,            )
                                   )
                 PLAINTIFFS,       )
                                   )
VS.                                ) CV11-08007-JAK
                                   ) CV11-08276-JAK
NAKED JUICE COMPANY, ET AL.,       ) CV11-01701-JAK
                                   ) CV11-09412-JAK
                 DEFENDANTS.       ) CV11-09677-JAK
_____)
                                   )
AND ALL CONSOLIDATED ACTIONS       )
_____)
```

REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

MONDAY, DECEMBER 2, 2013, 8:30 AM

_____

ALEXANDER T. JOKO, CSR NO. 12272
FEDERAL OFFICIAL COURT REPORTER
255 EAST TEMPLE STREET, ROOM 181-F
LOS ANGELES, CA 90012
AJ_CSR@YAHOO.COM

1    **APPEARANCES OF COUNSEL:**

2    FOR PLAINTIFF SANDYS:    YVETTE GOLAN
                             THE GOLAN FIRM
3                            1919 DECTUR STREET
                             HOUSTON, TX 77007
4

5    FOR PLAINTIFF PAPPAS:    TINA WOLFSON
                             ROBERT AHDOOT
6                            AHDOOT & WOLFSON PC
                             10850 WILSHIRE BOULEVARD
7                            SUITE 370
                             LOS ANGELES, CA 90024
8

9    FOR PLAINTIFF PARK:     MARC L. GODINO
                             GLANCY BINKOW & GOLDBERG LLP
10                           1925 CENTURY PARK EAST
                             SUITE 2100
11                           LOS ANGELES, CA 90067

12

      FOR PLAINTIFF MARCHEWKA:
13                           ROSEMARY M. RIVAS
                             FINKELSTEIN THOMPSON LLP
14                           100 BUSH STREET SUITE 1450
                             SAN FRANCISCO, CA 94104
15

16   FOR PLAINTIFF EVANS:    CHRISTOPHER RIDOUT
                             RIDOUT LYON AND OTTOSON
17                           555 E. OCEAN BLVD
                             SUITE 500
18                           LONG BEACH, CA 90802

19

20

21

22

23

24

25

1     **APPEARANCES (CONTINUED)**

2

       FOR DEFENDANT NAKED JUICE COMPANY:
3
                          ANDREW S TULUMELLO
4                         GIBSON DUNN & CRUTCHER LLP
                          1050 CONNECTICUT AVENUE NW
5                         WASHINGTON, DC 20036

6                         CHRISTOPHER CHORBA
                          DHANANJAY MANTHRIPRAGADA
7                         GIBSON DUNN & CRUTCHER LLP
                          333 SOUTH GRAND AVENUE
8
                          LOS ANGELES, CA 90071-3197
9
       FOR OBJECTOR ROSSIGNOL:
10
                          JOSHUA FURMAN
11                        15260 VENTURA BLVD
                          SUITE 2250
12                        SHERMAN OAKS, CA 91403

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1          LOS ANGELES, CALIFORNIA; MONDAY, DECEMBER 2, 2013

 2                           8:30 AM

 3                         - - - - -

 4

 5

 6          THE COURT:  ITEM NO. 5, CV11-08276, NATALIE

 7  PAPPAS V. NAKED JUICE COMPANY.

 8          MS. WOLFSON:  GOOD MORNING, YOUR HONOR.  TINA

 9  WOLFSON, AHDOOT WOLFSON, ON BEHALF OF NATALIE PAPPAS

10  AND THE CLASS.

11          MR. AHDOOT:  GOOD MORNING, YOUR HONOR.  ROBERT

12  AHDOOT ON BEHALF OF PLAINTIFFS.

13          MR. RIDOUT:  GOOD MORNING, YOUR HONOR.

14  CHRISTOPHER RIDOUT, RIDOUT, LYON AND OTTOSON ON BEHALF

15  OF THE PLAINTIFFS.

16          MS. RIVAS:  GOOD MORNING, YOUR HONOR.

17  ROSEMARY RIVAS OF FINKELSTEIN THOMPSON ON BEHALF OF THE

18  PLAINTIFFS.

19          MR. GODINO:  GOOD MORNING, YOUR HONOR.  MARK

20  GODINO FROM GLANCY BINKOW & GOLDBERG ON BEHALF OF

21  PLAINTIFFS.

22          MR. CHORBA:  GOOD MORNING, YOUR HONOR.  CHRIS

23  CHORBA ON BEHALF OF DEFENDANT NAKED JUICE.

24              AND I BELIEVE MY COLLEAGUE,

25  MR. TULUMELLO, IS ON THE LINE ON BEHALF OF NAKED JUICE
```

```
 1    AS WELL.

 2            MR. MANTHRIPRAGADA:  GOOD MORNING, YOUR HONOR.

 3    DHANANJAY MANTHRIPRAGADA ON BEHALF OF DEFENDANT NAKED

 4    JUICE.

 5            MR. FURMAN:  GOOD MORNING, YOUR HONOR.  JOSHUA

 6    FURMAN FOR OBJECTOR JOANNE ROSSIGNOL.

 7            MS. GOLAN:  GOOD MORNING, YOUR HONOR.  YVE

 8    GOLAN ON BEHALF OF CONSOLIDATED PLAINTIFF SARA SANDYS.

 9            THE COURT:  GOOD MORNING.

10              YOU CAN BE SEATED.

11            MR. TULUMELLO:  ANDREW TULUMELLO OF GIBSON,

12    DUNN AND CRUTCHER IN WASHINGTON DC FOR NAKED JUICE.

13              THANK YOU FOR ALLOWING ME TO APPEAR BY

14    TELEPHONE, YOUR HONOR.

15            THE COURT:  GOOD MORNING, MR. TULUMELLO.

16              WE'RE HERE ON THE PLAINTIFF'S MOTION

17    FOR -- WELL, THE MOTION FOR FINAL APPROVAL OF THE

18    SETTLEMENT OF THE CLASS ACTION, THE MOTION FOR

19    INCENTIVE AWARDS AND ATTORNEY'S FEES, SANDYS' MOTIONS

20    FOR -- A MOTION FOR ATTORNEY'S FEES AND REIMBURSEMENT

21    OF EXPENSES.

22              THERE ARE ALSO -- I THINK, MR. FURMAN, I

23    THINK YOU'RE THE ONLY PERSON APPEARING IN PERSON --

24    WHERE IS MR. FURMAN -- ON BEHALF OF AN OBJECTOR; IS

25    THAT RIGHT?
```

1        MR. TULUMELLO:  IT APPEARS TO BE THE CASE,

2   YOUR HONOR.

3        THE COURT:  THERE WERE OTHER OBJECTORS --

4   CLASS MEMBERS WHO OBJECTED.

5            MR. FURMAN, LET ME ASK YOU THIS QUESTION:

6   WHAT IS THE DIFFERENCE BETWEEN THE OBJECTIONS THAT YOU

7   HAVE MADE IN CONNECTION WITH THE FINAL CLASS APPROVAL

8   AND THOSE THAT WERE MADE IN CONNECTION WITH THE

9   PRELIMINARY CLASS APPROVAL?

10        MR. FURMAN:  MY UNDERSTANDING IS THAT THERE

11   WERE OBJECTIONS ON BEHALF OF ORIGINAL PLAINTIFF SANDYS

12   TO THE PRELIMINARY APPROVAL.

13            OUR BIG DISTINGUISHING OBJECTION -- I

14   THINK THE PRIMARY ISSUE THAT WE'RE HAVING IS THIS

15   QUESTION OF TIERED DISTRIBUTION.

16        THE COURT:  RECEIPT/NO RECEIPT?

17        MR. FURMAN:  RECEIPT/NO RECEIPT, YOUR HONOR.

18            WE DON'T HAVE INFORMATION FROM THE --

19   ANYWHERE IN THE CLASS CERTIFICATION OR SETTLEMENT

20   DOCUMENTS ABOUT, DO THESE CLASS REPRESENTATIVES HAVE

21   RECEIPTS OR DO THEY NOT HAVE RECEIPTS?

22            THE ONLY JUSTIFICATION WE HAVE FOR THE

23   RECEIPT/NO RECEIPT DISTINCTION IS THE ONE THAT WAS

24   OFFERED IN THE REPLY BRIEF SAYING, "WELL, IT'S TO

25   REDUCE FRAUD."  THAT'S -- THERE'S NO SUPPORT FOR THAT.

1   ALL WE HAVE IS THE OPINION OF MR. SHERWOOD WHO DOESN'T

2   STATE THE BASES FOR HIS OPINION.  HE JUST SAYS, "IN MY

3   ESTEEMED OPINION, THIS HELPS REDUCE FRAUD."

4               WHEN WE LOOK AT -- ELSEWHERE IN HIS

5   DECLARATION, IN PARAGRAPH 30, THERE'S NOTHING ABOUT

6   USING THAT METHOD TO REDUCE FRAUD.

7               THEY HAVE OTHER MEANS TO REDUCE FRAUD,

8   AND THERE'S NO INDICATION OF WHY IT'S NECESSARY TO HAVE

9   THIS ADDITIONAL HURDLE FOR NON-RECEIPT-BEARING CLASS

10  MEMBERS TO HAVE TO JUMP THROUGH OR TO BE SUBJECT TO IN

11  TERMS OF A REDUCED AMOUNT OF RECOVERY JUST FOR THE

12  PURPOSES OF REDUCING FRAUD.

13              THERE'S NOTHING IN ANY OF THE PAPERS IN

14  RESPONSE THAT PROVIDES OTHER CASES WHERE THIS HAS BEEN

15  AN APPROVED METHOD.  IT DOES MAKE SENSE ON A BASIC

16  LEVEL.  BUT WHEN YOU LOOK AT WHAT IT DOES TO THE

17  NON-RECEIPT-BEARING CLASS, WHICH I HAVE TO POINT OUT TO

18  THE COURT IS --

19              THE COURT:  DO WE HAVE ANY DATA ON THIS IN

20  TERMS OF THOSE CLASS MEMBERS WHO HAVE RESPONDED --

21  WHICH IS SEVERAL HUNDRED THOUSAND; CORRECT?

22              MR. FURMAN:  RIGHT.

23              THE COURT:  DO WE HAVE DATA AS TO HOW MANY

24  CLAIMED TO HAVE RECEIPTS?

25              MR. FURMAN:  YES.

```
 1            THE COURT:  WHAT PERCENTAGE?

 2            MR. FURMAN:  ACCORDING TO THE INFORMATION THAT

 3   WAS PROVIDED, I BELIEVE, IN THE DEFENSE REPLY BRIEF,

 4   WE'RE TALKING ON THE ORDER OF A FRACTION OF A PERCENT

 5   OF DOLLAR AMOUNTS.  $22 MILLION IN TOTAL CLAIMS WERE

 6   MADE.  AND OF THOSE, $163,000 WORTH HAD PROOF OF

 7   PURCHASE.

 8            MR. CHORBA:  YOUR HONOR, IT'S APPROXIMATELY

 9   ONE-HALF OF A PERCENT -- ONE-HALF OF 1 PERCENT OF ALL

10   CLAIMANTS SOUGHT AN AMOUNT WITH PROOF OF PURCHASE.

11            THE COURT:  JUST A MINUTE.

12              IS THERE A -- WHAT EFFECT, IF ANY, IS

13   THERE ON THE DEFENDANT IN TERMS OF WHETHER THE

14   AMOUNT -- LET ME PUT IT DIFFERENTLY.

15              IF THE AMOUNTS -- IF THE LIMIT IS -- IF

16   THE CURRENT LIMIT IS APPLIED FOR RECEIPT AND

17   NON-RECEIPT, WILL THE EFFECT BE THAT THERE WOULD BE A

18   GREATER AMOUNT THAT WOULD GO INTO THE CY PRES FUND THAN

19   IF THERE WERE NO DISTINCTION?

20            MR. CHORBA:  YOUR HONOR, I CAN ANSWER THAT.

21   THERE WOULD BE NO AMOUNT LEFT OVER FOR CY PRES.  THE

22   TOTAL RESPONSIVE CLASS MEMBERS HAS BEEN OVERWHELMINGLY

23   POSITIVE SUCH THAT THE FULL AMOUNT OF THE $9 MILLION

24   CASH FUND AFTER DEDUCTION FOR ANY FEES AND THE NOTICE

25   AND ADMINISTRATION COSTS WOULD BE DELIVERED DIRECTLY TO
```

1    CLASS MEMBERS.

2                    AND IT'S A CAPPED AMOUNT TO ANSWER

3    YOUR --

4              THE COURT:  NO, IT'S $9 MILLION; CORRECT?

5              MR. CHORBA:  CORRECT.

6                    AND IF I MAY, YOUR HONOR, THAT HALF A

7    PERCENT, THE OVERWHELMING MAJORITY OF CLASS MEMBERS

8    SOUGHT AN AMOUNT WITHOUT PROOF OF PURCHASE.

9                    I CAN SAY, AND CLASS COUNSEL CAN SPEAK TO

10   THIS, DURING THE DISCOVERY, SEVERAL OF THE NAMED

11   PLAINTIFFS DID PRODUCE SOME FORM OF PROOF OF PURCHASE.

12             THE COURT:  BASED ON THE PERCENTAGE THAT YOU

13   JUST STATED, LESS THAN 1 PERCENT OF THE CLAIMANTS HAVE

14   CLAIMED TO HAVE RECEIPTS?

15             MR. CHORBA:  CORRECT, YOUR HONOR.

16             THE COURT:  HOW MANY PEOPLE IS THAT?

17             MR. CHORBA:  YOUR HONOR, IT'S PERHAPS AROUND

18   3,000 TOTAL.

19                    ONE OF THE ISSUES IS, GIVEN THE VOLUME OF

20   CLAIMS, THE ADMINISTRATOR IS CONTINUING TO REVIEW

21   THOSE.

22                    I CAN TELL YOU THAT SOME CLASS MEMBERS,

23   FOR EXAMPLE, UPLOADED A DOCUMENT.  AND IT WAS A PICTURE

24   OF A STORE, FOR EXAMPLE.  THAT'S NOT A VALID PROOF OF

25   PURCHASE.  SO THAT WOULD BE NOT A VALID CLAIM WITH

1    PROOF OF PURCHASE.  BUT IT'S APPROXIMATELY 3,000 THAT

2    HAVE SUBMITTED A VALID PROOF OF PURCHASE AS SPECIFIED

3    IN THE STIPULATION OF SETTLEMENT.

4              THE COURT:  IS THE NUMBER OF CLAIMS THAT HAVE

5    BEEN SUBMITTED APPROXIMATELY 600,000?

6              MR. CHORBA:  JUST UNDER, YOUR HONOR.

7              THE COURT:  DO YOU AGREE WITH THAT?

8              MR. CHORBA:  I SHOULD SAY, YOUR HONOR, THAT IT

9    WAS ACTUALLY OVER.  BUT AFTER YOU REDUCE THE NUMBER OF

10   INVALID OR FRAUDULENT CLAIMS, IT'S JUST UNDER 600,000.

11             THERE'S APPROXIMATELY 92,000, AS WE

12   STATED IN THE PAPERS.  AND THAT REVIEW PROCESS IS

13   ONGOING.

14             THE COURT:  OKAY.  WHAT'S THE RATIONALE --

15   INASMUCH AS -- WHAT'S THE RATIONALE FOR TREATING THIS

16   LESS THAN 1 PERCENT WITH THE HIGHER NUMBER?

17             MS. WOLFSON:  FIRST OF ALL, YOUR HONOR, IT'S

18   THE OBJECTOR'S BURDEN TO PROVE THEIR VALID OBJECTION.

19             THE WAY THAT THE OBJECTION APPEARS TO BE

20   FRAMED IS THAT MS. ROSSIGNOL IS ATTACKING CERTIFICATION

21   BASED ON THE TIERED APPROACH TO SETTLEMENT.  YOUR

22   HONOR, WE SUBMIT TO YOU THAT'S A DISTINCTION WITHOUT A

23   DIFFERENCE FOR THE PURPOSES OF CLASS CERTIFICATION AND

24   FOR THE PURPOSES OF ADEQUACY.

25             IN FULL DISCLOSURE, SOME OF OUR

 1    PLAINTIFFS HAD PROOFS OF PURCHASE AND ALSO HAD MADE

 2    PURCHASES WITHOUT PROOF OF PURCHASE.  SO, THEREFORE,

 3    THEY'RE ADEQUATE REPRESENTATIVES FOR BOTH TYPES OF

 4    PLAINTIFFS.

 5              WITH RESPECT TO THE SETTLEMENT, YOUR

 6    HONOR, WE HAD VALID REASONS, SUCH AS THOSE OUTLINED IN

 7    MR. MARKHAM SHERWOOD'S DECLARATION, HAVING TO DO WITH

 8    FRAUD.

 9              AND, ALSO, WE BELIEVED THAT IT MADE SENSE

10    TO COMPENSATE THOSE WITH PROOF OF PURCHASE WITH A

11    SLIGHTLY HIGHER AMOUNT BECAUSE PROOF DOES MAKE A

12    DIFFERENCE WHEN IT COMES TO TRIAL.

13              AND SO UNDER THE CONSIDERATION OF THE

14    TOTALITY OF THE CIRCUMSTANCES, THIS WAS ONE OF THE

15    TERMS THAT WAS VERY HEAVILY NEGOTIATED THROUGH THE

16    SEVEN MONTHS AFTER THE PRINCIPAL TERMS OF THE

17    SETTLEMENT WERE REACHED AT THE FOURTH MEDIATION.  I'M

18    SORRY, THE THIRD MEDIATION.

19              AND WE BELIEVE THAT OUR BURDEN ON PROVING

20    WHY THE SETTLEMENT WAS FASHIONED THIS WAY IS VERY

21    SMALL, AND WE'VE MET IT.

22              THE OBJECTOR IS COMPLAINING ABOUT THE

23    FACT THAT WE SHOULD HAVE FASHIONED IT SOME OTHER WAY.

24    HOWEVER, THAT DOES NOT CONTRADICT THE FACT THAT THE

25    SETTLEMENT OVERALL IS FAIR AND ADEQUATE.

```
 1              MR. CHORBA:  YOUR HONOR, MAY I BE HEARD ON

 2    THIS POINT AS WELL?

 3              THE COURT:  GO AHEAD.

 4              MR. CHORBA:  THERE'S REALLY TWO -- I GUESS WE

 5    HAVE TWO PRINCIPAL RESPONSES TO MS. ROSSIGNOL'S

 6    OBJECTION ON THIS GROUND.  FIRST, AND I THINK

 7    MS. WOLFSON ALLUDED TO THIS POINT, IS THE NINTH CIRCUIT

 8    HELD IN THE HANLON CASE, "SETTLEMENT IS THE OFFSPRING

 9    OF COMPROMISE.  THE QUESTION WE ADDRESS IS NOT WHETHER

10    THE FINAL PRODUCT COULD BE PRETTIER, SMARTER OR

11    SNAZZIER, BUT WHETHER IT IS FAIR, ADEQUATE AND FREE

12    FROM COLLUSION."

13              SO AS A THRESHOLD MATTER, WE WOULD SUBMIT

14    THAT THIS ISN'T JUST A VALID OBJECTION.  IT'S REALLY A

15    QUASI-MONDAY-MORNING-QUARTERBACKING "WHY DID YOU DO IT

16    THIS WAY INSTEAD OF THAT WAY?"

17              SECOND, AND PERHAPS MOST IMPORTANTLY, THE

18    REASON WHY IT WAS TIERED THIS WAY, IN ADDITION TO WHAT

19    MS. WOLFSON SAID, IS THERE ARE SEVERAL CASES, THE

20    CARRERA CASE, THE HODES CASE AND THE WEINER VERSUS

21    SNAPPLE CASE, WHERE COURTS HAVE REJECTED CLASS

22    CERTIFICATION ON THE GROUNDS THAT CLASS MEMBERS DID NOT

23    RETAIN RECEIPTS.  SO THERE WOULD BE A VALID BASIS HERE,

24    WE BELIEVE, TO REQUIRE ALL CLASS MEMBERS TO SUBMIT

25    RECEIPTS TO OBTAIN ANY PURCHASE.
```

13

1              AND WE, FRANKLY, SUBMIT THAT IF THIS CASE

2    WERE TO PROCEED TO LITIGATION, WHICH IS ONE OF THE

3    FACTORS THIS COURT MUST EVALUATE IN CONSIDERING THE

4    SETTLEMENT, THAT MOST CLASS MEMBERS, BY VIRTUE OF THE

5    NUMBERS THAT WE JUST GAVE YOU, 99.5 PERCENT, WOULD NOT

6    BE ENTITLED TO ANYTHING, OR AT LEAST THAT WOULD BE AN

7    ARGUMENT THAT THE PARTIES WOULD HAVE TO LITIGATE.

8              BUT BECAUSE THIS IS A SETTLEMENT, WE'RE

9    ACTUALLY PROVIDING THOSE AMOUNTS AS A RESULT OF THE

10   COMPROMISE IN THIS CASE.  WE'RE ACTUALLY PROVIDING

11   PEOPLE WITH AN OPPORTUNITY TO CLAIM AN AMOUNT WITHOUT

12   ANY PROOF OF PURCHASE.  SO THE FACT THAT THERE IS THIS

13   TIERED APPROACH, WE THINK IS LEGITIMATE.

14             WE THINK IF THIS CASE WERE TO PROCEED

15   THROUGH LITIGATION, THERE'S A VERY STRONG LIKELIHOOD

16   THAT THE MAJORITY OF CLASS MEMBERS WOULD NOT GET ANY

17   MONETARY RECOVERY.  SO IT'S THIS VERY SMALL GROUP THAT

18   HAVE SUBMITTED WITH PROOF OF PURCHASE, WE DON'T BELIEVE

19   THAT THAT'S IN ANY WAY ILLEGITIMATE.  IT WAS AN

20   APPROPRIATE BARGAIN.  AND IT'S KEYED OFF THE CASE LAW

21   IN THIS AREA.

22             MR. FURMAN:  IF IT MAKES NO DIFFERENCE TO THE

23   TOTAL AMOUNT THAT THE DEFENSE IS GOING TO END UP PAYING

24   TO FUND THE SETTLEMENT FUND, THEN WHY DO WE HAVE TO

25   HAVE A TIERED DISTRIBUTION AMONG CLASS MEMBERS?  WHY

```
1    ARE CERTAIN CLASS MEMBERS GETTING PREFERENCE AND

2    CERTAIN CLASS MEMBERS ARE NOT GETTING PREFERENCE?  WHY

3    IS THAT ARBITRARY DISTINCTION BEING MADE?

4              THIS CONCEPT OF PROOF AT TRIAL BEING AN

5    ISSUE THAT IS REFLECTED LEGITIMATELY IN THIS DIFFERENCE

6    IS NON-SENSE.  YOUR HONOR --

7         THE COURT:  JUST A MINUTE.

8              THE DIFFERENCE BETWEEN THE TIERS IS A

9    MAXIMUM OF $45 AND $75; CORRECT?

10        MR. CHORBA:  CORRECT.

11        THE COURT:  THAT'S $30.

12             THERE ARE APPROXIMATELY HOW MANY PEOPLE

13   THAT HAVE FILED CLAIMS WITH RECEIPTS, ABOUT 1,000?

14        MR. CHORBA:  ABOUT 3,000, YOUR HONOR.

15        THE COURT:  JUST A MINUTE.

16        MR. FURMAN:  TO DATE, YOUR HONOR.

17             OF COURSE, THE CLAIMS PERIOD IS OPEN.

18        THE COURT:  OKAY.  YOU HAVE SOMETHING NEW ON

19   THIS?

20        MR. FURMAN:  ONLY TO SAY, YOUR HONOR, ON THIS

21   PARTICULAR POINT, YOUR HONOR ALREADY HAS, LOOKING AT

22   THE PAPERS, IN CAMERA REVIEW OF THE PROFITS DOCUMENTS

23   THAT WOULD SHOW THIS BURDEN OF PROOF.

24        THE COURT:  WELL, AS I RUN THE NUMBERS HERE,

25   THE AMOUNT AT ISSUE -- OF THE $9 MILLION TOTAL FUND,
```

```
1   THE AMOUNT AT ISSUE IS APPROXIMATELY $90,000, WHICH IS
2   1 PERCENT.
3             IF THE $90,000 WERE ALLOCATED ACROSS THE
4   ENTIRE CLASS, THE DIFFERENCE WOULD BE -- I DIDN'T DO
5   ALL OF THE MATH HERE, BUT IT WOULD BE UNDER 20 CENTS.
6   IT WOULD BE -- PROBABLY BE BETWEEN 10 AND 15 CENTS PER
7   CLASS MEMBER.  I DON'T THINK THAT'S A MATERIAL
8   DIFFERENCE.
9             AND IN LIGHT OF THE ISSUES THAT ARE
10  RAISED BY THE RECEIPT/NO RECEIPT MATTER, MY TENTATIVE
11  VIEW, ALTHOUGH I'LL GIVE THIS FURTHER THOUGHT, WOULD BE
12  THAT I WOULD NOT -- THAT THIS WOULD NOT BE A SUFFICIENT
13  BASIS TO DEFEAT THE MOTION OR TO REQUIRE A
14  MODIFICATION.  BUT I'LL REFLECT ON IT IN LIGHT OF YOUR
15  COMMENTS.  THANK YOU.
16            MR. CHORBA:  THANK YOU, YOUR HONOR.
17            THE COURT:  THE OTHER OBJECTIONS THAT WERE
18  RAISED BY OTHERS WHO ARE NOT REPRESENTED TODAY, I THINK
19  WERE MATTERS THAT WERE PREVIOUSLY ADDRESSED BECAUSE
20  CERTAIN PERSONS OBJECTED, NOT JUST THE -- THERE WERE
21  CERTAIN OBJECTIONS MADE IN CONNECTION WITH THE
22  PRELIMINARY APPROVAL THAT WERE ADDRESSED.
23            IS THERE SOMETHING MORE, MR. FURMAN?
24            MR. FURMAN:  MAY I ADDRESS A FEW POINTS IN THE
25  REPLY BRIEFS THAT CAME UP?
```

```
1              THE COURT:  IS THIS NEW?

2              MR. FURMAN:  YES, YOUR HONOR.  AS TO THE WAY

3    THAT THE CLAIMS WERE HANDLED AND WHICH CLAIMS WERE

4    REJECTED.

5              THE COURT:  GO AHEAD.

6              MR. FURMAN:  YOUR HONOR, JUST QUICKLY LOOKING

7    AT MR. SHERWOOD'S DECLARATION, AGAIN, AT PARAGRAPH 30,

8    THERE WERE SEVERAL ISSUES IN REJECTING SEVERAL HUNDRED

9    THOUSAND CLAIMS, IT LOOKS LIKE.

10                  FIRST OF ALL, WITH REGARD TO DUPLICATES,

11   MR. SHERWOOD SAID THAT THEY REJECTED ALL CLAIMS WHERE

12   THE NAME AND THE ADDRESS WERE THE SAME.  WELL, THAT

13   POINTS TO A PROBLEM BECAUSE THERE APPEARS TO HAVE BEEN

14   SIGNIFICANT CONFUSION BY CLASS MEMBERS TRYING TO MAKE

15   CLAIMS.  THERE'S NO INFORMATION AS TO WHETHER OR NOT

16   THOSE CLAIMS THAT WERE ALLEGEDLY DUPLICATES WERE FROM

17   MULTIPLE PURCHASES BY THE SAME PERSON, AND THEY DIDN'T

18   UNDERSTAND THAT THEY COULD SUBMIT IT ALL IN ONE CLAIM.

19   WE DON'T KNOW THE AMOUNTS OF THE CLAIMS THAT WERE

20   DUPLICATES.  WE JUST DON'T HAVE ENOUGH INFORMATION.  IT

21   SEEMS THERE'S A POTENTIAL DISCREPANCY THERE.

22                  THAT ALSO COMES UP BECAUSE 50,000 CLAIMS

23   WERE REJECTED BASICALLY ON THE FACT THAT THE PERSON

24   FILLING OUT THE CLAIM FORM WAS APPARENTLY CONFUSED AS

25   TO WHETHER THEY'RE SUBMITTING A PROOF OF PURCHASE OR A
```

```
1    NOT-PROOF-OF-PURCHASE CLAIM.  THAT REPRESENTS OVER $2

2    MILLION WORTH OF CLAIMS, APPROXIMATELY 10 PERCENT OF

3    THE SETTLEMENT FUND IN TERMS OF PROPORTION.  ALL THOSE

4    WERE JUST FLATLY REJECTED.  YOU KNOW, WE DIDN'T GO

5    THROUGH ANY SORT OF HANGING CHAD PROCESS OR SOMETHING

6    LIKE THAT TO PROTECT THOSE CLASS MEMBERS.

7                  15,000 OF THE CLAIMS WERE REJECTED AS

8    FRAUDULENT.  THERE WAS NO USE OF RECEIPTS OR NOT

9    RECEIPTS TO DETERMINE WHICH WERE FRAUDULENT AND

10   REJECTING THOSE CLAIMS BASED SOLELY ON TECHNICAL

11   MEASURES, LOOKING AT THE IP ADDRESSES OF THE CLAIMANT.

12                  AND ANOTHER 16,000 OF THE CLAIMS WERE

13   REJECTED FOR SO-CALLED "INADEQUATE PROOF OF PURCHASE."

14   THE BASES UPON WHICH THAT WAS DONE, IT LOOKS LIKE SOME

15   PEOPLE SENT IN PHOTOS.  WELL, OKAY, SO THEY SENT IN A

16   PHOTO OF THE STORE.  WHY IS THAT NOT AN ADEQUATE CLAIM

17   JUST BECAUSE IT'S INADEQUATE PROOF OF PURCHASE?

18              THE COURT:  I UNDERSTOOD THAT TO BE A COMMENT

19   AS TO SUBSTITUTE FOR A RECEIPT.

20              MR. CHORBA:  CORRECT, YOUR HONOR.  THE

21   SETTLEMENT AGREEMENT SPECIFIED THE REQUIRED PROOF OF

22   PURCHASE.  IF THEY DIDN'T SUBMIT --

23              THE COURT:  I UNDERSTAND.

24              MR. FURMAN:  WHY ARE THOSE CLASS MEMBERS NOT

25   ENTITLED TO GET ANY MONEY WHATSOEVER?
```

1        THE COURT:  THEY'RE NOT ENTITLED TO THE HIGHER

2   LEVEL BECAUSE THAT'S NOT A RECEIPT.

3        MR. FURMAN:  WITH ALL DUE RESPECT,

4   MR. SHERWOOD'S DECLARATION APPEARS TO BE QUITE

5   UNEQUIVOCAL.  THOSE CLAIMS WERE REJECTED.  16,000 OF

6   THOSE CLAIMS WERE --

7        THE COURT:  WAIT A MINUTE.

8        I UNDERSTOOD YOU TO SAY TWICE NOW THAT

9   YOU'RE REPRESENTING TO ME THAT THE PHOTOGRAPH CLAIMANTS

10  WERE REJECTED AS RECEIPT -- AS AN ALTERNATIVE TO A

11  RECEIPT.

12        WERE THEY FULLY REJECTED?

13        MR. CHORBA:  THEY WERE, YOUR HONOR, IF THE

14  CLAIMANT SELECTED -- AGAIN, THE CLAIM FORM HERE WAS

15  EXCEEDINGLY SIMPLE.  600,000 PEOPLE WERE ABLE TO FIGURE

16  IT OUT, WHICH IS AN ASTOUNDINGLY LARGE NUMBER.

17        THE COURT:  SO IF SOMEBODY SENT A PHOTOGRAPH

18  AND IT WERE REJECTED BECAUSE THEY WERE CLAIMING A

19  RECEIPT, WERE THEY PERMITTED TO RESUBMIT AS A

20  NON-RECEIPT CLASS MEMBER?

21        MR. CHORBA:  NO, YOUR HONOR.  BECAUSE THERE

22  WERE TWO -- AGAIN, A VERY SIMPLE CLAIM FORM.  IT HAD

23  TWO SECTIONS.  IT HAD SECTION A WITH PROOF.  IT HAD

24  SECTION B WITHOUT PROOF.

25        IF SOMEBODY OPTED TO SELECT "WITH PROOF,"

1    AND THEY UPLOADED AN INVALID FORM OF PROOF, SUCH AS MY

2    EXAMPLE EARLIER, A PICTURE OF A STORE, THAT'S AN

3    INVALID CLAIM.  THAT'S ALL WE HAVE.  THERE'S NOTHING IN

4    THE CLAIM FORM OR THE SETTLEMENT THAT ALLOWS US TO JUST

5    INFER -- TO USE COUNSEL'S HANGING CHAD EXAMPLE --

6            THE COURT:  I WANT TO KNOW WHETHER THEY CAN

7    REFILE A CLAIM AS A NON-RECEIPT?

8            MR. CHORBA:  IF THEY FILE A CLAIM BEFORE THE

9    DECEMBER 17TH DEADLINE, IT'S POSSIBLE, YOUR HONOR, YES.

10           THE COURT:  OKAY.  GO AHEAD.

11           MR. CHORBA:  IF IT WAS JUST WITH PROOF AND IT

12   WAS AN INVALID PROOF --

13           THE COURT:  I UNDERSTAND.

14           MR. CHORBA:  THERE ARE COSTS.  THERE ARE COSTS

15   ASSOCIATED WITH THIS.  IF WE HAVE TO GO THROUGH AND

16   START CONTACTING -- YOU KNOW, IT'S EXPENSIVE TO DO

17   THAT.  SO THE JUDGMENT WAS MADE TO MAKE THIS A VERY

18   SIMPLE CLAIM FORM.

19           THE COURT:  THANK YOU.

20           MR. FURMAN:  SO THE LAST POINT JUST ON THE

21   NUMBERS THERE, YOUR HONOR, TALKING ABOUT APPROXIMATELY

22   600,000 CLAIMS TO DATE, 575,000 OF WHICH ARE

23   REFLECTED -- ALMOST 575,000 ARE REFLECTED ON THE

24   DOCUMENTS THAT WE HAVE, OVER 81,000 ADDITIONAL CLAIMS

25   HAVE BEEN REJECTED, NOT IN COUNTING THE DUPLICATE

1    CLAIMS.  SO IT IS A SIGNIFICANT NUMBER, YOUR HONOR.

2              THE COURT:  OKAY.  THANK YOU, MR. FURMAN.

3              MR. FURMAN:  THANK YOU, YOUR HONOR.

4              THE COURT:  DID ANY OF THE LEAD PLAINTIFFS

5    SUBMIT A DECLARATION STATING HOW MUCH TIME HE OR SHE

6    SPENT AS A LEAD PLAINTIFF?

7              MS. WOLFSON:  YOUR HONOR, EACH LEAD PLAINTIFF

8    SUBMITTED A DECLARATION DESCRIBING THEIR EFFORTS.

9    THOSE DO NOT CONTAIN HOUR AMOUNTS.

10             THE COURT:  WHY NOT?

11             MS. WOLFSON:  WE THOUGHT THAT GIVEN THE VERY

12   RATIONAL AMOUNT THAT'S BEING REQUESTED, $2,500, IT WAS

13   NOT NECESSARY.  BUT, OF COURSE, IF YOUR HONOR THINKS IT

14   IS, WE WOULD LIKE THE OPPORTUNITY TO MODIFY THOSE

15   DECLARATIONS.

16             THE COURT:  DO YOU THINK THERE'S A VARIATION

17   IN THE AMOUNT OF TIME DIFFERENT CLASS REPRESENTATIVES

18   SPENT?

19             MS. WOLFSON:  I THINK THERE MAY BE, YES.

20             THE COURT:  HOW IS THE CALCULATION OF THE

21   ASSIGNED VALUE OF INJUNCTIVE RELIEF MADE?

22             MR. CHORBA:  YOUR HONOR, THAT WAS SUBMITTED

23   WITH THE PRELIMINARY APPROVAL PAPERS, AS YOUR HONOR MAY

24   RECALL.  WE HAD ANDREA THEODORE, A MARKETING

25   REPRESENTATIVE OF NAKED JUICE.  AND WE VALUED THAT, AS

1    STATED IN THAT DECLARATION, THE ACTUAL COSTS TO NAKED

2    JUICE.  AND THAT WAS A PRODUCT OF HEAVY NEGOTIATION.

3    IT WAS THE OUT-OF-POCKET COSTS, FOR EXAMPLE, HIRING A

4    NEW OR ASSIGNING SOMEONE WITHIN THE COMPANY TO FULFILL

5    THE NEW ROLE, TO SORT OF OVERSEE THE COMPLIANCE

6    EFFORTS, THE COSTS OF SUBMITTING SAMPLES FOR OUTSIDE

7    VERIFICATION AND TESTING.  THESE ARE ACTUAL

8    OUT-OF-POCKET.  COSTS, CONSTRUCTING A DATA BASE WAS

9    ANOTHER ELEMENT OF THE INJUNCTIVE RELIEF.

10           THE COURT:  JUST A MINUTE.

11               MS. GOLAN, YOU'RE HERE; CORRECT?

12           MS. GOLAN:  YES, YOUR HONOR.

13           THE COURT:  WHAT EFFORT HAVE YOU MADE TO

14   QUANTIFY THE PORTION OF THE FEES YOU SEEK AS RELATED TO

15   THE GMO MATTER, WHICH YOU CONTEND WAS THE -- IN YOUR --

16   IN THE SANDYS' COMPLAINT, BUT NOT OTHERS?

17           MS. GOLAN:  YES, YOUR HONOR.  THE SANDYS'

18   COMPLAINT WAS THE ONLY COMPLAINT THAT BROUGHT GMO

19   CLAIMS.  WE WERE ALSO THE ONLY COUNSEL TO DO ANY GMO

20   INVESTIGATION.  WE'RE ALSO THE ONLY ONE --

21           THE COURT:  WHAT EFFORT HAVE YOU MADE TO

22   QUANTIFY THE AMOUNT OF YOUR EFFORTS THAT WERE MADE WITH

23   RESPECT TO GMO?  THAT WAS MY QUESTION.

24           MS. GOLAN:  I'M NOT UNDERSTANDING THE

25   QUESTION, YOUR HONOR.

 1          THE COURT:   OKAY.  LET ME MAKE IT CLEARER.

 2   YOU'RE SEEKING HUNDREDS OF THOUSANDS OF DOLLARS IN

 3   FEES.  YOU'RE NOT CLASS COUNSEL.  THAT WAS -- THAT

 4   DECISION WAS PREVIOUSLY MADE.

 5              THERE'S A DISPUTE AMONG THE PARTIES AS TO

 6   WHETHER THERE'S ANY -- EVEN A BASIS TO AWARD ANY FEES.

 7   HOWEVER, THERE'S AUTHORITY THAT SUGGESTS THAT FEES

 8   COULD BE AWARDED TO YOU IN CONNECTION -- TO THE EXTENT

 9   YOU HAVE ADDED VALUE.

10              THE ONLY AREA, ON MY REVIEW OF THE

11   BILLING STATEMENTS AND BRIEFING, THAT I THINK THERE'S A

12   POTENTIAL FOR HAVING ADDED VALUE IS IN CONNECTION WITH

13   THE GMO ISSUE.  THEREFORE, THAT'S WHY I ASKED MY

14   QUESTION.

15              NOW, THERE IS AN ALLOCATION OF TIME -- OF

16   YOUR TIME SPENT ON THE COMPLAINT THAT YOU DRAFTED.  AND

17   THERE'S DISPUTES ABOUT WHETHER OR NOT THAT WAS

18   REASONABLE IN TIME.  SO THAT'S WHY I ASKED.

19              HAVE YOU THOUGHT ABOUT HOW TO QUANTIFY

20   THE TIME SPENT ON THE GMO ISSUE?

21          MS. GOLAN:  WITH MY REGARD TO MY DRAFTING OF

22   THE INITIAL COMPLAINT, I CAN GO BACK TO MY RECORDS AND

23   DIVIDE -- SEE WHICH PART OF IT WAS ON THE GMO

24   ALLEGATIONS AND WHICH PART WAS ON OTHER ALLEGATIONS.

25              THERE'S ALSO THE -- THE TIME SHEETS THAT

1    WE SUBMITTED ALSO SPECIFIED THE WORK THAT WE WERE DOING

2    ON THE DAYS THAT WE WERE DOING IT AND HOW MUCH TIME WE

3    SPENT ON IT, INCLUDING OUR DISCUSSION OF THE CLAIMS AND

4    ALSO THE TESTING OF THE PRODUCTS WITH EXPERTS AND

5    VARIOUS LABS.

6              THE COURT:  OKAY.  THANK YOU.

7              IS THERE ANYTHING MORE YOU WANT TO ADD AT

8    THIS POINT, MS. GOLAN?

9              MS. GOLAN:  NO, YOUR HONOR.

10             THE COURT:  THANK YOU.

11             YES?

12             MS. WOLFSON:  THANK YOU, YOUR HONOR.

13             I JUST WANT TO STATE THAT IT IS INCORRECT

14   TO SAY THAT MS. SANDYS WAS THE ONLY PLAINTIFF WHO

15   INVESTIGATED THE GMO MATTER.  LEAD COUNSEL INVESTIGATED

16   THAT ISSUE.  WE DID INCLUDE IT IN THE CONSOLIDATED

17   COMPLAINT.

18             THE COURT:  BUT IT WAS ONLY IN THE SANDYS'

19   COMPLAINT INITIALLY?

20             MS. WOLFSON:  THAT'S CORRECT.

21             HOWEVER, THE INVESTIGATION WAS ONGOING.

22   WE DID DO OUR OWN EXPERT WORK.  EXPERTS WERE DESIGNATED

23   FOR THIS ISSUE.  TESTS WERE DONE.  AND ALL OF THOSE

24   WERE PROVIDED IN DISCOVERY.

25             THE COURT:  WAS THAT PRE OR POST DRAFTING OF

```
 1        THE CONSOLIDATED COMPLAINT?

 2             MS. WOLFSON:  I DON'T KNOW THE ANSWER TO THAT,

 3        YOUR HONOR.

 4             THE COURT:  OKAY.

 5             MS. GOLAN:  AFTER YOUR HONOR RULED ON THE

 6        INTERIM LEAD MATTER, YOUR HONOR ORDERED INTERIM LEAD

 7        COUNSEL TO CONFER WITH US REGARDING THE AMENDED

 8        CONSOLIDATED COMPLAINT.  AND IT WAS THIS PROCESS THAT

 9        HELPED US ENSURE THAT THE GMO ALLEGATIONS WERE MADE IN

10        THE AMENDED CONSOLIDATED COMPLAINT AND THEY WERE MADE

11        AS STRONGLY AS POSSIBLE.

12             THE COURT:  OKAY.  THANK YOU.

13             MY TENTATIVE THINKING WITH RESPECT TO

14        OTHER ISSUES IS THIS:  IN APPLYING THE SETTLEMENT

15        FAIRNESS FACTORS THAT HAVE BEEN RECOGNIZED BY THE NINTH

16        CIRCUIT ON NUMEROUS OCCASIONS, INCLUDING IN THE LINNEY

17        CASE, 151 F.3D 1234, WHICH INCLUDES THE STRENGTH OF THE

18        PLAINTIFF'S CASE, THE RISK, EXPENSE, COMPLEXITY, THE

19        LIKELY DURATION OF FURTHER LITIGATION, THE RISK OF

20        MAINTAINING THE CLASS ACTION STATUS, THE AMOUNT OFFERED

21        IN SETTLEMENT, THE EXTENT OF DISCOVERY COMPLETED, THE

22        EXPERIENCE AND VIEWS OF COUNSEL, THE PRESENCE OF A

23        GOVERNMENTAL PARTICIPANT, THE REACTION OF CLASS MEMBERS

24        TO THE PROPOSED SETTLEMENT.

25             OTHER FACTORS CAN INCLUDE THAT THE
```

1  SETTLEMENT WAS ACHIEVED THROUGH MEDIATION WITH A

2  NEUTRAL, ARM'S LENGTH NEGOTIATIONS.

3          ANOTHER FACTOR HERE -- OR AMONG THOSE

4  FACTORS THAT IS RECOGNIZED IS, THIS IS NOT A CASE IN

5  WHICH YOU PRESENTED EVIDENCE AS TO WHAT RANGE YOU

6  BELIEVE WOULD HAVE BEEN RECOVERED HAD THERE BEEN A

7  TRIAL; CORRECT?

8          MS. WOLFSON:  YOUR HONOR, WITH ALL DUE

9  RESPECT, THAT'S NOT ENTIRELY CORRECT.  WE PRESENTED THE

10  COURT -- DOCUMENTS WERE FILED UNDER SEAL REGARDING

11  DEFENDANT'S REVENUES.

12          IF YOU RECALL, THE COURT HAD CONTINUED --

13          THE COURT:  WHAT EVIDENCE WAS PRESENTED WITH

14  RESPECT TO A RANGE OF POTENTIAL RECOVERY AS ESTIMATED

15  BY COUNSEL IN CONNECTION WITH THE NEGOTIATED SETTLEMENT

16  OF THIS CASE?

17          MS. WOLFSON:  I BELIEVE I'M ANSWERING THE

18  QUESTION, BUT MAYBE I'M MISUNDERSTANDING.  THERE WAS --

19          THE COURT:  DURING THE NEGOTIATION OF THE

20  SETTLEMENT, WERE RANGES OF SETTLEMENT DISCUSSED?

21          MS. WOLFSON:  YES, YOUR HONOR.

22          THE COURT:  EXCUSE ME, RANGES OF POTENTIAL

23  RECOVERY WERE DISCUSSED?

24          MS. WOLFSON:  YES.

25          THE COURT:  WHICH DOCKETED SEALED DOCUMENTS

1   CONTAIN THE INFORMATION?

2                MS. WOLFSON:  JUST A MINUTE, YOUR HONOR.

3                DOCKETS 141 AND 142.

4            THE COURT:  JUST ONE SECOND, PLEASE.

5                I HAVE IT.  THANK YOU.

6                I'VE JUST EXAMINED THE DATA IN EXHIBIT --

7   IN DOCKET 141, WHICH DOES ADDRESS THE QUESTION I

8   RAISED.  THANK YOU.

9                I'M MINDFUL OF THE -- THEREFORE, AMONG

10  OTHER FACTORS, THE CALCULATIONS THAT WERE MADE IN TERMS

11  OF POTENTIAL RECOVERY, THE ISSUES ABOUT WHETHER THE

12  ACTION COULD BE MAINTAINED AS A CLASS ACTION, THE

13  AMOUNT OF THE SETTLEMENT, THE USE OF A NEUTRAL, AS I

14  STATED, THE AMOUNT OF DISCOVERY COMPLETED AND THE STAGE

15  OF THE PROCEEDINGS, THE EXPERIENCE OF COUNSEL, THE

16  REACTIONS OF CLASS MEMBERS TO THE SETTLEMENT, THE ARM'S

17  LENGTH NEGOTIATIONS.

18                AND I'M ALSO MINDFUL OF THE OBJECTIONS,

19  SOME OF WHICH HAVE BEEN UNDERSCORED THIS MORNING, SOME

20  OF WHICH, AS I STATED, WERE OF THE SAME NATURE AND TYPE

21  THAT WERE PRESENTED IN CONNECTION WITH THE PRELIMINARY

22  APPROVAL.

23                AND I WILL REFLECT FURTHER IN LIGHT OF

24  THE COMMENTS MADE TODAY AND DIRECT THAT THE -- I WOULD

25  LIKE TO SEE, WITHIN A WEEK, A BRIEF FROM SANDYS'

1    COUNSEL SEEKING TO IDENTIFY THE WORK PERFORMED UP TO

2    THE TIME OF THE APPOINTMENT OF CLASS COUNSEL ON THE GMO

3    ISSUE.

4                AND, SECOND, I'D LIKE TO SEE THE EVIDENCE

5    FROM CLASS COUNSEL ON THE GMO WORK PERFORMED BY CLASS

6    COUNSEL, WHEN THAT WAS PERFORMED.  SO I'D LIKE EACH OF

7    YOU TO USE DATES IN ANY DATA SUBMITTED SO I CAN SEE HOW

8    THE WORK OVERLAPS, IF AT ALL.

9                WITH RESPECT TO THE PROPOSED $2,500

10   AMOUNT TO EACH CLASS REPRESENTATIVE, I'D LIKE TO HAVE

11   DATA SUBMITTED AS TO HOW MUCH TIME EACH OF THESE

12   INDIVIDUALS SPENT IN CONNECTION WITH THIS MATTER.

13               I DO HAVE THE DECLARATIONS AS TO WHAT

14   EACH DID, BUT I'D LIKE TO KNOW APPROXIMATELY HOW MANY

15   HOURS EACH SPENT.

16               WITH RESPECT TO THE COSTS OF CLASS

17   COUNSEL, MY TENTATIVE VIEW IS THAT THE COSTS HAVE BEEN

18   ADEQUATELY AND APPROPRIATELY DOCUMENTED AND ARE

19   REASONABLE AND WERE REASONABLY RELATED TO ACHIEVING THE

20   OUTCOME HERE.

21               WITH RESPECT TO THE REQUEST FOR LEGAL

22   FEES BY CLASS COUNSEL, I'VE LOOKED AT THAT IN SEVERAL

23   DIFFERENT WAYS.  FIRST, I HAVE NOTED THAT THERE'S A

24   VARIATION IN THE HOURLY RATES OF DIFFERENT CLASS

25   COUNSEL, THAT'S FINE, IN THE MARKETPLACE.  HOWEVER, I'M

1    NOT -- AT THIS POINT, I'M NOT -- I WAS NOT PERSUADED AS

2    TO WHY CERTAIN CLASS COUNSEL COULD JUSTIFY A HIGHER

3    HOURLY RATE AT THE TOP THAN OTHERS.

4              I'M ALSO MINDFUL THAT CERTAIN OF THE

5    UNDERLYING HOURLY RECORDS WHICH WERE DESIGNED TO SHOW

6    AN ABILITY TO DO AN EVALUATION ON THE LODESTAR NUMBER

7    INVOLVED CERTAIN INDIVIDUALS WHO BILLED RELATIVELY

8    SMALL NUMBERS OF HOURS.  MR. FINKELSTEIN, 16 HOURS.

9    MR. THOMPSON, I THINK IT WAS 6.8 HOURS.  THERE WERE

10   OTHERS WHO WERE IN THIS VERY SMALL -- RELATIVELY SMALL

11   COMPARED TO OTHERS' HOURLY RANGE.  AND I -- I -- IN

12   DOING MY ANALYSIS, I WAS INCLINED TO REDUCE SOME OF

13   THESE HOURS OR -- AND IN SOME INSTANCES, POTENTIALLY

14   ELIMINATE THEM BECAUSE I WAS OVERALL CONCERNED ABOUT

15   THE EFFICIENCIES.

16             I ALSO BELIEVE, YOU CAN CORRECT ME ON

17   THIS, THAT THE RECORDS REFLECT THAT MORE THAN 26

18   LAWYERS BILLED TIME.  THAT'S NOT INCLUDING THE LEGAL

19   ASSISTANTS AND OTHERS.  AND THAT ALSO RAISED AN ISSUE

20   FOR ME IN TERMS OF EFFICIENCY AND EVALUATING THE

21   REASONABLENESS OF FEES.

22             NOW, BASED ON THE TOTAL AMOUNT OF THE

23   SETTLEMENT, WHICH IS IN CASH $9 MILLION, AND THEN THE

24   ASSIGNED VALUE FOR THE VALUE OF -- OR THE COST OF THE

25   INJUNCTIVE RELIEF, THE PERCENTAGES VARY WHETHER --

```
1    DEPENDING -- THE PERCENTAGE OF LEGAL FEES REQUESTED --

2    WHICH I BELIEVE IS $2.6 MILLION; CORRECT?

3          MS. WOLFSON:  YES, YOUR HONOR.

4          THE COURT:  THAT PERCENTAGE IS A HIGHER --

5    THAT FIGURE IS A HIGHER PERCENTAGE OF $9 MILLION THAN

6    IT IS OF MORE THAN $10 MILLION THE ESTIMATED COST,

7    WHICH IS THE APPROXIMATE ESTIMATED ADDITIONAL --

8    INCLUDES THE APPROXIMATE ESTIMATED ADDITIONAL COST OF

9    THE INJUNCTIVE RELIEF.  SO THOSE FIGURES CAN BE USED TO

10   EVALUATE CLAIMS OF LEGAL FEES -- LEGAL FEES -- LEGAL

11   FEE CLAIMS.

12          AND THEN THE CROSS-CHECK IS WHAT I

13   DESCRIBED EARLIER, WHICH IS LOOKING AT YOUR HOURLY

14   RATES, LOOKING AT THE NUMBERS OF HOURS AND DETERMINING

15   WHETHER THE PERCENTAGE METHOD IS APPROPRIATE.

16          AND AT THIS POINT -- HAVING REVIEWED THE

17   BILLING STATEMENTS, THE HOURS BILLED, THE NUMBERS OF

18   HOURS BILLED BY CERTAIN INDIVIDUALS AND THE NUMBERS OF

19   LAWYERS, AT THIS POINT, I THINK THAT THE AWARD -- MY

20   TENTATIVE VIEW IS THAT THE AWARD WOULD BE REDUCED.  NOT

21   $2.6 MILLION, WHICH IS APPROXIMATELY 25 PERCENT OF THE

22   $10.4 MILLION, BUT AT A PLACE BETWEEN 25 PERCENT OF THE

23   $9 MILLION RECOVERY, WHICH IS $2.25 MILLION, AND

24   SLIGHTLY MORE THAN THAT.  I'M GOING TO GIVE THIS SOME

25   FURTHER THOUGHT.  BUT I BELIEVE THAT SOME REDUCTIONS
```

1    ARE APPROPRIATE.  AND IN MY TENTATIVE THINKING BASED ON

2    THE ANALYSIS THAT I HAVE DONE TO THIS POINT, IS THAT

3    THE FIGURE SHOULD BE NO MORE THAN $2.4 MILLION, BUT IT

4    MIGHT BE SOMEWHAT LESS THAN THAT.

5              AGAIN, BASED ON HOURLY RATES, I'M NOT

6    PERSUADED BY $850 HOURLY RATES.  I'M NOT PERSUADED BY,

7    AS I SAY, CERTAIN OF THE RATES THAT ARE HIGHER THAN

8    THAT.  I'M NOT PERSUADED THAT THE WORK THAT WAS

9    PERFORMED, ESPECIALLY WHEN IT WAS OF LIMITED AMOUNT,

10   WARRANTS THE APPLICATION OF SUCH RATES.

11             TO BE SURE, THOSE AMOUNTS DID NOT

12   GENERATE SUBSTANTIAL PORTIONS OF THE TOTAL BILL.  BUT

13   WHEN LOOKING THROUGH IT AND COMING THROUGH THESE

14   ANALYSES AND THE 35 LAWYERS ISSUE, I'M -- IT'S -- I'M

15   NOT PERSUADED THAT THE REQUESTED $2.6 MILLION IS THE

16   RIGHT NUMBER.

17        MS. WOLFSON:  IF I MAY BE HEARD, YOUR HONOR?

18             THE $2.6 MILLION REQUESTED IS 25 PERCENT

19   OF THE $10.4 MILLION, IF YOU INCLUDED THE INJUNCTIVE

20   RELIEF VALUE.  AND IT'S 28 PERCENT OF THE $9 MILLION

21   VALUE.  WE WOULD SUBMIT TO YOU, THAT IS STILL WELL

22   WITHIN THE RANGE OF THE BENCHMARK IN A BENEFIT-TO-

23   THE-FUND METHOD.

24             AS YOUR HONOR INDICATED, THE LODESTAR IS

25   A CROSS-CHECK.  AND WE WOULD BE HAPPY TO ADDRESS THE

1    CONCERNS THAT YOUR HONOR MENTIONED.  HOWEVER, THE NINTH

2    CIRCUIT DOES ALLOW US TO INCLUDE A RISK MULTIPLIER IN

3    CASES LIKE THIS UNDER THE FISCHEL CASE, NUMEROUS CASES

4    WE'VE CITED, WPPSS, FLORIN.

5                    AND THE LODESTAR THAT WE'VE PRESENTED TO

6    THE COURT, THE FEES -- THE FEES THAT WE ARE REQUESTING

7    IS ACTUALLY LOWER THAN THE ACTUAL LODESTAR WITHOUT ANY

8    MULTIPLIER.  SO WE WOULD ASK THE COURT TO CONSIDER THAT

9    IN ITS ANALYSIS.

10                THE COURT:  ALL RIGHT.  THANK YOU.

11                MS. RIVAS:  YOUR HONOR, IN TERMS OF MY

12   PARTNERS, DOUG THOMPSON AND BURT FINKELSTEIN, THEY HAVE

13   30 YEARS OF EXPERIENCE OF DOING THIS TYPE OF WORK.

14   THEY HAVE RELATIVELY A SMALL NUMBER OF HOURS BECAUSE

15   THEY WERE BROUGHT IN IN KEY TIMES DURING THE LITIGATION

16   WHERE I THOUGHT THEIR EXPERIENCE WOULD BE VALUABLE.

17   BUT I UNDERSTAND, YOUR HONOR, IF THE COURT IS INCLINED

18   TO REDUCE THOSE.  BUT THAT'S WHY THEY WERE BROUGHT IN.

19                   IN TERMS OF THE NUMBER OF BILLERS, MY

20   FIRM -- I DON'T KNOW ABOUT OTHER FIRMS.  BUT MY FIRM --

21   AT DIFFERENT POINTS IN THE CASE, DIFFERENT LAWYERS

22   BECOME INVOLVED.  FOR INSTANCE, CERTAIN LAWYERS MIGHT

23   START THE INVESTIGATION INITIALLY.  AND THEN OTHER

24   FIRMS GET OTHER -- I'M SORRY, OTHER LAWYERS GET

25   INVOLVED WITH THE PLEADINGS AND WHATNOT.  SO THAT'S

```
 1    WHY, AT CERTAIN POINTS, THERE MIGHT BE, YOU KNOW,

 2    VARIOUS PEOPLE WORKING ON IT.

 3              BUT WE DID ALLOCATE, FOR INSTANCE, FACT

 4    RESEARCH TO A LOT OF THE PARALEGALS.  WE ALLOCATED A

 5    LOT OF THE LEGAL RESEARCH TO THE MORE JUNIOR ASSOCIATES

 6    SO THAT WE COULD MAKE SURE THAT BILLING WAS EFFICIENT.

 7              THE COURT:  OKAY.  THANK YOU, MS. RIVAS.

 8              MS. WOLFSON:  YOUR HONOR, IF YOU'LL INDULGE ME

 9    FOR A MINUTE?

10              TAKING A STEP BACKWARDS, THIS IS A REALLY

11    GREAT SETTLEMENT FOR THESE TYPES OF CASES.  WE ARE

12    SEEKING AN EXTREMELY MODEST AWARD, AN AWARD THAT IS

13    LESS THAN WHAT WAS CONTEMPLATED BY THE AGREEMENT.

14              AND I THINK IF YOU COMPARE THIS CASE TO

15    THE OTHER SETTLEMENTS IN THIS INDUSTRY, IN THIS TYPE OF

16    CASE, THE AWARDS -- THE ATTORNEY'S FEES AWARDS ARE

17    TYPICALLY GREATER WITH, IN MY OPINION, MUCH LESS

18    RESULTS.

19              OTHER THAN THE DANNON CASE AND PURE CASH

20    VALUE, THIS IS THE BIGGEST FOOD FALSE ADVERTISING CLAIM

21    THAT I'M AWARE OF.

22              THE CLASS HAS HAD AN OVERWHELMING

23    RESPONSE.  TYPICALLY ONE WORRIES ABOUT A LACK OF

24    CLAIMS.

25              THIS WAS A VERY SUCCESSFUL SETTLEMENT
```

1    WITH CLOSE TO 600,000 VALID CLAIMS WHERE PEOPLE ARE

2    GETTING DIRECT CASH IN HAND.

3         THE COURT:  I UNDERSTAND.

4              THE ESTIMATE OF THE CLASS SIZE WAS

5    BETWEEN 8- AND 16 MILLION; IS THAT RIGHT?

6         MS. WOLFSON:  YES.

7              AND THERE WAS A NUMBER USED TO BE EXTRA

8    CONSERVATIVE IN TERMS OF HOW THE NOTICE WAS FASHIONED.

9    THERE WAS -- I BELIEVE IT WAS APPROXIMATELY 21 MILLION

10   APPROXIMATED CLASS MEMBERS FOR THE PURPOSES OF

11   CONSTRUCTING THE NOTICE.

12        THE COURT:  OKAY.  THANK YOU, MS. WOLFSON.

13             ANYONE ELSE HAVE ANYTHING HE OR SHE

14   WISHES TO ADD AT THIS POINT?

15             MS. GOLAN, AS I THINK I SAID EARLIER,

16   I'VE FOCUSED -- IN TERMS OF THE FEE AWARD THAT'S BEING

17   SOUGHT BY SANDYS' COUNSEL, I'M DISINCLINED TO MAKE AN

18   AWARD THAT APPROACHES THAT LEVEL.

19             I THINK THAT IF THE TIME SPENT INCLUDES

20   WORK ON APPOINTMENT OF COUNSEL, THE DRAFTING OF THE

21   COMPLAINT, THE ISSUES ABOUT CONSOLIDATED LEADERSHIP,

22   THE MOTION TO DISMISS, DISCOVERY, OBJECTIONS TO

23   SETTLEMENT AND CERTAIN MISCELLANEOUS MATTERS, WHICH

24   LEAD TO A TOTAL NUMBER OF HOURS, APPROXIMATELY 1,000

25   HOURS, AND A FEE REQUEST OF APPROXIMATELY $568,000, AS

1    WELL AS COSTS OF APPROXIMATELY $19,000, A SUBSTANTIAL

2    AMOUNT OF THESE HOURS WERE SPENT AFTER OTHER CLASS

3    COUNSEL WAS APPOINTED.  THERE'S -- I DON'T THINK I'M

4    PERSUADED THAT THERE'S BEEN A SHOWING THAT, OTHER THAN

5    ON THE GMO ISSUE AND THE INITIAL WORK PRIOR TO THE

6    SELECTION OF CLASS COUNSEL, LEAD COUNSEL, THAT THE

7    OTHER WORK IS SUBJECT TO BEING COMPENSATED.

8              THERE WAS NO PARTICIPATION IN THE

9    SETTLEMENT.  THERE WAS AN OBJECTION TO THE SETTLEMENT.

10   THERE ARE STATEMENTS ABOUT DISCOVERY AND OTHER WORK.

11   BUT I'M JUST NOT PERSUADED THAT THIS WORK WASN'T

12   ALREADY BEING HANDLED BY THE 35 LAWYERS TO WHICH I'VE

13   ALREADY REFERRED.

14             MS. RIVAS:  YOUR HONOR, AFTER THIS COURT

15   APPOINTED INTERIM LEAD CLASS COUNSEL, WE WERE VERY,

16   VERY CAUTIOUS ABOUT DOING -- WELL, BILLING FOR ANY WORK

17   ON THIS CASE.

18             THE TIME THAT WE DID INCLUDE IN OUR FEE

19   REQUEST WAS SPENT ON REVIEWING THE AMENDED CONSOLIDATED

20   COMPLAINT, AS YOUR HONOR ALLOWED US TO DO, AND ALSO ON

21   THE SETTLEMENT OBJECTION, WHICH -- YOUR HONOR, IF YOU

22   RECALL, AT THE TIME WE MADE THOSE OBJECTIONS, WE

23   SUPPORTED THE SETTLEMENT.  BUT WE WANTED -- WE FELT

24   THAT THERE WERE SOME ISSUES IN THE SETTLEMENT THAT

25   COULD BE DEALT WITH EARLY, AND THAT MAY POSE A PROBLEM

1    LATER ON BY THE OBJECTIONS THAT WE IN FACT SEE NOW.  WE

2    DID NOT -- THE COURT APPROVED THE SETTLEMENT.  BUT

3    THROUGH OUR OBJECTIONS, THE CLASS COUNSEL DID SUBMIT AN

4    APPROVED WRITTEN NOTICE.

5                    THE MOTION TO DISMISS, YOUR HONOR, THAT

6    WAS FILED BY NAKED JUICE BEFORE THE COURT APPOINTED

7    INTERIM LEAD CLASS COUNSEL.  SO THERE WAS VERY, VERY

8    LITTLE WORK DONE ON THAT.  BUT THAT WAS SOMETHING THAT

9    WE HAD TO DO.

10                   DISCOVERY MATTERS AS WELL.  WE DID NOT

11   BILL FOR ANY DISCOVERY WORK AFTER THE COURT APPOINTED

12   INTERIM LEAD CLASS COUNSEL.  ALL OF THE DISCOVERY WORK

13   THAT WE DID WAS BEFORE THEN, AS WE HAD TO DO FOR THE

14   RULE 16 REPORT.

15              THE COURT:  I UNDERSTAND.  THANK YOU.

16                   HERE'S THE -- THE THREE -- AS I STATED, I

17   WANT INFORMATION FROM THE -- AS TO -- FROM SANDYS'

18   COUNSEL AND FROM CLASS COUNSEL ON THE GMO IMPACT.

19                   DID I SET A DATE FOR THAT?

20              MS. WOLFSON:  YOU SAID ONE WEEK.

21              THE COURT:  CAN YOU DO THAT?

22                   IS THERE ANYTHING ELSE ANYONE WOULD LIKE

23   TO RAISE?

24                   OKAY.  I'LL ISSUE A WRITTEN RULING UPON

25   RECEIVING THESE THINGS.  THANK YOU VERY MUCH.

1        MR. CHORBA:  THANK YOU, VERY MUCH, YOUR HONOR.

2              **(END OF PROCEEDINGS)**

1  **CERTIFICATE OF OFFICIAL REPORTER**

2

3  COUNTY OF LOS ANGELES          )
                                  )
4  STATE OF CALIFORNIA            )

5              I, ALEXANDER T. JOKO, FEDERAL OFFICIAL

6  COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT

7  COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY

8  CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED

9  STATES CODE, THAT THE FOREGOING IS A TRUE AND CORRECT

10 TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS

11 HELD IN THE ABOVE-ENTITLED MATTER, AND THAT THE

12 TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13 REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED

14 STATES.

15 DATE:  DECEMBER 5, 2013

16

17

18              /S/ ALEXANDER T. JOKO
              _____
19              ALEXANDER T. JOKO, CSR NO. 12272
              FEDERAL OFFICIAL COURT REPORTER

20

21

22

23

24

25